UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

| | |
|---|---|
| KENNETH MAURY,<br>Plaintiff<br><br>V.<br><br>COMPUTER SCIENCES CORPORATION,<br>Defendant | CIVIL ACTION NO.<br>3:02-CV-1492 (DJS)<br><br><br><br>December 1, 2003 |

2003 DEC -1 P 2: 3b
US DISTRICT COURT
HARTFORD CT

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. PRELIMINARY STATEMENT

Defendant Computer Sciences Corporation ("CSC") provides a wide range of computer related services to businesses and governments. Plaintiff was hired by CSC in August 2000 to work at Carrier's headquarters in Farmington, Connecticut.

In connection with the performance of his duties, Plaintiff observed other CSC employees installing unlicensed software on CSC equipment provided to Carrier employees. Plaintiff objected to this unlawful conduct verbally and in writing to Carrier and CSC employees and managers. Although warned to cease his objections, Plaintiff persisted.

Within weeks of his last written objection to unlawful activity, Plaintiff was terminated. CSC has admitted that the decision to terminate Plaintiff was motivated by Plaintiff's expressions of concern over unlawful activity.

Plaintiff initiated this action in Connecticut Superior Court in August 2002. The complaint stated claims for Wrongful Termination in Violation of Public Policy and Infringement upon Plaintiff's Constitutional Rights in Violation of Connecticut General Statutes

1

Section 31-51q. Pursuant to Defendant's motion, this action was removed to the United States District Court for the District of Connecticut on the basis of diversity jurisdiction.

After discovery was completed, the Defendant initiated the instant motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. In substance, Defendant argues that Plaintiff's Wrongful Termination and §31-51q claims should be dismissed because Plaintiff's expressions of concern did not address matters of public policy or public concern. As set forth *infra*, this argument is without merit. Accordingly, Defendant's motion should be denied in all respects and this action should be scheduled for trial on the merits.

## II. FACTUAL BACKGROUND

A.  <u>Computer Sciences Corporation and its relationship with Carrier Corporation</u>

Computer Sciences Corporation ("CSC") contracts with businesses to outsource their information technology support functions. Under those agreements, CSC provides its clients with computers and software, as well as support staff who install, maintain and repair that technology. (CSC's 4/4/02 CHRO Opposition Statement at p.2 ("CHRO Opp'n") annexed hereto at Exhibit A; Deposition of Jo-Anne Baxter ("Baxter Dep.") at 10.)

CSC entered into an outsourcing agreement with United Technologies, which extended to United Technologies' subsidiaries Carrier, Otis Elevator, Pratt & Whitney, Sikorsky Aircraft, Hamilton Sun Strand, and UTC Corp. & UTC Research Group. (CHRO Opp'n at p.2; Second Am. Compl. ("Compl.") ¶ 8.) Pursuant to that agreement, CSC provides Carrier Corporation ("Carrier") computer equipment, software and support staff. (Baxter Dep. at 14.) The services include a help desk, equipment and software purchasing and installation, as well as day to day maintenance and support functions. (Id. at 15; CHRO Opp'n at p. 2)

Before Carrier contracted with CSC they had an internal department that handled computer related issues. (Deposition of Amy Carlough ("Carlough Dep.") at 18-19.) After CSC took over Carrier's computer support functions, a contractually mandated process for Carrier employees to place all computer related orders or service requests from CSC was implemented. (Id. at 17-25.)

Pursuant to that process, Carrier employees fill out a Service Request form and send their requests through specified channels for approval. (Carlough Dep. at 17-25.) The forms are initially processed and approved by Carrier, and then they are transmitted to CSC for further processing and approval. (Id.) The necessary approvals come from financial departments, UTC management, and other CSC personnel; final approval has to be provided by both Carrier and CSC. (Baxter Dep. at 14-16.) After final approval, the request is assigned to a CSC technician who performs the requested work. (Id. at 19.)

