UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| KENNETH MAURY,<br>Plaintiff<br><br>V.<br><br>COMPUTER SCIENCES CORPORATION,<br>Defendant | CIVIL ACTION NO.<br>3:02-CV-1492 (DJS)<br><br><br><br>December 1, 2003 |

## PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT

Pursuant to Local Rule 9(c)(2), the Plaintiff, Kenneth Maury, provides the following response to Defendant's Statement of Undisputed Facts and submits his own statement of material facts as to which there is a genuine issue to be tried.

### A.  RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS

1. Plaintiff was employed in CSC's Global Infrastructure Services ("GIS") Group from August 1, 2000 until September 21, 2001. (Deposition of Kenneth Maury ("Maury Dep.") at 51-52, 169.) He worked on-site at Carrier Corporation's ("Carrier's") Farmington, Connecticut facility. (Maury Dep. at 34.)

   **Admitted**

2. Plaintiff shared the duties of a "Site Coordinator" with one of his coworkers, Larry Thompson. (Maury Dep. at 37.)

   **Admitted**

3. One of plaintiff's responsibilities was to ensure that proper software licenses were ordered for all CSC and Carrier employees in the Farmington, Connecticut facility. (Maury Dep. at 148.)

1

**Admitted**

4. Plaintiff began complaining about alleged illegal software installations at least as early as October 2000. (Compl. ¶¶ 25-27.)

**Admitted**

5. When plaintiff found what he thought constituted violations of software license agreements and reported those alleged violations to his supervisor, Michael Bondi, Bondi instructed plaintiff to order the proper software licenses and to ensure compliance with applicable license agreements. (Maury Dep. at 109-11, 227.)

**Admitted**

6. Other CSC personnel, including Joanne Baxter, a Service Delivery Coordinator located in Syracuse, had insisted that CSC employees order proper licenses before installing computer software. (Maury Dep. at 205; Compl. ¶ 21.)

**Admit that Ms. Baxter instructed CSC employees that CSC policy was to order proper licenses before installing software.** Email 7/24/00, attached as Exhibit B.

7. On January 17, 2001, plaintiff's supervisor, Michael Bondi, sent an e-mail to plaintiff referencing "numerous complaints" he had received concerning plaintiff's "approach." (E-mail from Bondi to Maury of 1/17/01, Exhibit B.) The e-mail noted that "[i]n one case a comment came to me that you try to make certain people feel inferior." (Id.)

**Admit that Mr. Bondi sent an email to Plaintiff on January 17, 2001. Plaintiff adds, however, that that email specifically criticized Plaintiff for expressing his concerns about illegal conduct. Specifically, Mr. Bondi stated: "Telling them they could be liable for fines is unacceptable" and "We are not law breakers or criminals and the customer does not need to hear that."** (Ibid.)

2

8. Dyrinda Cole, an administrative assistant at Carrier, told Bondi that she felt that plaintiff had interrogated her concerning certain software and made her feel "inferior." (Bondi Dep. at 114.) Another Carrier employee, Janet Linden, complained to Bondi that plaintiff's approach was "brash." (Id. at 123.) Tim Fleming, Carrier's Director of Global Managed Services, voiced concerns to Bondi regarding interpersonal difficulties that several administrative assistants had with plaintiff. (Id. at 125-26.)

**Plaintiff denies that these objections were made. Moreover, Plaintiff objects to Mr. Bondi's testimony regarding these alleged comments by Carrier employees on the grounds of hearsay.**

9. In plaintiff's performance appraisal of March 31, 2001, Bondi stated that "Ken's structured approach, although an asset to his process, has conflicted with the customer expectation. I am working with Ken to improve his approach with a sensitive user environment (Executive Assistants)." (Performance Appraisal at 5, Exhibit D.)

**Admitted. Plaintiff adds, however, that his overall rating was very good. Moreover, Mr. Bondi described Plaintiff's work as "excellent" and "impeccable," and that his goals and objectives were on target.** (Ibid. at Section II. A.)

10. Bondi met with plaintiff to discuss the appraisal. He told plaintiff that his approach was "brash" and that he needed to "work on [his] interpersonal skills." (Maury Dep. at 40-41.)

**Admitted.**

11. Bondi and plaintiff also discussed a confrontation plaintiff had with a Vice President at Carrier, who had complained that she felt "intimidated" by plaintiff's approach.

3

(Maury Dep. at 41-43.) Plaintiff testified at his deposition that he understood why that Vice President might have felt intimidated by his approach. (Id. at 42-43.)

