```
1                UNITED STATES DISTRICT COURT
                   DISTRICT OF CONNECTICUT
2
3
                                                    COPY
4
5
6       - - - - - - - - - - - - - - - -x
        KENNETH MAURY                   :
7                                       :
                                        :
                                        :
8                                       :
        vs                              :  CIV. ACTION NO.
9                                       :  3:02 CV 492 (DJS)
                                        :
10                                      :
        COMPUTER SCIENCES CORPORATION   :
11      - - - - - - - - - - - - - - - -x
12
13
14
15           Deposition of KENNETH MAURY, taken pursuant
        to the Connecticut Practice Book, before Melissa J.
16      Kelly, RPR, LSR, Licensed Shorthand Reporter
        #00307, and Notary Public within and for the State
17      of Connecticut, held at the offices of Day, Berry &
        Howard, CityPlace I, Hartford, Connecticut, on
18      February 7, 2003, at 11:28 a.m.
19
20
21
22
23
24
25
```

```
 1   you begin to list 15 issues.  Do you see that?
 2       A.   Yes.
 3       Q.   It says, "other know."  I assume that's
 4   supposed to be "other known issues" --
 5       A.   Yes.
 6       Q.   And No. 1 says, "have stemmed from illegal
 7   software installs."
 8            What are you referring to here?
 9       A.   There are several instances that pertain to
10   examples of installing the software.
11       Q.   And what were you referring to when you
12   referred to "illegal software installs"?
13       A.   When software was being installed without
14   proper licensing.
15       Q.   When did that happen?
16       A.   On numerous occasions.  For example, with
17   Rick Gonchar.
18       Q.   So there was an incident with Rick Gonchar
19   where you thought there was an illegal software
20   installation?
21       A.   Yes.
22       Q.   Are there any other incidents that you can
23   recall where you thought there was an illegal
24   software installation?
25       A.   There was when Photoshop was ordered for
```

```
 1      Q.   With respect to each of these installations
 2   of software that you say were illegal, had you read
 3   the applicable licensing agreement?
 4      A.   Yes.
 5      Q.   In each instance?
 6      A.   Yes.
 7      Q.   Did you understand them?
 8      A.   Yes.
 9              (Defendant's Exhibits H, I and J:
10           Marked for identification.)
11              (Off the record from 3:23 to 3:31 p.m.)
12   BY MR. SUSSMAN:
13      Q.   Showing you now what's been marked as
14   Exhibits H, I and J.  These are documents I found
15   among those that you produced to us.  Do you
16   recognize those documents?
17      A.   Yes.
18      Q.   Are there any license agreements aside from
19   these that you believe CSC has violated?
20      A.   Yes.
21      Q.   How many license agreements other than
22   these?
23      A.   The ones that are recognizably missing
24   would be the Windows license agreement.
25      Q.   Windows 2000?
```

```
 1    A.   Windows products in general and the Office
 2   products, the Microsoft Office 2000 products.
 3    Q.   Any others?
 4    A.   There possibly are.  Without going over the
 5   list of software, again, that I was responsible
 6   for --
 7    Q.   Is it your testimony that CSC has also
 8   violated all three of these license agreements,
 9   meaning Exhibits H, I, and J?
10    A.   To the best of my knowledge, yes.
11    Q.   What do you mean, to the best of your
12   knowledge?
13    A.   In Exhibit H, you show WinZip standard
14   license, which the document includes on the third
15   page WinZip evaluation license agreement.
16              MR. PRESTLEY:  I'd just like the record
17         to show he's talking about these documents
18         that have been handed to him.  I don't think
19         you've taken the time to read them, have you,
20         Ken, before you're talking about what's in
21         these?
22              MR. SUSSMAN:  Feel free to take as much
23         time you need to review the documents.
24              MR. PRESTLEY:  That's the point I'm
25         making.  He hasn't looked at them.
```

1       MR. SUSSMAN: I don't have any
2   objection to him --
3       MR. PRESTLEY: If you want to talk
4   about these documents, you should look at
5   them before you talk about them, even if you
6   think you recognize them.
7       MR. SUSSMAN: If you'd like to take a
8   short break so that you can look at the
9   documents, I'd be happy to do that.
10      MR. PRESTLEY: If you're going to ask
11  about each of the documents, I prefer he
12  spends some time looking at them before he's
13  asked about them.
14      MR. SUSSMAN: I have no problem with
15  that. Why don't we go off the record.
16      (Off the record from 3:34 to 3:36 p.m.)
17  BY MR. SUSSMAN:
18      Q.  Do you believe that CSC has violated all
19  three of those agreements: H, I and J?
20      A.  To the best of my knowledge and
21  understanding of these license agreements, yes.
22      Q.  Looking at Exhibit H, in what way did CSC
23  violate the license agreements embodied in Exhibit
24  H?
25      A.  On the third page of Exhibit H, which is

```
 1  Which one got installed first I am not aware of.
 2      Q.   What did you do when you discovered that?
 3      A.   I went to Mike Bondi and I went to Larry
 4  Thompson to discuss it.  Mike Bondi's
 5  recommendation was put another order in and get the
 6  license for it.
 7      Q.   Did you do that?
 8      A.   Yes.
 9      Q.   Did Mr. Bondi say anything else to you?
10      A.   Not to my knowledge.
11      Q.   Turning back to Exhibit H, you had
12  mentioned what you thought was a violation of
13  Exhibit H as well.  I'm wondering whether you
14  brought that violation to anyone's attention.
15      A.   Yes.
16      Q.   Whose attention did you bring it to?
17      A.   Mike Bondi, Brad Short, Karen Shafer, Jo
18  Anne Baxter.  I'm sure there was more in the chain
19  that we had to follow procedure.
20      Q.   Do you recall when the violation occurred?
21      A.   Which violation are we referring to now?
22      Q.   Exhibit H?
23      A.   Of the installation of WinZip?
24      Q.   That's correct.
25      A.   It wasn't a single incident.
```

