UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **KENNETH MAURY,** :<br>　　Plaintiff, :<br> :<br>v. :<br> : No. 3:02CV1492 (DJS)<br>**COMPUTER SCIENCES CORPORATION,** :<br>　　Defendant. : | |

## MEMORANDUM OF DECISION

Defendant, Computer Sciences Corporation, has moved for summary judgment **[doc. #35]** on both counts of the Second Amended Complaint. Plaintiff, Kenneth Maury, claims wrongful termination in violation of public policy and also retaliatory discharge in violation of his right to free speech under the First Amendment of the United States Constitution. The motion, for the following reasons, is **GRANTED in part**.

## Facts

Plaintiff, Kenneth Maury ("Maury"), was hired by the defendant, Computer Sciences Corporation ("CSC"), on July 13, 2000. Prior to that time, Maury was directly employed by Inacom, a subcontractor for CSC. Maury was part of a group of Inacom employees contracted to service various United Technologies ("UT") accounts held by CSC; specifically Maury worked on-site a the Carrier Corporation ("Carrier") in Farmington, Connecticut. Inacom filed for bankruptcy in June 2000 and Maury was retained by CSC to continue the work he was already doing as a subcontractor. Maury was employed as a Senior Systems Engineer, Site Coordinator and Asset Manager, although his primary work was as Site Coordinator for the Carrier account, a position he shared with Larry Thompson ("Thompson") another CSC employee. Both Maury and

Thompson were supervised by Mike Bondi ("Bondi").

CSC is an information technology support company that provides computers, software and support services to various corporate clients. CSC has an outsourcing agreement with UT which includes services for Carrier. Pursuant to the agreement with UT, CSC provides hardware, a software help desk, purchasing support and on-site maintenance and technology support to Carrier. Maury shared the Site Coordinator responsibilities with Thompson and the two men divided the work roughly along administrative and technical lines. Thompson was primarily responsible for technical support while Maury handled administration. A large part of Maury's job involved asset management, i.e., the purchase, installation and inventory of equipment and software in use at Carrier.

CSC has a process that Carrier employees must follow when requesting new software, hardware or other technical support services. A Carrier employee fills out a Service Request form and submits the form to a Carrier supervisor for purchase approval. Carrier then transfers the forms to CSC, and once CSC approves the work a technician is assigned to fill the request. Any purchase of new software requires a waiting period for licensing to be secured before the software can be installed. Maury was responsible for ensuring that all software in use at Carrier was properly licensed.[1]

---

[1] Software licenses come in two types. The most common is the single-user license (also called the retail copy). A single-user license is issued each time an individual consumer buys a software program, usually stored on a CD for installation on the user's computer. Corporate entities will sometimes purchase multi-use licenses that enable hundreds of employees to use a single piece of software. Generally, a multi-user license will involve a single, un-encrypted CD that holds software capable of installation on any number of computers, up to the number of purchased licenses. A single-user CD will be encrypted and require the input of a pass-code prior to installation of the software.

CSC suffered economic difficulties in 2001 that eventually led to a reduction in the size of the company's workforce. CSC ordered Bondi to reduce the size of the CSC staff at Carrier by one person, and Maury was selected. Maury's complaint alleges that he was fired because he spoke out against allegedly illegal software installation practices at CSC and Carrier. According to Maury, the reassignment of Thompson away from the Carrier site satisfied the staff reduction and so it cannot be the reason Maury was terminated. Further, Maury claims that Jeremy Pollack ("Pollack") was involved in the use of unlicensed software and eventually received his job, implying that Pollack was rewarded for the allegedly illegal acts that Maury protested. Defendant asserts that Maury was fired because of the required downsizing, and his inability to work well with customers and staff made him a reasonable candidate for termination. Bondi testified that one of the factors leading to Maury's termination was his insistence on telling Carrier employees that CSC was violating the law and that they could be subject to criminal fines. CSC initially replaced Maury by promoting Michael Cote, a CSC technician, to Site Coordinator. Pollack was made Site Coordinator months after Maury was fired.

The parties agree that Maury had contentious relationships with both CSC colleagues and Carrier employees. According to Bondi, Maury's negative interactions with others were a factor in the decision to terminate his employment on September 21, 2001. Maury repeatedly confronted CSC staff and Carrier employees regarding what he perceived to be the illegal installation of improperly licensed software. Dates and times of the various events are not entirely certain, but they all occurred between August 1, 2000 and September 21, 2001. The first incident seems to have involved a Carrier employee named Denise McBride, who requested the installation of certain software that she needed to complete a time-sensitive task. According to

Maury, the CSC help desk violated CSC procedure by simply downloading the requested software from Microsoft's website rather than submitting the paperwork to Maury that would have permitted him to purchase the requested programs. Maury testified that the act of downloading the software from Microsoft's website did not violate any laws or licensing agreements of which he was aware.

