**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| KENNETH MAURY | : | CIVIL ACTION NO. |
| | : | |
| Plaintiff, | : | |
| VS. | : | 3:02CV01492 (PCD) |
| | : | |
| COMPUTER SCIENCES CORPORATION | : | |
| | : | NOVEMBER 21, 2005 |
| Defendant. | : | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF MOTION IN LIMINE**</u>
<u>**TO EXCLUDE EXPERT TESTIMONY OF GARY M. CRAKES**</u>

The Defendant, Computer Sciences Corporation ("CSC"), respectfully submits this

Memorandum of Law in Support of Its Motion in Limine to Exclude Expert Testimony of Gary M.

Crakes ("Crakes") pursuant to Rule 702 of the Federal Rules of Evidence and <u>Daubert v. Merrell</u>

<u>Dow Pharms., Inc.</u>, 509 U.S. 579 (1993).  Crakes's testimony is inadmissible because his

methodology is unreliable in that it is based on unfounded and unrealistic assumptions.  Crakes

adopted those assumptions, without any independent verification of their accuracy, and used them

as a basis for his calculation of the Plaintiff's alleged damages.  Because Crakes's assumptions

lack a sufficient factual foundation, his "methodology" amounts to nothing more than a simple

exercise in arithmetic, which is not a proper subject of expert testimony.

## I.    __BACKGROUND__

The plaintiff, Kenneth Maury ("Plaintiff" or "Maury"), alleges wrongful termination in violation of public policy.[1]  (Compl. at 1.)  CSC employed Maury from August 2000 through September 21, 2001, when CSC laid him off.[2]  (See id. at 3,7.)  In connection with his claim of damages, Maury has retained Gary M. Crakes ("Crakes") to testify regarding his lost future earnings.  (See Deposition of Gary M. Crakes ("Crakes Dep.") at 6.)[3]

Crakes primarily provides economic loss appraisals in wrongful death and personal injury cases.  (Id. at 20.)  While he has provided economic loss appraisals in *some* employment cases, he is only familiar with the fact patterns associated with those cases "in general terms," to wit: "as an estimate of what would have been earned by the plaintiff versus what the alternative employment may be . . . ."  (Id. at 23-24.)  He admitted, however, that he is "not qualified to make an assessment of the employability damages associated with Mr. Maury's ability to continue his career."  (Id. at 35.)

Crakes employed two alternative methods to determine Maury's alleged net economic loss. He based the first method on a generic estimate of the earnings of a "male with an associate's

---

[1] On March 16, 2005, the Court granted Defendant's Motion for Summary Judgment as to Count Two of the Second Amended Complaint, which alleged a violation of section 31-51q of the Connecticut General Statutes.  (Dkt. #83.)

[2] Plaintiff was 45 years old at the time of his layoff.

[3] Portions of Crakes's deposition transcript cited herein are attached as Exhibit A.

degree," without regard to position, industry, or any other factors. (Id. at 17, 40, 93.) Using this method, Crakes determined that Maury sustained a net economic loss of $694,652. (See Crakes's Appraisal of Economic Loss, 4/24/03, at 5.)[4]

Crakes based his second method on projected annual earnings of $28,333. (See id.) He arrived at this figure by annualizing Maury's receipts of $9,350 in self-employment over a four-month period, but disregarded the fact that he had earned approximately $51,000 in 2001 and $69,000 in 2000. (Crakes Dep. 43-45.) Using this method, Crakes determined that Maury sustained a net economic loss of $1,027,606. (See Crakes's Appraisal of Economic Loss, 4/24/03, at 5.)

### A.    Assumptions upon which Crakes based his Analysis

Under both methods, Crakes made several assumptions that are crucial to his analysis, including:

- that Maury would have remained a CSC employee until age sixty-five (Crakes Dep. at 33);

- that Maury will never in the future find alternate employment comparable to his former position at CSC (Id. at 45-46);

- that Maury will remain physically and mentally capable of working for CSC in the same capacity until age sixty-five (Id. at 37);

- that Maury would never have been laid off from CSC (Id. at 35);

---

[4] Crakes's Appraisal of Economic Loss is attached as Exhibit B.

