Case 3:02-cv-01492-PCD  Document 68-3  Filed 11/21/2005  Page 1 of 17
MAURY vs. COMPUTER SCIENCES CORP.                May 22, 2003

Page 41

1  the time when I performed my analysis, were $28,333,
2  and I was requested to make a calculation based upon
3  his current gross receipts, not his net income, but
4  the gross receipts from his employment, as a measure
5  of his earning capability in alternative employment.
6     Q.    So you made that assumption simply because
7  you were asked to do so?
8     A.    I inquired as to what types of assumptions
9  would be appropriate. I suggested the assumption
10 based upon his level of education, and I also
11 indicated that I requested information as to what
12 his current employment situation happened to be. I
13 did have information from his actual earnings in
14 2002, and I requested information concerning what he
15 had earned to date in 2003. It then was requested
16 that I make a computation based upon his gross
17 income, gross receipts from his self-employment, not
18 his income after expenses. That's what he is
19 currently doing, and that was the alternative
20 estimate.
21    Q.    But why did you -- I understand that you
22 were asked to assume that. My question is: Why did
23 you assume $28,000 a year, as opposed to taking an
24 average over the last several years of what his
25 annual income was, or using some other basis for an

Page 43

1  compensation, and a net loss from his
2  self-employment of $14,665.
3       Q.   What's that net loss based on?
4       A.   His self-employment efforts.
5       Q.   So if we were to take $61,704 and add to
6  it the $4,367, we would get $66,071, and then we
7  would subtract out -- if we subtracted out the
8  $14,665, we get $51,408?
9       A.   406. Assuming your calculations are
10 correct, yes.
11      Q.   So in 2001, even after you subtract what
12 you say his loss was, he's still making about
13 $51,000?
14      A.   Yes. Of course, his employment ended
15 September 21 of 2001 with Computer Sciences
16 Corporation.
17      Q.   Right. In 2000, do you have an
18 understanding as to what Mr. Maury's annual income
19 was?
20      A.   The values associated with the earnings
21 statements that were attached to the 2000 income tax
22 return show $30,289, $28,586, $16,965, and the
23 schedule C net loss of $6,851.
24      Q.   What's your understanding of the net loss
25 again?

SANDERS, GALE & RUSSELL

Page 44

```
 1     A.     $6,851.
 2     Q.     So if we were to add the $30,289, plus the
 3   29 --
 4     A.     $28,586.
 5     Q.     $28,586, plus the $16 --
 6     A.     965.
 7     Q.     -- 965, we get $75,840; is that right?
 8     A.     Yes.
 9     Q.     And then we subtract out the $6,851, to
10   get $68,989?
11     A.     Again, assuming your calculations are
12   correct, yes.
13     Q.     Sound right to you?
14     A.     Approximately, yes.
15     Q.     So in 2001, after you subtract out the
16   loss, he's making about $51,000; and in 2000, after
17   you subtract out losses, he's making about, close to
18   $69,000, and you're basing your entire projection
19   over the next 20 years just on 2002; is that right?
20     A.     I'm not following your question.  No, I'm
21   not basing it on 2002.  I'm basing it on his
22   annualized gross receipts to the date of my report
23   in 2003, which is greater than what he earned in
24   2002.
25     Q.     Okay; and what were those -- what's your
```

SANDERS, GALE & RUSSELL

Case 3:02-cv-01492-PCD   Document 68-3   Filed 11/21/2005   Page 4 of 17
MAURY vs. COMPUTER SCIENCES CORP.                          May 22, 2003