Consistent with the law, CSC corporate guidelines require all software to be properly licensed before installation. (Email 7/24/00, attached as Exhibit B.) When new software has to be ordered, there is a waiting period for the appropriate licensing to take affect before installation of the software can occur. (Id.) Only after a Service Request has been submitted, final approval is issued and CSC has purchased the software, is it legal to install the software. (Deposition of Kenneth Maury ("Maury Dep.") at 217-219.)

B.     Plaintiff's Job Responsibilities at CSC

After CSC and UTC entered their contract, Plaintiff was offered a full-time position with CSC on July 13, 2000. (Requisition Request, 6/28/00, attached as Exhibit C; Email 7/25/00, attached as Exhibit D; Offer Letter to Mr. Maury, attached as Exhibit E.) Plaintiff commenced

3

employment with CSC on approximately August 1, 2000. (CHRO Opp'n at p.2; Maury Dep. at 51-52, 169.) Thereafter, Plaintiff worked on-site at Carrier's Farmington, Connecticut headquarters. (CHRO Opp'n at p.2; Maury Dep. at 37).

Plaintiff held the position of site coordinator at Carrier's headquarters. (CHRO Opp'n at p.2; Site Coordinator's roles and responsibilities, attached as Exhibit F.) Plaintiff's primary functions as a site coordinator at Carrier's headquarters were administrative; Larry Thompson, the other CSC site coordinator assigned to Carrier's headquarters, was primarily responsible for technical duties. (CHRO Opp'n at p.2; Maury Dep. at 35-37.)

Plaintiff was the direct communication conduit between Carrier and CSC for service, equipment and software requests. (Carlough Dep. at 17-25.) In response to customer requests, Plaintiff completed the appropriate forms and sent them through the appropriate channels for approval. (Id.; CHRO Opp'n at p.2)

One of Plaintiff's job responsibilities was asset management, which dealt with receiving and keeping track of equipment and software. (CHRO Opp'n at p.2; Deposition of Michael Bondi ("Bondi Dep.") at 46-48, 56; Email 5/22/00 attached as Exhibit G; Email 5/25/00, attached as Exhibit H; Maury Dep. at 34.) In addition, Plaintiff's administrative function ensured that CSC was paid for the work and equipment they provided to Carrier. (CHRO Opp'n at p.2; Email 7/24/00, attached as Exhibit B; Email 8/2/00, attached as Exhibit I.)

Another aspect of Plaintiff's position was to ensure that CSC and Carrier were in legal compliance with the licensing agreements for the software and equipment that was purchased for CSC and Carrier employees. (Maury Dep. at 148, 217-219.) Only after Plaintiff received all approvals, equipment, software and appropriate licenses for installations, would he inform his

4

technical counterpart Mr. Thompson that the work on a service request could be performed. (Maury Dep. at 35-36; Bondi Dep. at 76-80.)

Plaintiff was recognized as being very effective at his job. Plaintiff received praise from customers and on his performance evaluation. For example, on or about June 7, 2000, Paul Duff, a supervisor at Carrier, sent an email to Plaintiff's supervisor stating, "Ken Maury is getting things done!" That email praised Plaintiff's work and stated that Carrier had been experiencing problems with CSC prior to the Plaintiff taking on the account, but now things were "getting better." (Bondi Dep. at 66-67, Email 6/9/00, attached as Exhibit J.) And in November 26, 2001 letter, Carrier's Director of Global Real Estate Operations Ronald Zappile described Plaintiff as "always customer focused, attentive to details, and concerned that customer requirements were identified, reconciled and satisfied." (11/26/01 Letter attached as Exhibit K.)

In addition, Plaintiff's supervisor Michael Bondi gave him an overall rating of "very good" on his performance appraisal. (Performance Appraisal at 3, 7, attached as Exhibit L.) That appraisal also included comments such as "...does an excellent job managing...", "...record keeping impeccable.", "...resourcefulness has enabled CSC Farmington to deliver a high level of service to the customer.:, "...goals and objectives are on target with improving process at Farmington WHQ." (Id.)