**Admitted.**

12. At the time of his performance appraisal, plaintiff agreed to work to improve his interpersonal skills. (Maury Dep. at 41.)

**Admitted.**

13. Amy Carlough, Carrier's liaison to CSC, recommended to her manager, Tim Fleming, that plaintiff be removed altogether from the Carrier facility in Farmington. (Deposition of Amy Carlough ("Carlough Dep.") at 82-83.)

**Admitted.**

14. On May 29, 2001, plaintiff sent an e-mail to several Carrier employees in which he criticized one of his CSC coworkers, Larry Thompson. (E-mails between Loucks, Maury, Fleming and Bondi of 5/29/01, Exhibit F.) Upon reading the e-mail, Tim Fleming, Carrier's Director of Global Managed Services, sent an e-mail to plaintiff in which he admonished plaintiff, "Let's offer a positive coaching point on this note. Let's not leave our own teammates out to dry in public!" (Id.) Plaintiff understood that Mr. Fleming was upset that plaintiff had criticized Larry Thompson. (Maury Dep. at 82.)

**Admitted.**

15. Alan Mechuga, a senior executive at Carrier, also requested plaintiff's dismissal. (Deposition of Michael Keywan ("Keywan Dep.") at 41.)

**Plaintiff denies that this comment was made. Moreover, Plaintiff objects to Mr. Keywan's testimony regarding these alleged comments by a Carrier employee on the grounds of hearsay. Plaintiff adds that Mr. Keywan unequivocally objected to Plaintiff's**

termination, stating, "I am the one customer who has an extensive history with Ken Maury, few customers have spent as much time with him in an operational capacity as I have. With that, it is a mistake to remove him, he is a talented 'A' player and CSC needs talent." (9/6/01 Emails, attached as Exhibit R; Deposition of Michael Keywan at 71-77).

16. Plaintiff had a personality conflict with Larry Thompson. (Maury Dep. at 75-76.)

**Admitted. Plaintiff adds that Mr. Thompson was involved with the illegal software copying that Plaintiff objected to.**

17. Michael Bondi instructed plaintiff to "work together" with Larry Thompson. (E-mail from Bondi to Maury of 10/26/00, Exhibit H.) Plaintiff understood that Bondi wanted him to "quit butting heads with Larry Thompson." (Maury Dep. at 77.)

**Admitted.**

18. Jeremy Pollack, another one of plaintiff's coworkers, also raised concerns about plaintiff to Michael Bondi. (Deposition of Jeremy Pollack ("Pollack Dep.") at 130-31.) At one point, Pollack considered resigning from CSC because, although he enjoyed his job from a technical standpoint, his interactions with plaintiff caused sufficient frustration to prompt him to consider leaving the company. (Id. at 152-53.)

**Admitted. Plaintiff adds, however, that Mr. Pollack was involved in the illegal software copying that Plaintiff objected to and that Mr. Pollack eventually received Plaintiff's job after his termination.** (Bondi Dep. at 190-192, 242-243; Maury Dep. at 212-216.)

19. In response to economic difficulties in 2001, CSC tried to cut costs through reductions in travel and entertainment, use of consultants and contract labor, frozen internal

capital expenditures and reductions in the company's workforce, including a round of layoffs in September 2001. (See Internal Company Memoranda dated 4/2/02 and 9/21/01, Exhibit J.)

**Admitted.**

20.  CSC did not hire any new employees to replace plaintiff following his layoff. (Deposition of Michael Bondi ("Bondi Dep.") at 243.) Rather, immediately following plaintiff's layoff, Michael Cote, a CSC desktop technician who worked on site at Otis Elevator Company, assumed plaintiff's Site Coordinator duties in addition to his own duties. (Bondi Dep. at 217-18.) Months later, Cote transferred to another project and Jeremy Pollack took over the Site Coordinator responsibilities. (Bondi Dep. at 243.)

**Denied. CSC's headcount reduction objective for the Carrier headquarters was one. At the time of Plaintiff's termination, Mr. Thompson had already been reassigned to another location.** (Bondi Dep. at 215.)

21.  Plaintiff admitted in discovery that "no one specifically asked [him] to make illegal use of 'unlicensed' software." (Plaintiff's Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents, Interrogatory No. 15, Exhibit L.)

**Admit. Plaintiff, however, objected to other employees illegal copying and use of unlicensed software.** See e.g., August 14, 2001 email from Maury to Kutil, *et al.*

22.  The only reason plaintiff believes that he was terminated for refusing to make illegal use of unlicensed computer software is because he cannot think of any other reason for his termination. (Maury Dep. at 228-30.)