1    Q.    There was more than one?

2    A.    Yes.

3    Q.    How many times did it occur?

4    A.    Every time a machine was imaged.

5    Q.    When you went to Mr. Bondi and explained
6    this violation to him, what did Mr. Bondi say?

7    A.    I don't believe he was really worried about
8    it.

9    Q.    But what did he say; did he say anything?

10   A.    I believe that in our discussions it was
11   whose responsibility it was at that time to order
12   site licenses for this software to become
13   compliant.

14   Q.    Mr. Bondi was asking that question?

15   A.    It was in our discussions.

16   Q.    But when you brought the issue to
17   Mr. Bondi's attention, what was his reaction?

18   A.    It was of concern, and it's, "Okay, why is
19   it -- what's wrong with it?

20        "Mike, it's an evaluation copy.  We're not
21   supposed to have it in a corporate environment.  We
22   have to be licensed.

23        "Let's find out who's responsible for
24   owning that site license."

25   Q.    Who said that, you did?

1    A.   Mike.

2    Q.   Mr. Bondi did?

3    A.   Yes.

4    Q.   Did you do that?

5    A.   Yes. I proceeded to put in the purchase
6  req and went to Mike Keywan because ultimately he
7  was going to have to purchase the site license for
8  Carrier. So in talking with Brad Short through the
9  chain there, I was the only one that ordered and
10 had licensed a 300-user site license for WinZip 8.

11   Q.   So you went ahead and took care of ordering
12 the proper licenses?

13   A.   Yes.

14   Q.   And CSC was thereafter in compliance?

15   A.   Carrier was.

16   Q.   Is it your testimony that CSC was not in
17 compliance?

18   A.   CSC no longer had that responsibility of
19 that because it was purchased under Carrier.

20   Q.   So CSC wasn't involved in a violation of
21 the WinZip standard license?

22   A.   After the site license was purchased.

23   Q.   And after the site license was purchased,
24 they were also no longer involved in any violation
25 of the WinZip evaluation license?

1    Q    And following this incident, Joanne Baxter,
2 Service Delivery Coordinator, located in Syracuse, New
3 York, told the team that no software was to be
4 installed until proper licensing was purchased.
5    A    Correct.
6    Q    She told this to the team you say. Who
7 specifically did she tell?
8    A    Jeremy Pollock, I believe Todd LeForte,
9 Larry Thompson, Jim Swiatek, myself and even
10 Mike Bondi.
11    Q    Was this at a meeting of some sort?
12    A    I believe it was a conference call.
13    Q    Did she say anything else?
14    A    I'm not really sure if it was strictly just
15 for that or if it was for a general conference on the
16 ordering of parts and procurement, and there was an
17 issue raised up about when -- and I believe Mike Bondi
18 brought it up, when we would be compliant for software,
19 at what point, because CSC's practice was to purchase
20 the license, but we never really received a copy of the
21 license. That's held in CSC's procurement forms.
22    Q    When you say you never received a copy of the
23 license --
24    A    Right.
25    Q    -- do you mean the license agreement or do

1  in each one of the files which we created.
2      Q    And what did you say to Mr. Bondi when he
3  told you that?
4      A    We did it.
5      Q    So he instructed you to ensure compliance?
6      A    Yes.
7      Q    But as you sit here today, you're telling me
8  that you refused to engage in or condone illegal
9  activity and that Mr. Bondi instructed you to engage in
10 illegal activity?
11     A    Yes.
12     Q    Do you see an inconsistency between those?
13     A    No, sir, I do not.  Once I started
14 complaining about Mike Bondi's catering to the
15 sensitive environment he was managing, it got to the
16 point to where he threw temper tantrums, slamming doors
17 because CSC does not install illegal software, but yet
18 I continually brought up documentation from
19 Larry Thompson, Jeremy that were installing illegal
20 software and kept bringing it to his attention to where
21 he said fine, then you keep all the CDs.
22     Q    And then it says in paragraph 51, "The
23 defendant terminated the plaintiff's employment because
24 of his refusal to make illegal use of unlicensed
25 computer software."  Do you see that?