Maury described a second incident involving Todd LeForte ("LeForte") a temporary worker subcontracted to CSC by another company. According to Maury, LeForte installed a copy of Windows 2000 on the computer of a Carrier employee named Darynda Cole ("Cole"). Maury confronted LeForte about the installation in front of Cole and stated that LaForte may have done something illegal that could lead to Carrier being fined by the government. Maury testified that the operating system installed by LeForte was purchased for use only by CSC employees at Carrier and not for installation on Carrier's computers. Maury stated that he was told by Brian Dudley ("Dudley"), an employee of UT, that Carrier would need to purchase new software or software licenses before using any software that did not have an installation CD licensed to the particular user. Maury, as the individual tasked to purchase software licenses, knew that no license had been purchased for Windows 2000.

A third incident involved the alleged installation of Photoshop onto a Carrier computer from the CSC server. Maury had purchased a single-user license of Photoshop for use by Cole on her computer. Thompson installed the software on the CSC server and later told Maury that he was having trouble installing the software from the server on a computer and so needed to use the original software CD to install the program. Maury decided to contact Cole directly to confirm that she was having a problem with the program and discovered that Thompson was not re-

installing Photoshop on her computer, leading to his conclusion that Thompson was improperly installing unlicensed software.

A fourth incident involved the installation of Microsoft Outlook 2000. According to Maury, Carrier purchased only two retail copies of the program. Thompson had installed the software on 20 to 30 computers without a multi-user license. Maury reported this alleged violation to his employer and Thompson was instructed that no more software be installed without proper licensing. The alleged lack of compliance with applicable copyright laws did not cease, however, because the management of CSC could not determine what company, CSC or Carrier, should purchase the necessary licenses.

Events similar to those described herein also occurred involving Microsoft Project 98 and Photoshop 5.5. In each instance Maury noted that Thompson had installed the software on more computers than there were licenses for use. A conflict also arose regarding actions by Jeremy Pollack ("Pollack") a temporary CSC employee whom Maury claims was involved in the installation and use of illegal software, specifically by the installation of software prior to final purchase approval and issuance of a proper license. Pollack testified that he was sufficiently frustrated by Maury's treatment that he considered quitting his job.

Maury not only confronted his co-workers, he regularly expressed his concerns to his superiors in very public fashion. Maury reported alleged violations of software licensing agreements to Bondi, who then instructed CSC staff to ensure that proper licenses were obtained. Maury criticized Thompson in an email sent to multiple Carrier employees, prompting Tim Fleming, a Carrier manager, to admonish Maury that such public criticism was inappropriate. On August 14, 2001, about one month prior to his termination, Maury sent a lengthy email to Don

Kutil, Bondi's supervisor, alleging a variety of illegal acts and violations of corporate policy that Maury wanted addressed. The email indicates that Maury felt a responsibility, as Site Coordinator, to do certain aspects of Bondi's supervisory work when Bondi was not present at Carrier. Maury discussed the email with Bondi prior to contacting Kutil, and Bondi warned him against sending it. Subsequently, Bondi spoke with Kutil and another CSC employee regarding the email and Maury's complaints. Bondi later addressed Maury after his conference with Kutil, although the record does not indicate the substance of Bondi's conversations with either Kutil or Maury.

Maury was the subject of numerous complaints from Carrier employees. Cole complained that Maury's treatment made her feel inferior. An unnamed vice-president at Carrier told Bondi that Maury intimidated her during a confrontation. Amy Carlough recommended that Maury be removed from the Carrier facility. Maury told Carrier employees that CSC was engaged in criminal activity that could expose them to criminal fines. Even a supporter of Maury, Mike Keywan ("Keywan") acknowledged that there were issues with how Maury conducted himself, although Keywan described Maury as an "A" talent that CSC should not dismiss. Another Carrier employee, Ronald Zappile, also had a positive working relationship with Maury.