- that Maury would never have been fired from CSC (Id. at 37); and

- that CSC will exist and continue to remain in business until Maury turns sixty-five.

Crakes made these assumptions at the behest of Kate Demitrus, Plaintiff's counsel's paralegal. (Id. at 13, 34, 38, 41, 70.)  Under the first method, Crakes further assumed that Maury's projected income would be representative of generic national averages regarding males with associate's degrees without regard to position, industry, or any other factors.  (Id. at 39, 47-48, 61-64, 69-70, 78-79, 88.)  Under the second method, Crakes assumed that Maury will never find a job making more than $28,333 a year any time in the twenty years following his layoff from CSC.  (Id. at 40.)

B.     **Factual Basis for Crakes's Analysis**

Crakes's report states that it is "an objective estimate of the loss in this case measured as scientifically and accurately *as the data permit*."  (Id. at 29) (emphasis added).  At his deposition, Crakes admitted that his report is "an estimate of loss based upon the information [he] *had been provided with*, and [he is] *relying on the accuracy of that information*."  (Id.) (emphasis added).  He did not independently verify the factual basis of any of that information.  (See id.)  Thus, Crakes based his analysis on unverified assumptions and knew nothing about Maury's job (other than his general understanding that it "involved some type of computer services"), (id. at 11), salaries or job security in Maury's field or in the computer field generally, (id.), Maury's employment history, (id. at 12), or his medical history.  (Id. at 47.)

Crakes's assumptions were simply "inputs" for his arithmetical calculations. Crakes admitted at his deposition that he did not verify the factual basis for those assumptions, that he made those assumptions at the request of Plaintiff's counsel, and that different inputs "would provide a different result." (Id. at 13, 29, 34, 38, 46, 70.) Crakes repeatedly acknowledged that, as a result of his failure to investigate the basis for his assumptions, he had no opinion regarding their reasonableness. (See, e.g., id. at 13, 34, 38.) Crakes further admitted that he is not "qualified to make an assessment of the employability damages associated with Mr. Maury's ability to continue his career." (Id. at 35.)

II.    **ARGUMENT**

   A.    **Legal Standard**

Rule 702 of the Federal Rules of Evidence, amended in 2000 in light of Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999),[5] sets forth the applicable standard by which courts determine whether to exclude the testimony of experts. Fed. R. Evid. 702 (2005). The rule states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts and data, (2) the testimony is the product of reliable principles and

---

[5] In Kumho Tire Co. v. Carmichael, the Supreme Court established that the Daubert test applies not just to scientific testimony, but also to testimony based on 'technical' and 'other specialized knowledge.' 526 U.S. 137, 147 (1999).

methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Id. Courts perform their "gate-keeping" function by assessing whether expert testimony is relevant and reliable. Campbell v. Metro. Prop. & Cas. Ins. Co., 239 F.3d 179, 184 (2d Cir. 2001) (citing Daubert, 509 U.S. at 587).

A proponent of expert testimony bears the burden of demonstrating reliability by a preponderance of the evidence. Travelers Prop. & Cas. Corp. v. Gen. Elec. Co., 150 F. Supp. 2d 360, 363 (D. Conn. 2001). The court has broad discretion in determining whether to admit expert testimony. Gen. Elec. Co v. Joiner, 522 U.S. 136, 141 (1997). However, "[a]dmission of expert testimony based on speculative assumptions is an abuse of discretion." Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 22 (2d Cir. 1996) (citation omitted); Scardina v. Maersk Line, LTD., No. 00-1512, 2002 U.S. Dist. LEXIS 13468, at *4 (E.D. La. Jul. 16, 2002) (noting that an "award of damages cannot be based on evidence that is speculative or purely conjectural").[6]

The test for reliability is "flexible" but "exacting." Daubert, 509 U.S. at 594; Weisgram v. Marley Co., 528 U.S. 440, 454 (2000). A court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho Tire Co., 526 U.S. at 154. However, an expert is expected to apply "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id. at 152.

---

[6] Copies of unreported cases cited herein are attached as Exhibit C.