Page 45

1   understanding of his gross receipts in 2003?
2       A.    That by the end of April, $9,350,
3   approximately a third of the year.
4       Q.    So you're saying it's slightly less than a
5   third of the year?
6       A.    Actually, the way to perform that
7   calculation I believe is to take $9,350 and divide
8   by .33.
9       Q.    That's where you got your $28,333?
10      A.    Yes.
11      Q.    So you're basing a projection of future
12  income on what he made in a third of one year?
13      A.    For that alternative, yes. His gross
14  income. His net would be less than that.
15      Q.    In the left-hand column of Exhibit 1 to
16  your report, you assume that Mr. Maury would never
17  in the next 20 years find a job making money
18  equivalent to what he was making while he was at
19  CSC?
20      A.    I've assumed that he has the ability to
21  earn based upon the earnings of a male with his
22  level of education.
23      Q.    If Mr. Maury found a job tomorrow making
24  as much money or more as he made at CSC, would that
25  affect your calculation of loss in this case?

Case 3:02-cv-01492-PCD   Document 68-3   Filed 11/21/2005   Page 5 of 17

MAURY vs. COMPUTER SCIENCES CORP.                                May 22, 2003

Page 46

1     A.     Different assumptions would provide a
2  different result, yes.
3     Q.     A lower number; isn't that right?
4     A.     In that situation, yes.  If he earned less
5  than what's been assumed in my analysis, the loss
6  would be greater.  Different assumptions would
7  provide a different result.
8     Q.     Do you have any understanding as to
9  whether, based on Mr. Maury's background, education
10 and experience, whether he's likely to find a job
11 making more than $28,333 a year?
12    A.     I don't know.  I'm not a vocational
13 expert.
14    Q.     Now, you haven't made any adjustments in
15 your projections from year to year to account for
16 the possibility of death or disability; is that
17 correct?
18    A.     No, I have not.  I have calculated the
19 life expectancy of Mr. Maury, which exceeds age 65.
20    Q.     Was that the sole purpose of calculating
21 the life expectancy, just to make sure he'd live
22 past age 65?
23    A.     Part of the reason, yes.  I typically
24 calculate life expectancies on all reports that I
25 do, and his life expectancy exceeds the point at

Case 3:02-cv-01492-PCD   Document 68-3   Filed 11/21/2005   Page 6 of 17

MAURY vs. COMPUTER SCIENCES CORP.                        May 22, 2003

Page 47

1  which I've stopped the calculation of his earnings
2  loss.
3      Q.   Is there any other reason for your
4  calculation of life expectancy in this case?
5      A.   No.
6      Q.   But you haven't made any adjustments in
7  your projections to account for the possibility of
8  death or disability; is that correct?
9      A.   No, I have not.
10     Q.   Have you reviewed any documents from any
11 physicians concerning the state of Mr. Maury's
12 health?
13     A.   No.
14     Q.   So your calculation of life expectancy was
15 based on what?
16     A.   The experience of the average male of
17 Mr. Maury's age.
18     Q.   Do you have any knowledge as to whether
19 Mr. Maury would fall into the category of what you
20 would call the average male?
21     A.   The average male includes, in essence, the
22 sample includes, the calculation of life expectancy
23 includes everyone, those who are in good health and
24 in bad health.
25     Q.   But do you know whether Mr. Maury's

Case 3:02-cv-01492-PCD   Document 68-3   Filed 11/21/2005   Page 7 of 17
MAURY vs. COMPUTER SCIENCES CORP.                May 22, 2003

Page 48

1   personal circumstances comport with that average?
2       A.   Well, since he's a white male, he would be
3   part of the pool for the calculation of life
4   expectancy. So it includes everyone. If you're
5   asking me if I know if he is exactly in the middle
6   of that range of the sample, no, I don't.
7       Q.   So if an individual had a terminal
8   illness, they wouldn't fall within that average; is
9   that correct?
10      A.   They would fall within the range of the
11  calculations because it includes everyone. Their
12  actual experience might be different from that of
13  the average per se.
14      Q.   So when you say that the average life
15  expectancy for somebody like Mr. Maury is 77 years,
16  that's based on national averages for white men?
17      A.   Yes, of his age.
18      Q.   Of his age; and it doesn't account for the
19  personal circumstances of anybody, of any one
20  individual, correct?
21      A.   Only to the extent that that's captured in
22  the average.
23      Q.   So it takes into account the personal
24  circumstances of the populous at large, but not the
25  personal circumstances of any one individual?