C.  Plaintiff's expressions of concern over illegal activity

Plaintiff worked very hard from the beginning of his employment to bring CSC and Carrier into compliance with software and equipment licensing agreements so that the companies would not be subject to legal liability. (Plaintiff's Performance Appraisal at Section II. A.; Maury Dep. at 127-152.) Plaintiff had also been working very hard to not violate the contract

5

between CSC and Carrier. (Email 2/28/01, attached as Exhibit M.) Plaintiff became stuck in the middle of pressure from the customer for expediency and doing his job in accordance with the contract and the law. (Email 8/2/00, attached as Exhibit I; Email 8/9/00, attached as Exhibit N.)

Plaintiff understood that Carrier's headquarters was a highly sensitive environment where high level executive customers wanted computer related issues resolved immediately. (Email 8/2/00, attached as Exhibit I.) Plaintiff also knew that adherence to appropriate company procedures yielded at least a three day turn around time to receive licensing for software. (Id.) Based on his observations, however, Plaintiff realized issues were being handled in a manner that was not in accordance with the corporation's procedures. (Id.)

Specifically, CSC's technical staff at Carrier's headquarters maintained copies of software on a computer server, known as "Optiserve". (Maury Dep. at 96-97.) Optiserve was attached to Carrier's network and was available to CSC technicians, who would use it to copy software onto other equipment attached to the network. (Maury Dep. 96-98.)

Plaintiff observed a series of incidents where software was being copied from Optiserve onto CSC and Carrier employee's computers without an approved license. (Maury Dep. at 45-46, 56-62, 92.)[1] For instance, in October 2000, Plaintiff learned that Larry Thompson had installed software onto computers before licenses had even been ordered. (Maury Dep. at 96-98, 206-207.) Plaintiff also discovered that Jeremy Pollack, a CSC technician, had been copying

---

[1] *See* Email 5/2/00, attached as Exhibit W (Thirty users had Outlook 2000 installed without proper licensing and approvals.); Email 6/6/00, attached as Exhibit X (Request for quote on a 250 user site license for WinZip which had already been installed.); Email 7/21/00, attached as Exhibit Y (No records of any site licenses ever being purchased for software already installed.); Purchase Requisitions 8/22/00, attached as Exhibit Z (To bring users into licensing compliance, because the software was already installed on their computers.); PWOF 10/27/2000, attached as Exhibit AA (To bring user into licensing compliance, because the software was already installed on his computer.); Email 2/28/01, attached as Exhibit M (States that Users had software installed on computers before order was made for licenses.); Purchase Requisition 5/7/2001, attached as Exhibit BB (Request for user upgrade to Win98 initiated after the software had been installed.)

6

software from Optiserve without obtaining licenses. (Bondi Dep. at 190-192; Maury Dep. at 212-216.) In response to his observations, Plaintiff repeatedly expressed to Carrier employees, his supervisors, and other CSC technical staff that it was illegal to install software without a proper license. (Bondi Dep. at 85-86, 127-138.)

Plaintiff's supervisor Michael Bondi was aware that if software was installed without proper licensing a fine could result. (Bondi Dep. at 128.) Nevertheless, after Plaintiff tried to warn customers, coworkers and his supervisors numerous times regarding the illegal installation of software, Bondi sent him an email stating that telling customers "they could be liable for fines is unacceptable" and "we are not law breakers or criminals and the customer does not need to hear that." (Email from Bondi to Maury of 1/17/01, attached as Exhibit O.)

### D. The Events that Led to Plaintiff's Wrongful Termination

Following numerous observations of unlicensed software copying and installation, several efforts to curb that conduct, and no apparent change, Plaintiff drafted an email expressing concerns over what was occurring at the Carrier headquarters site. (Email from Maury to Donald Kutil on 8/14/01, attached as Exhibit P.) Before sending the email, Plaintiff discussed it with Mr. Bondi and showed him the 16 bulleted points that were the main issues he was raising. (Maury Dep. at 90.) Bondi warned Plaintiff against sending the email, stating: "It would be in your best interest not to do it." (Id. at 89.) On August 14, 2001, despite Bondi's warning, Plaintiff sent the email containing his specific concerns about unlawful software copying to Donald Kutil, the CSC Operations Manager for Carrier, with copies sent to Michael Bondi and John Hay, Mr. Bondi's supervisor.