**Denied. Mr. Bondi admitted that his January 17, 2001 criticisms of Plaintiff about warning clients about possible fines and portraying CSC as criminals factored into his decision to terminate Plaintiff.** (Bondi Dep. at 230-233). **CSC also admitted that the**

6

concerns reflected in Mr. Bondi's email factored into the decision to terminate Plaintiff. (CSC's CHRO Response at p. 4).

23. Plaintiff reported alleged illegal software installations to CSC management to protect only the interests of CSC and its clients. (Maury Dep. at 242.)

**Denied. As reflected in Mr. Bondi's January 17, 2001 email, Plaintiff warned clients about possible fines and that he described CSC employees conduct as criminal. Moreover, Plaintiff expressly described CSC employee's conduct as illegal in his August 14, 2001 email.**

24. Prior to his termination, plaintiff did not report any alleged illegalities to anyone outside of CSC. (Maury Dep. at 241.)

**Admitted.**

## B. PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE

1. Plaintiff was recognized as being very effective at his job. Plaintiff received praise from customers and on his performance evaluation. For example, on or about June 7, 2000, Paul Duff, a supervisor at Carrier, sent an email to Plaintiff's supervisor stating, "Ken Maury is getting things done!" That email praised Plaintiff's work and stated that Carrier had been experiencing problems with CSC prior to the Plaintiff taking on the account, but now things were "getting better." (Bondi Dep. at 66-67, Email 6/9/00, attached as Exhibit J.)

2. In November 26, 2001 letter, Carrier's Director of Global Real Estate Operations Ronald Zappile described Plaintiff as "always customer focused, attentive to details, and concerned that customer requirements were identified, reconciled and satisfied." (11/26/01 Letter attached as Exhibit K.)

3. Plaintiff's supervisor Michael Bondi gave him an overall rating of "very good" on

7

his performance appraisal. (Performance Appraisal at 3, 7, attached as Exhibit L.) That appraisal also included comments such as "...does an excellent job managing...", "...record keeping impeccable.", "...resourcefulness has enabled CSC Farmington to deliver a high level of service to the customer.:, "...goals and objectives are on target with improving process at Farmington WHQ." (Id.)

4. Plaintiff worked very hard from the beginning of his employment to bring CSC and Carrier into compliance with software and equipment licensing agreements so that the companies would not be subject to legal liability. (Plaintiff's Performance Review at Section II. A.; Maury Dep. at 127-152.)

5. CSC's technical staff at Carrier's headquarters maintained copies of software on a computer server, known as "Optiserve". (Maury Dep. at 96-97.) Optiserve was attached to Carrier's network and was available to CSC technicians, who would use it to copy software onto other equipment attached to the network. (Maury Dep. 96-98.)

6. Plaintiff observed a series of incidents where software was being copied from Optiserve onto CSC and Carrier employee's computers without an approved license. (Maury Dep. at 45-46, 56-62, 92. Email 5/2/00 regarding thirty users that had Outlook 2000 installed without proper licensing attached as Exhibit W; Email 6/6/00 requesting quote on a 250 user site license for WinZip that had already been installed attached as Exhibit X; Email 7/21/00 noting no records of any site licenses ever being purchased for software already installed attached as Exhibit Y; Purchase Requisitions 8/22/00 to bring users into licensing compliance after the software was already installed on their computers attached as Exhibit Z; PWOF 10/27/2000 regarding effort to bring user into licensing compliance after the software was already installed on his computer attached as Exhibit AA; Email 2/28/01 states that Users had software installed on computers before order was made for licenses attached as Exhibit M; Purchase Requisition

8

5/7/2001 requesting user upgrade to Win98 after the software had been installed attached as Exhibit BB.)

7. In October 2000, Plaintiff learned that Larry Thompson had installed software onto computers before licenses had even ordered. (Maury Dep. at 96-98, 206-207.)

8. Plaintiff also discovered that Jeremy Pollack, a CSC technician, had been copying software from Optiserve without obtaining licenses. (Bondi Dep. at 190-192; Maury Dep. at 212-216.)

9. In response to his observations, Plaintiff repeatedly expressed to Carrier employees, his supervisors, and other CSC technical staff that it was illegal to install software without a proper license. (Bondi Dep. at 85-86, 127-138.)

10. Plaintiff's supervisor Michael Bondi was aware that if software was installed without proper licensing a fine could result. (Bondi Dep. at 128.)