1  A  Yes.

2  Q  What information do you have to indicate that
3  CSC laid you off because you refused to make illegal
4  use of unlicensed computer software?

5  A  What proof?

6  Q  What information do you have?

7  A  Everything that I've supplied, all the
8  e-mails, the CDs, everything that I've supplied
9  concerning to higher management.

10  Q  How do you know that the reason you were laid
11  off is because you refused to make illegal use of
12  computer software?  I understand that your allegation
13  is that CSC engaged in illegal use of unlicensed
14  computer software.  Is that your allegation?

15  A  Yes.

16  Q  And you're also alleging that CSC used that
17  as a basis for terminating your employment.  Is that
18  correct?

19  A  Yes.

20  Q  Okay.  What information do you have to show
21  that connection?  What information do you have to show
22  that CSC terminated your employment because you refused
23  to engage or to make illegal use of unlicensed computer
24  software?

25  A  Because that was the only complaint that I

1  had with CSC, even my performance evaluation stated
2  that my technical ability was good, that I was very
3  good at my job.
4       Q    So the reason that you believe that that
5  was -- that you were terminated for refusing to make
6  illegal use of unlicensed computer software is because
7  you can't think of any other reason?
8       A    I would have to say yes.
9       Q    Are there any other -- is there any other
10 information that you have to suggest that the reason
11 you were terminated was because you refused to make
12 illegal use of unlicensed computer software?
13      A    After thinking everything that we've gone
14 through with the so-called personality conflicts
15 between Larry Thompson and myself and supposedly other
16 people, it seems -- performance evaluations, raises, it
17 all boils down to the complaints that CSC has about me
18 in dealing with the same people that I'm referring to
19 all stems from software.
20      Q    But I'm asking you to explain to me -- and if
21 you don't have information, that's okay.  I'm just
22 asking whether you do or not.  What information do you
23 have, if any, to suggest that CSC laid you off or
24 terminated your employment because of your alleged
25 refusal to make illegal use of unlicensed computer

1  software?

2           MR. PRESTLEY: I'll let you answer one
3       more time.

4           You asked this question twice. He's
5       answered it twice, I think, quite
6       sufficiently.

7           MR. SUSSMAN: I'm asking whether he's
8       got any other reasons.

9           MR. PRESTLEY: You've asked twice. The
10      third time is it. Then it becomes badgering.

11  BY MR. SUSSMAN:

12      Q   I'm certainly not trying to badger you,
13  Mr. Maury. All I want to do is exhaust all the reasons
14  that you have, all the information that you have. So
15  the reason I'm asking you the question again is because
16  I want to find out if you have any other information
17  that indicates that CSC terminated your employment
18  because you refused to make illegal use of unlicensed
19  computer software.

20      A   No, there's no other reasons that I can think
21  of now.

22      Q   If I could turn your attention now to the
23  next page under count two, paragraph 52. Do you see
24  that?

25          It says, "The aforesaid actions on the part

1      A     On the bottom.

2      Q     And it refers to you reporting improper and
3  illegal conduct. To whom did you report improper and
4  illegal conduct on the part of CSC?

5      A     I reported it to Mike Bondi. I reported it
6  to Jeffrey Gossett. I reported it to Don Kutil. I
7  basically went up my management chain to get the issues
8  resolved.

9      Q     Did you report it to anybody outside of CSC?

10     A     Not until after my termination which would
11 have been to the agencies we already talked about.

12     Q     So prior to your termination, you hadn't
13 reported it to anybody outside of CSC?

14     A     Correct. Because CSC has a policy that if
15 you don't like your supervisor's answer, then you take
16 it to the next step up and that's -- systematically
17 that's what I did.

18     Q     What prompted you to raise these concerns
19 about alleged improper and illegal conduct?

20     A     My knowledge of software and the IT industry.

21     Q     What was your purpose, though, in going to
22 management to complain?

23     A     My purpose was the fact that we lost money
24 when we did this. CSC lost money.

25     Q     So you were looking out for CSC?

```
1     A     That's why I went to work for CSC.

2     Q     And so your purpose in going to management

3  was in an effort to protect CSC?

4     A     Yes.  Not only protect CSC, but also protect

5  CSC's clients.

6     Q     Is there anybody else you were seeking to

7  protect besides CSC and its clients?

8     A     Well, my job was to ensure that we had

9  software that was in compliance so that, one, we did

10 not run a risk of audits, the second thing to do was to

11 generate revenue which was my guidelines to follow that

12 if CSC is spending the money, then we need to make the

13 revenue.  So it was all part of my job.

14            MR. SUSSMAN:  Can you read my question

15       back?

16            (THEREUPON, THE REFERRED TO

17       QUESTION WAS READ BACK.)

18    A     No.  That's the only people that were

19 involved.

20 BY MR. SUSSMAN:

21    Q     Paragraph 52 also says that CSC retaliated

22 against you for reporting improper and illegal conduct.

23 Do you see that?

24    A     Yes, on the bottom 52.

25    Q     Yes.  In what way did CSC retaliate against
```