Maury was not disciplined by CSC, although he was contacted on numerous occasions and reprimanded for his behavior. In addition to the email admonishment from Fleming, Bondi instructed Maury on May 29, 2001 to cease making public reprimands of his colleagues, Thompson in particular. The May 29 email was a second warning to Maury regarding public criticism of Thompson, as Maury had previously, on October 26, 2000, been instructed by Bondi to work with Thompson and to direct any criticism of Thompson's work to Bondi for resolution.

Bondi also contacted Maury on January 17, 2001 regarding complaints from Carrier employees and Maury's description of CSC as engaged in criminal activities.

Maury was subject to a single performance review during his time at CSC, on February 15, 2001, and he received an overall rating of 'very good,' although his ratings in various specific categories were not as high. Maury received ratings of merely 'good'[2] in areas such as ability to lead, oral communication, customer relation, flexibility, ability to work with others, and acceptance of supervision and feedback. The reviewer, Bondi, noted that he was working with Maury to improve his ability to work with and lead others and his workplace flexibility and Maury agreed to work on his interpersonal skills. Maury received outstanding ratings in all technical categories.

CSC did not have any policies permitting or encouraging the use of illegal or improperly licensed software. Bondi warned staff not to download unlicensed software on August 1, 2000 and October 26, 2000. Bondi also told Maury to order proper licensing and to ensure compliance with all applicable license agreements. Joanne Baxter, a CSC employee in Syracuse, also instructed all staff that software was not to be installed until issuance of a proper software license. A memo, dated July 22, 2000, gives CSC staff permission to download software once a software request is transmitted to procurement, but both parties admit that Maury was never told to download any software unless a proper license had already been acquired by CSC or Carrier. Maury never attempted to contact any outside or government authorities to report the allegedly unlawful activity while he was employed at CSC.

---

[2]The CSC performance review rates employees in various areas on a scale with the following categories: excellent, very good, good, needs improvement and unacceptable.

**Standard of Review**

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Id.

**DISCUSSION**

Plaintiff brings two claims in this action. First, Maury seeks damages for his alleged wrongful termination in violation of public policy. Second, plaintiff alleges an infringement on his constitutional right to freedom of speech pursuant to Conn.Gen.Stat. §31-51q. The core of

Maury's complaint is that he was fired from CSC in retaliation for his persistent efforts to ensure compliance with copyright laws that make willful copyright infringement a crime. See, 17 U.S.C.A. §506.[3] Maury's allegations of copyright infringement fall into two general categories: a) distribution of software without proper licensing and b) installation of software prior to the purchase of a requested license. Maury raised his concerns only to his CSC superiors and colleagues and Carrier employees in private communications.

**A. Wrongful Termination**

There is no factual dispute that Maury was an at-will employee of CSC. It is axiomatic that contracts of permanent employment, or for an indefinite term, are terminable at will. Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471, 474 (1980). The at-will nature of employment is not, however, without limits and it may be abrogated when an employee is terminated in contravention of some important public policy. Id. at 475. Although "courts should not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation," employees are entitled to "a modicum of judicial protection when their conduct as good citizens is punished by their employers." Id. at 477.

The exact definition of a 'public policy' is vague. "The employee has the burden of pleading and proving that his dismissal occurred for a reason violating public policy." Morris v. Hartford Courant Co., 200 Conn. 676, 679 (1986). There must be a showing either that the discharge violated an explicit statutory or constitutional provision or that it contravenes a judicially conceived notion of public policy. Id. at 680. The Connecticut Supreme Court has

---

[3]Although Maury does not identify in his complaint the specific statutory provision that CSC allegedly violated, the descriptions of allegedly improper and illegal acts in the complaint provided CSC with sufficient notice of the basis for Maury's claims.

established that it is a violation of public policy for an employer to terminate an employee in retaliation for efforts to ensure compliance with state and federal laws. Faulkner v. United Technologies Corp., 240 Conn. 576, 585-586 (1997); Sheets, 179 Conn. at 479.

The facts presented to the court are not much in dispute. There is no doubt that Maury complained loudly and persistently to his clients, co-workers, supervisors and his superiors' superiors. He alleges numerous violations of copyright laws and licensing agreements that could be alternately described as willful or merely negligent. Maury does not dispute that he was actually fired as part of a company-mandated reduction of the workforce, and he offers no evidence that anyone at CSC ever instructed him to violate copyright laws, reprimanded him for following copyright laws or otherwise instructed him not to report violations of copyright laws. Maury was not threatened, disciplined or otherwise confronted regarding his allegations. He was repeatedly counseled regarding his treatment of co-workers and clients and he was admonished for actions that could be described as insubordinate toward his supervisor, Bondi, and his co-workers. The parties admit both that CSC had clear policies instructing employees not to violate copyright laws and that Bondi and other CSC management repeatedly told Maury's co-workers not to download software until all necessary licenses were acquired.