In <u>Daubert</u>, the Supreme Court posited four factors to aid in the determination of whether

an expert's reasoning or methodology is reliable:

> (1) whether the theory or technique relied on has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error . . .; and (4) whether the theory or method has been generally accepted by the [specialized] community.

<u>Donnelly v. Ford Motor Co.</u>, 80 F. Supp. 2d 45, 48 (E.D.N.Y. 1999) (citing <u>Daubert</u>, 509 U.S. at

593-94).  <u>See also</u>  <u>Total Containment, Inc. v. Dayco Prods., Inc.</u>, No. 1997-cv-6013, 2001 U.S.

Dist. LEXIS 15838, at *22-23 (E.D. Pa. 2001) (agreeing that, with regard to the third factor, a

methodology that employs unsupported and untested assumptions contains an "infinite" margin of

error).

### B.     <u>Crakes's Proposed Testimony is Not Reliable.</u>

In the context of expert testimony regarding future earning capacity, the Second Circuit has

confirmed that such testimony "may be suspect if it is presented by expert witnesses who do not

provide an adequate foundation for the assumptions they make."  <u>Oliveri v. Delta Steamship Lines,</u>

<u>Inc. et al.</u>, 849 F.2d 742, 745 (2d Cir. 1988) (citations omitted).  An expert is expected to conduct

an investigation into the reasonableness of the assumptions on which he bases his findings.

<u>Supply & Building Co. v. Estee Lauder Int'l, Inc.</u>, No. 95 Civ. 8136, 2001 U.S. Dist. LEXIS

20737, at *12 (S.D.N.Y. Dec. 14, 2001) (noting that "[a]ssumptions based on conclusory

statements of the expert's client, rather than on the expert's independent evaluation are not

reasonable") (citation omitted).  Furthermore, experts "should be aware that a party or counsel in a

litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply." <u>Rowe Entm't, Inc. v. William Morris Agency, Inc.</u>, No. 98 Civ. 8272, 2003 U.S. Dist. LEXIS 15976, at *11 (S.D.N.Y. Sept. 16, 2003). Where an expert relies on information supplied by his client, and fails to verify that the information accurately reflects the facts as they exist, his opinion should be excluded. <u>See id.</u> at *33-35; <u>Supply & Building Co.</u>, 2001 U.S. Dist. LEXIS 20737 at *16-17.

Moreover, an expert's assumptions should be reasonable in light of the facts of the case and supported by the evidence as a whole. The Second Circuit has confirmed that "[w]here future lost earnings are at issue, an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding the plaintiff's future." <u>Boucher</u>, 73 F.3d at 21-22 (citing <u>Gumbs v. Int'l Harvester, Inc.</u>, 718 F.2d 88, 98 (3d Cir. 1983) (expert testimony based on assumption that, absent injury, plaintiff would have earned twice his average annual income, should have been excluded because not based on sufficient factual foundation)). In <u>Boucher</u>, the plaintiff had worked sporadically during an eleven-year period before he sustained a disabling injury on the job. <u>Id.</u> at 20. Despite his work history, the plaintiff's expert calculated lost future earnings under the assumption that he would have worked full-time until retirement. <u>Id.</u> at 20-21. The court excluded the expert's testimony because it "was not accompanied by a sufficient factual foundation." <u>Id.</u> at *22. <u>See also</u> <u>Scardina v. Maersk Line, LTD.</u>, No. 00-1512, 2002 U.S. Dist. LEXIS 13468, at *5-9 (E.D. La. Jul. 16, 2002) (excluding expert's testimony regarding future earnings as "purely

speculative," "wildly inflated," and "not sufficiently tied to the facts of supported by the evidence" where selectively based on three months of employment).

Here, Crakes's testimony is not reliable because the assumptions upon which he based his opinion lack any factual foundation. Indeed, he admitted that he made those assumptions simply because Plaintiff's counsel instructed him to do so and that he failed to conduct any independent investigation into the validity of those assumptions. (Crakes Dep. at 13, 29, 34, 38.)