Page 61

1    $13,476.

2        Q.    So you're saying you did the same
3    calculation as you did on page 2, but instead of
4    using $82,444, you used $8,184?

5        A.    Yes.

6        Q.    Please continue.

7        A.    Subtracting that, those expenses, from the
8    future gross discounted earnings results in total
9    net earnings over the future time period of
10   $1,220,206, and that is what is entered at the top
11   of the two columns beginning with Roman numeral III.

12            The next step is the deduction of future
13   alternative earnings. Under the first scenario,
14   it's based upon data for earnings of a male with an
15   associates's degree from the U.S. Bureau of the
16   Census based on a document entitled, "Educational
17   Attainment in the United States."

18       Q.    Do you have that document?

19       A.    I have referenced it and provided the
20   cover page. The document itself has only been
21   updated on the website for the Bureau of the Census.
22   At the time when I performed my analysis, I think it
23   was through 1998. There may be some additional
24   material on that now, but page 9, Exhibit Roman
25   numeral V of my report, is the cover page of the

Case 3:02-cv-01492-PCD  Document 68-3  Filed 11/21/2005  Page 9 of 17
MAURY vs. COMPUTER SCIENCES CORP.                    May 22, 2003

Page 62

1   document, which has not been published since 1994,
2   but updates to the data in it are available on the
3   Census Bureau's website.
4       Q.   Is it your testimony that according to
5   that report, the average male with an associate's
6   degree would earn $780,968 over this time period?
7       A.   The discounted earnings of a male with an
8   associate's degree from the date of the present, and
9   Mr. Maury's age at the date of present, which is
10  46.96, to age 65 would be the $78,968.
11      Q.   So you would use as an exponent the 18.04?
12      A.   Yes. Slightly different calculation here
13  because the Census Bureau provides the median annual
14  earnings of males with an associate's degree by
15  ten-year increments. So there's a value from age 45
16  to 54, and a value from age 55 to 64, and I have
17  employed those values adjusted to current levels in
18  my analysis. So, yes, in principle, that's correct.
19  It's just broken up into two subperiods.
20      Q.   In your notes, have you -- do you have any
21  specificity in that calculation?
22      A.   Page 5 of my notes. If you go to the
23  bottom portion, what I've referred to in my notes as
24  alternative two, earnings as a male with an
25  associate's degree, the median annual earnings in

Case 3:02-cv-01492-PCD  Document 68-3  Filed 11/21/2005  Page 10 of 17
MAURY vs. COMPUTER SCIENCES CORP.                    May 22, 2003

Page 63

1   1998 dollars are provided from age 45 to 54 and 55
2   to 64. I have adjusted those to current values,
3   which appear in the left-hand side of the page,
4   $48,012, and $43,482, and then applied those over
5   the relevant time periods, the period of time until
6   Mr. Maury would attain age 55, and then the ten-year
7   period from age 55 to 65. Adding those two together
8   gives us a value of $780,968.
9        Q.    That's why you did two calculations,
10  because the Census Bureau breaks it down by age?
11       A.    Yes.
12       Q.    Now, the $48,012, is that the present
13  value of -- is that the present value of the $40,689
14  from 1998?
15       A.    Yes.
16       Q.    And the same thing with the $39,920 and
17  $47,104?
18       A.    The $39,920 is the 1998 value. I've
19  adjusted that to a current value of $47,104. That
20  will not begin, however, for another eight years,
21  and I've applied the same assumption with respect to
22  the discount rate over that period of time.
23       Q.    How did you calculate the present values
24  of those numbers?
25       A.    By adjusting them by the same percentage