7

In this email, Plaintiff listed a series of concerns about what was occurring at Carrier headquarters, which list started with references to illegal conduct. (Email from Maury to Donald Kutil on 8/14/01, attached as Exhibit P.) Within a week of Plaintiff's email, Don Kutil, John Hay, and Michael Bondi had a conference call regarding that email. (Bondi Dep. at 187.) Michael Bondi was in charge of handling those issues and he talked to the Plaintiff briefly after the conference call. (Id.)

Sometime in mid to late August, Mr. Bondi learned about a CSC reduction in force, which was to occur in mid to late September. (Bondi Dep. at 215.) Mr. Bondi had a directive from management to reduce staff in the Carrier headquarters by one person. (RIF Process, attached as Exhibit Q.) At that juncture, Mr. Thompson had already been transferred to another location. (Bondi Dep. at 215.) Mr. Bondi had conversations with both John Hay and Anne McKenna, Mr. Hay's replacement, about who should be laid off and for what reasons. Mr. Bondi mentioned Plaintiff's name as a layoff candidate in both conversations. (Id. at 219-221.)

During the layoff selection process, objections were raised from people within Carrier and CSC that had worked closely with Plaintiff. (Id. at 234-235, Letter on 11/26/01, attached as Exhibit K.) For example, Michael Keywan expressly disagreed with the selection of Mr. Maury because:

> ... it is no secret that CSC is littered with 'B' and 'C' players. I am the one customer who has an extensive history with Ken Maury, few customers have spent as much time with him in an operational capacity as I have. With that, it is a mistake to remove him, he is a talented 'A' player and CSC needs talent.

(9/6/01 Emails, attached as Exhibit R; Deposition of Michael Keywan ("Keywan Dep.") at 71-77; Bondi Dep. at 234.)

On September 21, 2001, just a little over three weeks after he sent Mr. Kutil, Mr. Hay and Mr. Bondi the email addressing ongoing illegal conduct, Mr. Bondi selected Plaintiff for

8

termination by CSC. (Termination letter attached as Exhibit S.) Plaintiff was ultimately replaced by Jeremy Pollack, who had engaged in some of the software copying conduct that Plaintiff had objected to. (Bondi Dep. at 190-192, 242-243; Maury Dep. at 212-216.)

Bondi's selection of Plaintiff for termination was undeniably motivated by Plaintiff's objection to CSC employee's unlawful conduct. Indeed, Bondi specifically admitted that his motivation for selecting Plaintiff for termination was reflected in his January 2001 email to Plaintiff. (Bondi Dep. at 230-233, referencing 1/17/01 email from Bondi to Maury attached as Exhibit T.) Moreover, CSC admitted that the reason Plaintiff was selected for termination was reflected in Mr. Bondi's remarks in that email. (CHRO Opp'n at p. 4). In that email, Mr. Bondi chastised Plaintiff for warning Carrier employees that "they could be liable for fines is unacceptable," and admonished Plaintiff that, "we are not law breakers or criminals and the customer does not need to hear that." Thus, Plaintiff's termination was unequivocally motivated by his expression of concern about unlawful conduct.

### III.  STANDARD OF REVIEW

Summary judgment "shall be rendered forthwith" when the pleadings, depositions, answers to interrogatories, filed admissions and affidavits together demonstrate "no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The burden lies with the moving party to demonstrate the absence of any genuine issue of material fact; in that connection, all inferences and ambiguities are to be resolved in favor of the nonmoving party. See, e.g., Cruz v. Coach Stores, Inc., 202 F.3d 560, 567 (2d Cir. 2000); Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir.1999).

In the context of employment cases, the appropriateness of summary judgment is "a particularly delicate subject." Feliciano v. Alpha Sector, Inc., 2002 WL 1492139, at *5 (S.D.N.Y. July 12, 2002), copy attached as Exhibit U. The Second Circuit has recognized that a "smoking gun" rarely exists in employment actions, and that the challenged conduct "is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence." Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir.1991). A victim, therefore, is "seldom able to prove his or her claim by direct evidence and is usually constrained to rely upon the cumulative weight of circumstantial evidence." Id. at 533; Borrero v. Collins Bldg. Services, Inc., 2002 WL 31415511, *7 (S.D.N.Y.2002), ), copy attached as Exhibit V.