11. Nevertheless, after Plaintiff tried to warn customers, coworkers and his supervisors numerous times regarding the illegal installation of software, Mr. Bondi sent him an email stating that telling customers "they could be liable for fines is unacceptable" and "we are not law breakers or criminals and the customer does not need to hear that." (Email from Bondi to Maury of 1/17/01, attached as Exhibit O.)

12. Following numerous observations of unlicensed software copying and installation, several efforts to curb that conduct, and no apparent change, Plaintiff drafted an email expressing concerns over what was occurring at the Carrier headquarters site. (Email from Maury to Donald Kutil on 8/14/01, attached as Exhibit P.)

13. Before sending the email, Plaintiff discussed it with Mr. Bondi and showed him the 16 bulleted points that were the main issues he was raising. (Maury Dep. at 90.)

9

14. Mr. Bondi warned Plaintiff against sending the email, stating: "It would be in your best interest not to do it." (Id. at 89.)

15. On August 14, 2001, despite Mr. Bondi's warning, Plaintiff sent the email containing his specific concerns about unlawful software copying to Donald Kutil, the CSC Operations Manager for Carrier, with copies sent to Michael Bondi and John Hay, Mr. Bondi's supervisor. Plaintiff listed a series of concerns about what was occurring at Carrier headquarters, which list started with references to illegal conduct. (Email from Maury to Donald Kutil on 8/14/01 attached as Exhibit P.)

16. Within a week of Plaintiff's email, Don Kutil, John Hay, and Michael Bondi had a conference call regarding that email. (Bondi Dep. at 187.) Michael Bondi was in charge of handling those issues and he talked to the Plaintiff briefly after the conference call. (Id.)

17. At about the same time, Mr. Bondi learned about a CSC reduction in force, which was to occur in mid to late September. (Bondi Dep. at 215.) Mr. Bondi had a directive from management to reduce staff in the Carrier headquarters by one person. (RIF Process, attached as Exhibit Q.)

18. Mr. Bondi had conversations with both John Hay and Anne McKenna, Mr. Hay's replacement, about who should be laid off and for what reasons. Mr. Bondi mentioned Plaintiff's name as a layoff candidate in both conversations. (Bondi Dep. at at 219-221.)

19. During the layoff selection process, objections were raised from people within Carrier and CSC that had worked closely with Plaintiff. (Id. at 234-235, Letter on 11/26/01, attached as Exhibit K.) For example, Michael Keywan expressly disagreed with the selection of Mr. Maury because:

> . . . it is no secret that CSC is littered with 'B' and 'C' players. I am the one customer who has an extensive history with Ken Maury, few customers have spent as much time

10

with him in an operational capacity as I have. With that, it is a mistake to remove him, he is a talented 'A' player and CSC needs talent.

(9/6/01 Emails, attached as Exhibit R; Deposition of Michael Keywan ("Keywan Dep.") at 71-77; Bondi Dep. at 234.)

20. On September 21, 2001, just a little over three weeks after he sent Mr. Kutil, Mr. Hay and Mr. Bondi the email addressing ongoing illegal conduct, Bondi selected Plaintiff for termination by CSC. (Termination letter attached as Exhibit S.)

21. Plaintiff was ultimately replaced by Jeremy Pollack, who had engaged in some of the software copying conduct that Plaintiff had objected to. (Bondi Dep. at 190-192, 242-243; Maury Dep. at 212-216.)

22. Mr. Bondi specifically admitted that his motivation for selecting Plaintiff for termination was reflected in his January 2001 email to Plaintiff. (Bondi Dep. at 230-233, referencing 1/17/01 email from Bondi to Maury attached as Exhibit T.)

23. CSC also admitted that the reason Plaintiff was selected for termination was reflected in Mr. Bondi's remarks in the email chastising Plaintiff for warning Carrier employees that "they could be liable for fines is unacceptable," and stating "we are not law breakers or criminals and the customer does not need to hear that." (CHRO Opp'n at p. 4).

Respectfully submitted,
The Plaintiff

By: _____
Craig T. Dickinson (CT18053)
Madsen, Prestley & Parenteau, LLC
44 Capitol Avenue – Suite 201
Hartford, CT 06106
(860) 246-2466

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that a copy of the foregoing was hand delivered this date to:

Albert Zakarian
Eric L. Sussman
Day, Berry & Howard LLP
CityPlace I
Hartford, Connecticut 06103-3499

_____
Craig T. Dickinson

12