Despite the seeming weight of the evidence, the court cannot grant summary judgment on the claim of wrongful discharge in violation of public policy. Maury relates far too many incidents of possible copyright violations for his evidence to be dismissed as insufficient. The court must construe all facts and inferences in the light most favorable to the non-moving party, and when the record is viewed in that manner, Maury has presented evidence to sustain his claim. A reasonable jury could find that CSC had a "wink-wink" policy of ignoring or failing to

aggressively pursue copyright violations at the Carrier site. The attitude problem attributed to Maury could be the result of his efforts to change the alleged culture of improper behavior at Carrier and CSC, efforts that may have led to strained relations with co-workers who were inconvenienced by Maury's stringent behavioral requirements. There is a fine-line between an employee behaving as an obnoxious and insubordinate office trouble-maker and one acting conscientiously to ensure his own, and his company's, compliance with the law. The facts and questions presented here fall quite close to that line and warrant a full hearing at trial.

### B. First Amendment Retaliation Claim

Maury also claims that CSC violated his rights under the First Amendment of the United States Constitution as guaranteed against private employers pursuant to Conn.Gen.Stat. §31-51q. Under Section 31-51q an employee "who invokes constitutionally guaranteed free speech rights that, in turn, protect statements that address a matter of public concern" is protected from retaliatory discharge. Daley v. Aetna Life and Casualty Co., 249 Conn. 766, 776 (1999). It is a question of law for the court whether the content of a particular statement is a matter of public concern. Id. at 777. Speech addresses a matter of public concern if it relates to any "matter of political, social or other concern to the community." Connick v. Myers, 461 U.S. 138, 146 (1983). The determination that speech is a matter of public concern turns on the "content, form, and context of a given statement, as revealed by the whole record." Id. at 147-148. "[T]he court should focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." Lewis v. Cowan, 165 F.3d 154, 163-164 (2d Cir. 1999). The plaintiff must not only show that his speech was on a matter of public concern and therefore constitutionally protected, but also that the

speech was a "substantial or motivating factor" in the alleged retaliation. Schnabel v. Tyler, 230 Conn. 735, 755 (1994).

The facts of this case have been discussed at length and, even drawing all inferences in favor of the plaintiff, do not support the section 31-51q claim. There is nothing in the record to show that Maury was acting as a citizen or speaking out on a matter of public concern. Maury's own testimony shows that he was motivated by a desire to ensure that his co-workers complied with company policy, that his clients were properly billed and that his own work was not impugned because of Thompson's alleged improper activities. Maury was concerned with CSC management and operations at the Carrier site, but there is nothing to show that he was acting as a citizen motivated by the desire to raise a public issue in the context of his workplace.

Maury argues that because he was addressing alleged illegal acts, he was implicitly acting as a citizen and speaking on a matter of public concern, but this conclusion is not impelled by the facts or the law. Each of the cases cited by Maury in support of his claim involve public officials engaged in acts of municipal corruption or beach of the public trust; no such actions are alleged in this case. Maury was the employee of a private company that may have engaged in possibly illegal conduct that might have led to the imposition of fines or other sanctions against that private company or its employees. There is nothing in the underlying facts that implicates the general public or that could be said to raise a matter of public concern. The public suffered not at all from CSC's actions and policies, and the public would be unaffected, and largely unaware, of any penalties levied against CSC or its employees. It may be that violations of private licensing agreements or other copyright infringements are, broadly conceived, matters of public concern, but they were not treated as such in this case. Maury addressed a private matter in a private forum

largely for his own benefit, and such actions do not rise to the level of constitutionally protected employee speech. Summary judgment is granted to CSC on this issue.

## CONCLUSION

The motion for summary judgment **[doc. #35]** is **GRANTED in part**. Judgment shall enter in favor of the defendant on Count Two of the Second Amended Complaint.

This case is referred to the Hon. Thomas P. Smith, United States Magistrate Judge, for a settlement conference. The parties are **ORDERED** to submit a joint trial memorandum on or before May 2, 2005.

**IT IS SO ORDERED** at Hartford, Connecticut, this ___16th___ day of March, 2005.

_____/s/DJS_____
**DOMINIC J. SQUATRITO**
**UNITED STATES DISTRICT JUDGE**