At his deposition, Crakes admitted that he knows nothing about job security in the computer field, (id. at 11), or about Maury's work history, (id. at 12, 35-37), or his medical history. (Id. at 47.) Despite this admitted lack of knowledge, Crakes assumed in preparing his damages calculation that Maury would have remained an employee of CSC until age sixty-five, and that he will not in the future find comparable employment elsewhere. (Id. at 45-46.)

Crakes admitted that he knows nothing about Maury's job with CSC other than that it involved "some type of computer services." (Id. at 11.) He is not familiar with salaries in Maury's particular field or in the computer field generally. (Id.) Rather than investigating these issues, Crakes simply assumed that Maury's potential earning power is reflected in the generic national average of "males with associate's degrees" without regard to employment field, Maury's specific job, or any other factors.

Equally unfounded is Crakes's assumption that Maury would earn only $28,333 per year for the next twenty years. Crakes based this figure on just four months of earnings in 2003, when

Maury was self-employed and earned $9,350. (Id. at 43-45.) He simply divided that figure by .33 to arrive at an annualized income of $28,333.00. (Id. at 45.) Crakes admitted that he has no idea whether, based on Maury's background, education and experience, he is likely in the future to find a job making more than $28,333 a year. (Id. at 46.) He ignored the fact that Maury had earned approximately $51,000 in 2001 and $69,000 in 2000 and assumed, without any factual basis, that Maury will not find comparable employment making a comparable salary in the future. (Id. at 44.) In light of the utter lack of any factual basis for these assumptions, his conclusory opinion is inadmissible. Boucher, 73 F.3d at *22 (excluding expert testimony regarding future earnings based on full-time employment where plaintiff had work history of intermittent employment); Scardina, 2002 U.S. Dist. LEXIS 13468, at *5-9 (excluding expert's testimony regarding future earnings where expert selectively relied on earnings over a three month period and ignored rest of earnings history).

Crakes failed to conduct any independent investigation into the accuracy of the assumptions that formed the basis for his opinions. In this regard, his assumptions were nothing more than unsubstantiated "inputs" he used in his calculations. (Crakes Dep. at 29, 46, 70.) He had no opinion regarding the reasonableness of those assumptions. (See, e.g., id. at 13, 34, 38.) Under Daubert and its progeny, a methodology that is premised on untested assumptions contains an infinite margin of error and, therefore, is unreliable. See Total Containment, Inc., 2001 U.S. Dist. LEXIS 15838 at *21-23 (excluding testimony where expert could not explain why

assumptions were reasonable and agreeing that one "can't employ a methodology that on its face just uses data that's unsupported, untested, and unreliable because the level of risk, the error margin in that data is infinite, because there's no substantiation or no fact base in that data").

In sum, Crakes's "methodology" is really just an exercise in arithmetic. He simply plugged numbers into a formula to arrive at his result, without regard for whether those numbers accurately reflect Maury's particular circumstances or future earning potential. But because his variables have no factual foundation, his result will not assist a trier of fact to understand the evidence or determine a fact in issue. See Fed. R. Evid. 702. Simple mathematical manipulations do not require expert testimony. See Otis v. Doctor's Assocs., Inc., et al., No. 94 C 4227, 1998 U.S. Dist. LEXIS 15414, at *14 (N.D. Ill. Sept. 14, 1998) (rejecting testimony of expert because methodology used was nothing "more than an exercise in arithmetic based on inherently unreliable values").

## III.   CONCLUSION

For all of the foregoing reasons, this Court should grant CSC's Motion in Limine to Exclude Expert Testimony of Gary M. Crakes.

DEFENDANT,
COMPUTER SCIENCES CORPORATION

By _____

        Albert Zakarian (ct#04201)
        Eric L. Sussman (ct#19723)
        Day, Berry & Howard LLP
        185 Asylum Street
        Hartford, Connecticut 06103
        (860) 275-0100
        Its Attorneys

## **CERTIFICATION**

        THIS IS TO CERTIFY that a copy of the foregoing was sent this date, via facsimile and first class mail, postage prepaid, to:

        Peter B. Prestley, Esq.
        Craig Dickinson, Esq.
        Madsen, Prestley & Parenteau, LLC
        44 Capital Avenue, Suite 201
        Hartford, CT  06106

_____
Eric L. Sussman

-12-