Case 3:02-cv-01492-PCD    Document 68-3    Filed 11/21/2005    Page 11 of 17
MAURY vs. COMPUTER SCIENCES CORP.                              May 22, 2003

Page 64

1   change in earnings in the private sector.
2       Q.    What did you use as a discount rate?
3       A.    There's no need to discount in the past.
4   The discounting process only applies for the future,
5   and I've made the same assumption. You can see the
6   formula, that the discount rate will exceed the rate
7   of growth in earnings by 1 percent.
8       Q.    Let me ask it a different way. Maybe my
9   question wasn't clear. How did you get from $40,689
10  to $48,012? Did you do a calculation, or was that
11  something that you got from one of these tables?
12      A.    I did a calculation based on data from the
13  Bureau of Labor Statistics.
14      Q.    Would you be able to walk me through that
15  calculation?
16      A.    I did it by hand on my calculator. I can
17  tell you how I did it. I don't have the specific
18  numerical values written in.
19      Q.    Please do.
20      A.    The value for hourly earnings in the
21  private sector in 2003 would be divided by the value
22  of hourly earnings in the private sector in 1998.
23  That would give us the percentage increase in
24  private sector earnings over that period of time.
25  When I applied that to the $40,689, I get $48,012,

Case 3:02-cv-01492-PCD    Document 68-3    Filed 11/21/2005    Page 12 of 17
MAURY vs. COMPUTER SCIENCES CORP.                                May 22, 2003

Page 69

1   for all 20 years?
2       A.   It's not a maximum contribution. It's a
3   mandatory contribution. .3 percent is the employee
4   contribution. Some pension programs, of course, are
5   noncontributory. The program with Computer Sciences
6   Corporation was contributory, and I did deduct the
7   contribution that would have had to have been made
8   by Mr. Maury.
9       Q.   So is it your understanding that
10  Mr. Maury, if he wanted to participate -- strike
11  that.
12           You assumed that he would decide to
13  participate in the pension plan for all 20 years?
14      A.   My understanding of most defined benefit
15  plans is the participation isn't necessarily
16  voluntary, that is, that it's unlike a 401(k) or a
17  defined contribution. With a defined benefit plan,
18  one has the -- that's a part of one's fringe benefit
19  package, and my understanding was that was available
20  to Mr. Maury through his employment. But, yes, I
21  have assumed he would be a participant.
22      Q.   For the duration of his employment?
23      A.   Yes.
24      Q.   But you don't know one way or the other
25  whether or not he would be allowed to decline

Case 3:02-cv-01492-PCD  Document 68-3  Filed 11/21/2005  Page 13 of 17
MAURY vs. COMPUTER SCIENCES CORP.                     May 22, 2003

Page 70

1    participation in the pension plan?
2        A.    I don't know that that's the case.  It was
3    my understanding that this was part of his fringe
4    benefit package.
5        Q.    You don't know whether or not he could
6    have chosen to contribute a lesser amount?
7        A.    I don't think that's -- in most defined
8    benefit plans, that's not an option.  You're in or
9    you're out.
10       Q.    But you don't know one way or the other in
11   this case?
12       A.    The information I was provided with is
13   that he was a participant in the pension plan.
14       Q.    But you don't know whether or not he could
15   have, if he so chose, contributed a lesser amount?
16       A.    No, I don't know.  I would be surprised if
17   he could have, but I don't know.
18       Q.    If he could contribute a lesser amount, or
19   if he could choose not to participate and did so
20   choose, that would lower the estimate of the pension
21   benefits, correct?
22       A.    Different assumptions would provide a
23   different result.
24       Q.    And a lower result in that instance?
25       A.    In that instance, yes, it would.