Consequently, courts must be especially cautious in granting the drastic provisional remedy of summary judgment in a case such as this, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference sustaining the plaintiff's claim. Belfi, 191 F.3d at 135. Nonetheless, to survive summary judgment in an employment case, a plaintiff "must come forward with at least some credible evidence that the actions of the [defendants] were motivated by [ ... ] animus or ill will." Grillo v. New York City Transit Auth., 291 F.3d 231, 234 (2d Cir.2002).

In that context, the district court must diligently review the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. See Hayes v. New York City Dept. of Corrections, 84 F.3d 614, 619 (2d Cir.1996); Heilweil v. Mount Sinai Hospital., 32 F.3d 718, 721 (2d Cir.1994), cert. denied, 513 U.S. 1147, 115 S.Ct.1095, 130 L.Ed.2d 1063 (1995). In ruling on a motion for summary judgment, the court asks not whether the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the non-moving party on the evidence presented.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The ultimate question is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250, 106 S. Ct. at 2511.

IV.   ARGUMENT

    A.   **The Court Should Deny Defendant's Motion for Summary Judgment of Plaintiff's Termination in Violation of Public Policy Claim**

Defendant argues that Plaintiff's common law claim for Termination in Violation of Public Policy must be dismissed because Plaintiff's conduct did not implicate a matter of public policy and he did not report his concerns outside of CSC. For the reasons set forth herein, Defendant's argument is without merit.

In Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471, 480, 427 A.2d 385 (1980), the Connecticut Supreme Court recognized a public policy limitation on the traditional employment at-will doctrine. The Sheets court sanctioned a common law cause of action for wrongful discharge in situations where the reason for the discharge involved "impropriety ... derived from some important violation of public policy." Sheets, supra, at 475, 427 A.2d 385; see also Morris v. Hartford Courant Co., 200 Conn. 676, 679, 513 A.2d 66 (1986); and, Magnan v. Anaconda Industries, Inc., 193 Conn. 558, 572, 479 A.2d 781 (1984). While the Sheets court noted: "We are mindful that courts should not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation. We are, however, equally mindful that the myriad of employees without the bargaining power to command employment contracts for a definite term are entitled to a modicum of judicial protection when their conduct as good citizens is punished by their employers." 179 Conn. at 477, 427 A.2d 385.

11

In <u>Morris</u>, however, the Connecticut Supreme Court recognized the "inherent vagueness of the concept of public policy" and the difficulty encountered when attempting to define the precise contours of the public policy exception. 193 Conn. at 680, 513 A.2d 66. In evaluating claims, the court has found the determinative factor was "whether the plaintiff has ... alleged that his discharge violated any explicit statutory or constitutional provision ... or whether he alleged that his dismissal contravened any judicially conceived notion of public policy." <u>Antinerella v. Rioux</u>, 229 Conn. 479, 492, 642 A.2d 699 (1994), quoting <u>Morris</u>, 193 Conn. at 680, 513 A.2d 66.

For purposes of this matter, <u>Sheets</u> is instructive on this point. The plaintiff in <u>Sheets</u> alleged he was discharged *for reporting repeated violations of state law to his superiors*. 179 Conn. at 478, 427 A.2d 385. In <u>Sheets</u>, the court noted that the plaintiff's position as quality control director and operations manager exposed him to the possibility of criminal prosecution under the Connecticut Uniform Food, Drug and Cosmetic Act. <u>Id</u>. In allowing the plaintiff's wrongful discharge claim to proceed, the <u>Sheets</u> court stated that "an employee should not be put to an election whether to risk criminal sanction or to jeopardize his continued employment." 179 Conn. at 480, 427 A.2d 385. Although <u>Sheets</u> did not hold that a statutory violation was a prerequisite to public policy discharge claim, it did note that "when there is a relevant state statute we should not ignore the statement of public policy that it represents." <u>Id.</u>