Case 3:02-cv-01492-PCD   Document 68-3   Filed 11/21/2005   Page 14 of 17
MAURY vs. COMPUTER SCIENCES CORP.                                May 22, 2003

Page 78

1   A.   Because I don't know specifically what
2   fringe benefits, if any, will be available to
3   Mr. Maury through alternative employment.
4   Q.   Is that average based on the state of
5   Connecticut, or is it based on a national average?
6   A.   It's a national average.
7   Q.   For all employment with men with
8   associate's degrees?
9   A.   No. It's for workers in the United
10  States.
11  Q.   For all workers in the United States?
12  A.   That's correct.
13  Q.   And not necessarily those who have certain
14  degrees?
15  A.   That's correct.
16  Q.   Is it your opinion that Mr. Maury's
17  projected benefits would reflect the national
18  average?
19  A.   I don't know what benefits he will have
20  through his alternative employment. Certainly the
21  second alternative, we could have assumed zero
22  fringe benefits, because it's based on
23  self-employment; but it is an average based on
24  workers in the U.S.
25  Q.   But my question is: Is it your opinion

Case 3:02-cv-01492-PCD   Document 68-3   Filed 11/21/2005   Page 15 of 17
MAURY vs. COMPUTER SCIENCES CORP.                          May 22, 2003

Page 79

1   that Mr. Maury's projected benefits would reflect
2   the national average?
3       A.   That is the only basis upon which I can
4   make an estimate, because I don't know what his
5   actual alternative employment will be, so I have
6   relied on the national averages for fringe benefits
7   associated with employees in the U.S.
8       Q.   Do you have an opinion on whether
9   Mr. Maury's projected benefits would reflect the
10  national average?
11      A.   I based it on the national average.  That
12  is my opinion.
13      Q.   Your opinion is that they would reflect
14  the national average, or you don't have an opinion,
15  but you're just using the national average?
16      A.   I don't know what his actual alternative
17  employment will be.  Therefore, as with the median
18  earnings of males with associate's degrees, I've
19  replied on national data with respect to likely
20  levels of fringe benefits.
21      Q.   So you don't have an opinion on whether
22  projected benefits for Mr. Maury would reflect the
23  national average?
24      A.   I'm not sure I understand the question.  I
25  don't know exactly what his fringe benefits will be.

1  Q.  If the assumption were not accurate, in
2  other words, if his position didn't exist any
3  longer, that would change the number that you have
4  put there, correct?
5  A.  If we assumed that he did not have the
6  ability to continue that employment, that's correct.
7  Q.  When you say the ability, you mean for
8  reasons of his own, or for reasons that the company
9  may have?
10  A.  Potentially, yes.
11  Q.  Turning to page 5 of Exhibit D, I know you
12  walked me through earlier the earnings of a male
13  with an associate's degree, and you mentioned that
14  these are based on the national median, correct?
15  A.  Median annual earnings, yes.
16  Q.  Why did you assume that Mr. Maury would
17  make the median?
18  A.  It's an approximation of his earning
19  potential with his level of education.
20  Q.  But not based on his particular industry?
21  A.  That's correct.  It's not occupation
22  specific.
23  Q.  And not based on his particular
24  background?
25  A.  Other than his having an associate's

1   A.   By educational level, no, I do not.

2   Q.   I understand that you have done an
3   analysis based on average males with associate's
4   degrees in your calculations?  That's correct, yes?

5   A.   Median earnings of males with associate's
6   degrees, yes.

7   Q.   Have you done any analysis of what
8   somebody with Mr. Maury's particular background,
9   education and experience, over and above his status
10  as a male with an associate's degree, would likely
11  earn over time?

12  A.   Only to the extent that I have considered
13  his actual current employment and earnings.

14  Q.   But nothing over and above that?

15  A.   That's correct.

16  Q.   If I could direct your attention now to
17  Exhibit E.

18  A.   Yes.

19  Q.   On the first page of Exhibit E, you have
20  some calculations of adjusted gross income between
21  '99 and 2001; is that right?

22  A.   Yes.  That first page is a summary of the
23  income tax returns for Mr. Maury.

24  Q.   What was the purpose?  What was your
25  purpose in compiling this document?