The Connecticut Supreme Court reinforced and expanded that point in <u>Faulkner v. United Technologies Corporation, Sikorsky Aircraft Division</u>, 240 Conn. 576, 693 A.2d 293 (1997). In <u>Faulkner</u>, the plaintiff was allegedly terminated after *refusing to cooperate in illegal conduct.* 240 Conn. at 578-79, 693 A.2d 293. <u>Faulkner</u> claimed that his employer engaged in a scheme to defraud the government through the sale of substandard helicopters, which conduct violated the

12

public policy set forth in the Major Frauds Act, 18 U.S.C. § 1031. Id. Rejecting the defendant's argument that a Sheets claim could only be based upon Connecticut state public policy, the court found no difference between situations where employees are forced to engage in conduct that expose them to federal criminal sanctions or state criminal sanctions. 240 Conn. at 584, 693 A.2d 293. Indeed, the court found, "the effect on the employee of being forced to choose between violating the law or facing discharge by his employer is the same regardless of which sovereign criminalizes the conduct." Id.

The Plaintiff in the present case, like the plaintiffs in Sheets and Faulkner, held a position requiring him to ensure the quality of the defendant employer's products. In addition to a variety of administrative and customer service duties, Plaintiff was specifically responsible for ensuring that proper licenses were in place before software was installed on customer equipment. In connection with the performance of that duty, Plaintiff discovered that CSC employees were copying software without appropriate licenses. He objected to this illegal conduct to CSC customers, his CSC co-workers and his CSC superiors. He expressed his objections verbally and in writing. When Plaintiff persisted in objecting to the unlawful conduct despite warnings from his supervisor, he was terminated.

Defendant cannot dispute that Plaintiff was superb at his job. Moreover, Defendant has admitted that the termination decision was prompted by Plaintiff's efforts to curb unlicensed software copying. Accordingly, Defendant is compelled to argue that Plaintiff's conduct only addressed private, contract related interests, which did not imply an important public policy. Defendant's argument is without merit.

Contrary to Defendant's suggestion, the software licenses at issue are not simply contracts between private parties. It cannot be disputed that the software at issue was copyrighted

13

under Title 17 of the United States Code. Moreover, it cannot be gainsaid that Title 17 of the United States Code reflects federal public policy. Finally, like the plaintiffs in <u>Sheets</u> and <u>Faulkner</u>, Plaintiff faced sanctions for any participation or complicity in unlicensed copying of software.[2] Indeed, teenagers are currently facing prosecution for using their computers to copy music. Accordingly, Defendant's argument that Plaintiff's objections to illegal software copying did not address a matter of public concern is simply specious.

To the contrary, Plaintiff's objection to copyright infringement undeniably addressed a matter of public concern. Indeed, Plaintiff is precisely the type of "good citizen" that the <u>Sheets</u> court sought to protect from improper punishment by his employers. 179 Conn. at 477, 427 A.2d 385. Accordingly, this court should deny Defendant's motion to dismiss Plaintiff's claim for Wrongful Termination in Violation of Public Policy

**B.    The Court Should Deny Defendant's Motion for Summary Judgment of Plaintiff's Connecticut General Statute § 31-51q Claim**

Defendant argues that Plaintiff's C.G.S. § 31-51q claim must also be dismissed. For the reasons set forth herein, Defendant's arguments should be rejected.

Connecticut General Statutes § 31-51q provides in pertinent part:

> Liability of employer for discipline or discharge of employee on account of employee's exercise of certain constitutional rights. Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any

---

[2] 17 U.S.C.A. § 506 defines criminal infringement of a copyright as: "Any person who infringes a copyright willfully either: (1) for purposes of commercial advantage or private financial gain, or (2) by the reproduction or distribution, including by electronic means, during any 180-day period, of 1 or more copies or phonorecords of 1 or more copyrighted works, which have a total retail value of more than $1,000, shall be punished as provided under section 2319 of title 18, United States Code." Pursuant to 18 U.S.C.A. § 2319, a copyright violation can result in imprisonment of up to 10 years, as well as substantial fines.

> employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the constitution of the state, provided such activity does not substantially or materially interfere with the employee's *bona fide* job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages....

In other words, "Section 31-51q creates a cause of action for damages to protect employees from retaliatory action illegally grounded in the employees' exercise of enumerated constitutionally protected rights." D'Angelo v. McGoldrick, 239 Conn. 356, 685 A.2d 319 (1996), citing Lewis v. Gaming Policy Board, 224 Conn. 693, 711, 620 A.2d 780 (1993).

As an initial matter, the court must recognize the applicability of federal precedent in connection with the consideration of Plaintiff's §31-51q claim. In D'Angelo v. McGoldrick, the Connecticut Supreme Court expressly observed that it was "usually guided by federal precedent with respect to state statutes that are comparable to federal law," and that C.G.S. §31-51q is comparable to 42 U.S.C. §1983. 239 Conn. at 367-368 (dissenting opinion), citing Schnabel v. Tyler, 230 Conn. 735, 646 A.2d 152 (1994), Levy v. Commission on Human Rights & Opportunities, 236 Conn. 96, 103, 671 A.2d 349 (1996), and Miko v. Commission on Human Rights & Opportunities, 236 Conn. 192, 202, 596 A.2d 396 (1991).

Consistent with this approach, the Supreme Court has relied extensively upon federal precedent in connection with the application of §31-51q. Ibid, see also Daley v. Aetna Life and Casualty Co., 249 Conn. 766, 734 A.2d 112 (1999); and Cotto v. United Technologies Corp., 48 Conn.App. 618, 629, 711 A.2d 1180 (1998). Accordingly, Connecticut's District Courts have adopted the same approach. See Winik-Nystrup v. Manufacturers Life Insur. Co., 8 F.Supp.2d 157 (1998) and Ritz v. Town of East Hartford, 110 F.Supp.2d 94, 103 (2000), citing Gottlob v. Connecticut State University, 1996 WL 57087, 6 (Super. Ct.)(where the court adopted " the

15

federal §1983 analysis for a First Amendment claim under [§31-51q because] our statute explicitly refers to First Amendment rights so this seems to be the only course of action to take.")

Under controlling precedent, an employee seeking to prove that he was terminated in retaliation for exercise of First Amendment protected free speech, must establish: (1) the speech at issue was "made as a citizen on matters of public concern rather than as an employee on matters of personal interest," (2) he or she suffered an adverse employment action, and (3) "the speech was at least a substantial or motivating factor in the [adverse employment action]," (internal quotations and citations omitted). Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003), citing Grillo v. N.Y. City Transit Auth., 291 F.3d 231, 235 (2d Cir.2002); Diesel v. Town of Lewisboro, 232 F.3d 92, 107 (2d Cir.2001); and, Sheppard v. Beerman, 317 F.3d 351, 355 (2d Cir.2003); see also Ezewko v. NYC Health & Hospitals Corp., 940 F.2d 775, 780 (2d Cir. 1991). In light of Plaintiff's termination, the Defendant cannot dispute that he suffered adverse employment action. Accordingly, Defendant argues that Plaintiff did not speak on a matter of public concern and that there was no connection between Plaintiff's speech and his termination. These arguments are meritless.

1.      Plaintiff spoke on a matter of public concern.

Speech addresses a matter of public concern if it relates "to any matter of political, social, or other concern to the community." Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); Garcia v. State Univ. of N.Y. Health Sci. Ctr., 280 F.3d 98, 105 (2d Cir. 2001). On the other hand, speech focused on matters personal to the employee cannot be classified as being on a matter of public concern. Connick, 461 U.S. at 146, 103 S.Ct. 1684. "Whether an employee's speech addresses a matter of public concern must be determined by the

content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147-48, 103 S.Ct. 1684.

In <u>Johnson v. Ganim</u>, the plaintiff was a city employee who was terminated after he wrote a letter objecting to perceived misconduct and corruption. 342 F.3d at 107. The court held that <u>Johnson</u>'s speech touched on a matter of public concern. 342 F.3d at 114.

In reaching this conclusion, the <u>Johnson</u> court noted that expressions of opinion regarding possible criminal activity have regularly been found to satisfy the public concern requirement. 342 F.3d at 112-13, citing <u>Nebraska Press Ass'n v. Stuart</u>, 427 U.S. 539, 606, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) (remarks about the fact that there is strong evidence implicating criminal activity goes to the very core of matters of public concern); <u>Lewis v. Cowen</u>, 165 F.3d 154, 164 (2d Cir. 1999) (recognizing that corruption or wrongdoing is almost always a matter of public concern); <u>Glass v. Dachel</u>, 2 F.3d 733, 741 (7th Cir.1993) (speech on matters of public concern includes efforts aimed at uncovering wrongdoing or breaches of public trust.)

These decisions are consistent with the Connecticut Supreme Court's holdings in <u>Sheets</u> and <u>Faulkner</u>, discussed *supra* in connection with Plaintiff's Wrongful Termination claim. Thus, contrary to Defendant's argument, Plaintiff's objections to Defendant's illegal conduct is speech on a matter of public concern.

2.  <u>Plaintiff speech was a substantial or motivating factor in Defendant's decision to terminate the Plaintiff's employment.</u>

In addition to arguing that Plaintiff did not speak on matters of public concern, Defendant argues that there is no evidence that Plaintiff's speech was a motivating factor in its decision to terminate his employment. In light of Defendant's repeated admissions, and the temporal

proximity of Plaintiff's last written expression of opinion and his termination, this argument is completely without merit.

As an initial matter, Defendant unequivocally admitted that Plaintiff was excellent at his job. He received favorable feedback from customers and in his annual review. Indeed, a CSC manager objected to Plaintiff's termination because of his superior job performance.

Moreover, on January 17, 2001, Plaintiff's supervisor, Michael Bondi, wrote him an email regarding his "approach". In that email, Mr. Bondi admitted that Plaintiff was "exceptionally good" at his job. In addition, Mr. Bondi chastised Plaintiff for his objections to illegal conduct:

> *"Telling them they could be liable for fines is unacceptable."* and
>
> *"We are not law breakers or criminals and the customer does not need to hear that."*

When asked if his comments in the January 17, 2001 email factored into his decision to terminate the Plaintiff, Mr. Bondi admitted that they did.

This admission was expressly adopted by Defendant in its response to Plaintiff's CHRO charge. In connection with its denial that age factored into its decision to retain younger employees to perform Plaintiff's work, CSC referred to Mr. Bondi's January 17, 2001 email.

On top of these admissions, it is undisputed that Plaintiff was terminated three weeks after an email sent to Mr. Bondi's superiors at CSC which objected to illegal conduct. Indeed, discussions about Plaintiff's fate with CSC took place almost immediately after he sent that email. Thus, there is clear temporal proximity between Plaintiff's August 2001 email objecting to illegal conduct and Plaintiff's termination, from which it is reasonable to infer that there is a connection. See, e.g. Cifra v. General Electric Co., 252 F.3d 205, 217 (2d Cir. 2001); and, Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir.1998).

Furthermore, Defendant has repeatedly admitted that Plaintiff's objections to illegal conduct were a motivating factor for his termination. As a result Defendant's argument in support of summary judgment can not stand.

## V.  CONCLUSION

For the reasons set forth in the foregoing memorandum of law, Defendant's motion for summary judgment should be denied in all respects.

Respectfully submitted,<br>
The Plaintiff<br>
<br>
By: _____<br>
Craig T. Dickinson (CT18053)<br>
Madsen, Prestley & Parenteau, LLC<br>
44 Capitol Avenue – Suite 201<br>
Hartford, CT 06106<br>
(860)246-2466

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that a copy of the foregoing was hand delivered this date to:

Albert Zakarian
Eric L. Sussman
Day, Berry & Howard LLP
CityPlace I
Hartford, Connecticut 06103-3499

_____
Craig T. Dickinson