LEXSEE 2002 US DIST LEXIS 13468

**MICHAEL J. SCARDINA versus MAERSK LINE, LTD.**

CIVIL ACTION NO. 00-1512 SECTION: E/2

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

*2002 U.S. Dist. LEXIS 13468*

July 15, 2002, Decided
July 15, 2002, Filed; July 16, 2002, Entered

**DISPOSITION:** [*1] Defendants' motion in limine to limit the testimony of plaintiff's expert GRANTED. Defendants' motion in limine to exclude the report and testimony of plaintiff's expert GRANTED.

**LexisNexis(R) Headnotes**

**COUNSEL:** For MICHAEL L SCARDINA, plaintiff: Gordon Wright Matheny, Gordon W. Matheny, Attorney at Law, Hammond, LA.

For MICHAEL L SCARDINA, plaintiff: Jack W. Harang, Law Office of Jack W. Harang, Metairie, LA.

For MICHAEL L SCARDINA, plaintiff: Richard Hobbs Barker, IV, Smith & Harang, LLC, New Orleans, LA.

For WIEDEMANN & WIEDEMANN, intervenor: Lawrence D. Wiedemann, Wiedemann & Wiedemann, New Orleans, LA.

For MAERSK LINE LTD, defendant: Peter B. Tompkins, Scott E. Oliphant, Murphy, Rogers & Sloss, New Orleans, LA.

**JUDGES:** MARCEL LIVAUDAIS, JR., Senior United States District Judge.

**OPINIONBY:** MARCEL LIVAUDAIS, JR.

**OPINION:**

### RULING ON MOTIONS

The following motions in limine filed by defendant are before the Court: (1) motion to strike the report and testimony of Dr. Fereydoun Aghazadeh (R.D. # 83); and (2) motion to limit testimony of G. Randolph Rice (R.D. # 82). Plaintiff [*2] opposes the motions, which were taken under submission on the briefs on July 10, 2002.

This matter is set for a jury trial on July 22, 2002.

### BACKGROUND

Mr. Scardina is a merchant seaman, a 3rd assistant engineer, who signed on the M/V MAERSK TEXAS as a QMED/Electrician on about February 12, 2000. He alleges that on February 29, 2000, as he was entering the control room of the vessel, he stepped onto a raised stepping block outside the control room door, lost his balance and fell, striking his lower back on the corner of the step and causing a low back injury.

### ANALYSIS

*Fed. R. Evid. 702* permits opinion testimony of an expert witness if that testimony will assist the trier of fact to understand the evidence or determine a fact in issue, and "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is a product of reliable principals and methods, and (3) the witness has applied the principals and methods reliably to the facts of the case." The proffered witness must first be qualified as an expert by knowledge, skill, experience, training, or education, and second, the proffered expert's opinion, inference or other testimony must be based [*3] on scientific, technical or other specialized knowledge that will assist the trier of fact to understand the evidence or determine a fact at issue. *Moore v. Ashland Chemical, Inc., 126 F.3d 679, 684 (5th Cir.), aff'd. en banc, 151 F.3d 269 (5th Cir. 1998).*

The Federal Rules of Evidence require the trial judge to ensure that expert testimony or evidence presented to the jury is not only relevant, but reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 2794, 125 L. Ed. 2d 469 (1993); Moore, 126 F.3d at 684.* The trial judge must determine whether the reasoning or methodology underlying the proffered expert testimony is valid under the principles of the discipline involved in order to determine whether the expert (1) is proposing to testify to scientific, technical or other specialized knowledge, that (2) will assist the trier of fact to

Case 3:02-cv-01492-PCD    Document 68-5    Filed 11/21/2005    Page 2 of 10

Page 2
2002 U.S. Dist. LEXIS 13468, *3

understand or determine a fact in issue. *Daubert, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469* In other words, the proffered expert testimony must be sufficiently tied to the facts of the case that it will aid the trier of fact in resolving a factual dispute. Id. [*4] at 2795. An award of damages cannot be based on evidence that is speculative or purely conjectural. *Masinter v. Tenneco Oil Co., 929 F.2d 191, 194 (5th Cir. 1991)*, citing *In Re Air Crash Disaster at New Orleans, Louisiana, 795 F.2d 1230, 1235 (5th Cir. 1986)* and *Haley v. Pan American World Airways, Inc., 746 F.2d 311, 316 (5th Cir. 1984)*.

*Testimony of G. Randolph Rice*

Dr. Rice, plaintiff's expert economist, is expected to testify as to plaintiff's economic damages, that is, lost past and future income. In a report dated December 12, 2001, Dr. Rice set forth various projections using an annual wage base of approximately $30,000.00. n1 Plaintiff's average annual earnings in the three to five years preceding the accident were approximately $26,000.00. His annual earnings for the five years from 1994 through 1999 varied from a low of $15,895.43 in 1995 to a high of $39,536.06 in 1996. n2 On April 29, 2002, n3 Dr. Rice produced a second report at the request of plaintiff's counsel. n4 This report based plaintiff's "impairment of earning capacity" on projected annual incomes of $38,481.00 and $76,962.00, which of course produced [*5] much higher economic damages.

n1 Exhibit A to defendant's motion.

n2 Exhibit D to defendant's motion – Summary of Social Security Earnings.

n3 Defendant also argues that this expert report should be excluded because it was provided to him nine days past the deadline for plaintiff to produce expert reports. The Court does not reach this argument as its ruling is based on other reasons.

n4 See Exhibit B to defendant's motion – letter from Mr. Barker to Dr. Rice dated January 29, 2002.

Defendant argues that these numbers are not supported by any evidence, are purely speculative and "wildly inflated" and should be excluded. Plaintiff notes that defendant did not attack Dr. Rice's calculations which were made pursuant to generally accepted accounting principals of economics. It is not the calculations that defendant objects to, it is the underlying assumptions of plaintiff's projection annual income on which those calculations are based. Plaintiff argues that using $38,481.00 as a base wage is justified [*6] because he had actually demonstrated the historical exercise of his capacity to earn those wages on one occasion while working for only three months in 1997. Using that amount as a springboard, plaintiff further argues that his recent receipt of a PIC n5 certificate could double his earning capacity since some employment contracts requiring a 3rd assistant engineer with a PIC certificate, call for 100%, or even 150% overtime whereas in the past he could get only 50% overtime.

n5 Person In Charge of Hazardous Cargo, including hazardous liquids.

Mr. Scardina argues that those potential wages are supported by evidence because he will testify at trial that he has seen postings at the union hall for such positions, and it is possible that in his future employment he will be paid at the exact same rate of pay as he demonstrated his ability to earn in 1997 as a 3rd Assistant engineer, and he believes that it will be easier for him to find such work due to the availability of higher paying jobs for 3rd assistant engineers [*7] with a PIC certificate. According to plaintiff, this provides a reasonable foundation to assume that, unlike his past employment history, he now would always be able to sail six months per year earning at that rate while also being paid for six months vacation time. The Court disagrees.

For whatever reasons, plaintiff's employment records from 1990 through 1999 demonstrate a sporadic work and earnings history. During that period, his annual earnings varied from $12,851.00 in 1993 to $39,536.06 in 1996. His average annual income for the last nine years before his accident was $28,416.00. It is true that plaintiff demonstrated that it was possible for him to actually earn in one year, $38,900.00 because he did so in 1997. On the other hand, it is also possible for him to actually earn only $15,895.43, as he did the following year, 1998. Plaintiff asks the Court to assume that in the future a high paying employment contract requiring a PIC and providing 100% to 150% overtime would always be available, that he would always be hired for that contract, and that, unlike his practice in the past, he would have always worked to his full capacity, for his future work-life expectancy of [*8] 9 years. Even assuming Mr. Scardina testifies at trial to his personal knowledge that such jobs exist, such a scenario is pure speculation and, even acknowledging his recent receipt of the PIC certificate, is not supported by the evidence of his past work history.

Plaintiff next argues that it is for the jury to determine, under the facts of the case, which of the three alternative earnings assumptions is most accurate. He argues that he will testify at trial as to the reasons for his past somewhat erratic work history — that he took time off to study for the PIC certificate and to care for his daughter "who was

in trouble." He again assumes, and asks the Court to assume, that because those particular distractions no longer exist, he will always work steadily in the future, and always at the higher wages. Again, this scenario is based on speculation that in the future there will be no more family problems, nor any other distractions to influence plaintiff's future work performance.

It is the provenance of the Court to assure that an expert's testimony is not based on evidence that is speculative or conjectural, but is sufficiently tied to the facts of the case so that it will actually [*9] assist the trier of fact in resolving a factual dispute or to understand the evidence. *Daubert, 113 S. Ct. at 2795*. The Court concludes that Dr. Rice's testimony as to his supplemental opinion based on plaintiff's projected annual incomes of $38,000.00 and nearly $77,000.00 is not sufficiently tied to the facts or supported by the evidence available to the Court at this time, and is therefore excluded, subject to the Court's reconsideration of the issue should evidence introduced at trial provide sufficient factual basis for such testimony.

*Report and testimony of Dr. Fereydoun Aghazadeh*

Dr. Aghazadeh is identified as plaintiff's expert Industrial Engineer/Ergonomist. n6 Dr. Aghazadeh's report states in pertinent part as follows:

> Given the dimensions of the block, the place where he had placed his right foot, and his height, it is very likely that his lower back collided with the block. It appears that Mr. Scardina's fall was due to fatigue, coordination impairment, and drowsiness/grogginess. I believe that the workplace was unreasonably dangerous due to the physical and mental condition of Mr. Scardina and the sustained injury is attributed [*10] to his work.

Report dated May 20, 2002, at p. 2, emphasis added.

> n6 Again, defendant argues that Dr. Aghazadeh's report and testimony should be excluded because his report was provided to defendant 30 days after plaintiff's deadline to provide its expert reports to defendant. Again, the Court does not address this argument because its ruling is based on other reasons.

Defendant argues that while Dr. Aghazadeh has extensive education and experience in ergonomics, industrial engineering, biomechanics and workplace design, he has no education, training or experience in any medical or pharmaceutical field. Dr. Aghazadeh opined, however, that Mr. Scardina's accident was due to his physical and mental impairments, not to the design or construction of the stepping block in front of the control room hatch. In fact, other than describing the dimensions of the stepping block on which Mr. Scardina allegedly fell, he expresses no opinion at all that the workplace was unreasonably dangerous because of its particular [*11] design or construction.

Plaintiff argues that Dr. Aghazadeh did not render an opinion in the field of pharmacology, but simply accepted as true the facts recited by Mr. Scardina that his fall was caused by his impaired physical condition, and that his impaired physical condition rendered the workplace unsafe. He submitted a letter from Dr. Aghazadeh dated July 11, 2002, in which Dr. Aghazadeh clarifies his prior report as follows:

> As he lifts his left foot to bring it forward, and while the left foot is off the ground and his weight is on his right foot, he collapses. ... Given the height of Mr. Scardina, applying the data from the anthropometric tables, and using the empirical evidence for subject experimentation and accident recreation, we can conclude that Mr. Scardina's back came in contact with the stepping block ...
>
> ...
>
> ...I accepted the testimony of plaintiff and his pharmacologist that Mr. Scardina was drowsy and groggy and his coordination was impaired due to the medications. Based upon these facts, I feel that the workplace was unreasonably dangerous.

Again, Dr. Aghazadeh states that, in his opinion, the workplace was unreasonably dangerous due to Mr. Scardina's [*12] physical and mental impairments, not due to the design or construction of the workplace itself. He does not state that the workplace was unreasonably dangerous because Mr. Scardina's fall due to the fact that the step on which he fell was to high or too narrow or unable to safely support a person's weight. He states simply the Mr. Scardina struck his back because he collapsed while on the step due to his physical and mental impairments. The Court considers that most workplaces would be unreasonably dangerous to someone who is "drowsy and groggy" and is therefore likely to fall or collapse at any time and in any place. The Court concludes that Dr. Aghazadeh's testimony will not actually assist the trier of fact in understanding the evidence or resolving a factual dispute in this case.

Accordingly, for the foregoing reasons,

Case 3:02-cv-01492-PCD    Document 68-5    Filed 11/21/2005    Page 4 of 10

Page 4
2002 U.S. Dist. LEXIS 13468, *12

**IT IS ORDERED** that defendants' motion in limine to limit the testimony of plaintiff's expert economist, G. Randolph Rice, to his report dated December 12, 2001, is **GRANTED** subject to the Court's reconsideration at trial if warranted; and

**IT IS FURTHER ORDERED** that defendants' motion in limine to exclude the report and testimony of plaintiff's [*13] expert industrial engineer/ergonomist, Dr. Fereydoun Aghazadeh is **GRANTED.**

New Orleans, Louisiana, July 15, 2002.

MARCEL LIVAUDAIS, JR.

Senior United States District Judge

LEXSEE 2001 U.S. DIST. LEXIS 15838

TOTAL CONTAINMENT, INC. v. DAYCO PRODUCTS, INC.

CIVIL ACTION NO. 1997-cv-6013

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*2001 U.S. Dist. LEXIS 15838*

September 6, 2001, Decided
September 6, 2001, Filed; September 6, 2001, Entered

**DISPOSITION:** [*1] Defendant Dayco Product's Motion in Limine GRANTED.

**LexisNexis(R) Headnotes**

**COUNSEL:** For TOTAL CONTAINMENT, INC., PLAINTIFF: PHILIP G. KIRCHER, JENNIFER DUFAULT JAMES, RALPH G. WELLINGTON, MARGARET S. WOODRUFF, J. ROBERT STOLTZFUS, THOMAS S. BLOOM, SCHNADER, HARRISON, SEGAL & LEWIS, PHILA, PA USA.

For DAYCO PRODUCTS, INC., DEFENDANT: NATHAN A. SCHACHTMAN, McCARTER & ENGLISH, PHILA, PA USA.

For DAYCO PRODUCTS, INC., DEFENDANT: GLENN P. CALLAHAN, MC CARTER & ENGLISH, PHILA, PA USA.

For DAYCO PRODUCTS, INC., DEFENDANT: MARK L. MANEWITZ, MICHAEL T. HEYRICH, FRANK E. DERBY, CYNTHIA V. FITZGERALD, JAMES J. SAVAGE, SKADDEN, ARPS, SLATE, MEAGHER, AND FLOM, LLP, NEWARK, NJ USA.

For DAYCO PRODUCTS, INC., DEFENDANT: JOHN A. AMODEO, SKADDEN, ARPS, SLATE, ET AL., WASHINGTON, DC USA.

For DAYCO PRODUCTS, INC., DEFENDANT: EDWARD V. FILARDI, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP, NEW YORK, NY USA.

**JUDGES:** Berle M. Schiller, J.

**OPINIONBY:** Berle M. Schiller

**OPINION:**

**MEMORANDUM AND ORDER**

**SCHILLER, J.**

September 6, 2001

**INTRODUCTION**

On May 3, 2001, I ordered remittitur of all but $1,325,808 of Total Containment's (TCI) $23,000,000 verdict against Dayco or a partial retrial of [*2] this action limited to the assessment of damages incurred due to Dayco's breach of a 1993 Supply Agreement between the parties. For the retrial, TCI proffered a June 2001 Supplemental Report ("The June 2001 Report") by its economic expert, Dr. William Latham, III linking a portion of its lost sales and profits to Dayco's price increase. By Memorandum Order on July 19, 2001, I found TCI could try to establish that link at retrial. Dayco then moved to exclude Dr. Latham's testimony on the basis that his latest opinion on lost sales failed to satisfy the criteria of *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)*. I held a "Daubert" hearing at which both Dr. Latham and Dayco's economic expert, Dr. Geoffrey Osborne, testified as to the reliability of Dr. Latham's economic analysis. However, because Dr. Latham's arrived at his expert opinion by an unreliable methodology, I rule that he may not testify as to the contents of his June 2001 report reflecting lost sales and profits.

**I. BACKGROUND**

Pursuant to the 1993 Supply Agreement, Dayco charged $3.75 for each linear foot of Dayco's primary pipe. n1 On August 2, 2001, Dayco [*3] mailed a letter to TCI advising TCI that the price per foot of primary pipe would be raised to $5.00. Following talks between Dayco and TCI, Dayco lowered the price to $4.40. TCI yielded and purchased the primary pipe at $4.40.

Case 3:02-cv-01492-PCD    Document 68-5    Filed 11/21/2005    Page 6 of 10

Page 2
2001 U.S. Dist. LEXIS 15838, *3

n1 Dayco had previously asserted that the 1993 Supply Agreement fixed $4.19 as the cost per foot for the primary pipe. However, in a memorandum Dayco advised the Court that it was willing to agree that the price in effect as of August 2, 1995 was $3.75 per foot. See Dayco's Memorandum and Opposition to TCI's Motion in Limine to Preclude Dayco Products, Inc. from Relitigating the Existence of the Supply Agreement and the Contract Price, and to Preclude the Testimony of Richard Bing, at 2 (doc. 246-1, August 8, 2001).

TCI sued Dayco, alleging that Dayco had breached warranty and price provisions of the 1993 Supply Agreement. At the first trial, TCI sought direct damages in the amount of $1,325,808 — the total "overcharge" on the primary pipe. However, TCI did not explicitly pursue [*4] consequential damages as a result of the price increase at the first trial. Rather, TCI sought compensation for lost profits and sales without specifying whether those losses were ascribable to their breach of warranty claim or their breach of pricing claim. n2

n2 As discussed in my July 19, 2001 Memorandum, TCI's earlier representations as to the cause of their lost profits were hardly a model of consistency or clarity.

Consonantly, Dr. Latham's earlier expert reports lacked any suggestion that the price increase caused TCI to suffer consequential damages in the form of lost profits or sales. Indeed, at the fall of 2000 trial, Dr. Latham testified, "With the price increase, that was all in the past. So there are no future damages at all." See Tr. Trans. Nov. 3, 2000, at 29. Dr. Latham's report contained many references to the "pipe problem" — evidently his shorthand for the alleged defects in the Dayco primary pipe n3 — as the source of TCI's future losses.

n3 See e.g. Tr. Trans., Nov. 3, 2000, at 16 ("One of the costs that TCI has suffered is in the area of profits they've lost on sales they haven't been able to make because of the defective pipe problem").

[*5]

The first jury found TCI's claim time-barred and awarded it $23 million on its pricing claim. However, because nothing on the record at the first trial supported an award of that magnitude, I ordered remittitur or a new trial limited to assessing damages on TCI's breach of pricing claim.

TCI opted for a new trial. It now explicitly seeks both direct and consequential damages (i.e. lost sales and profits) on its breach of pricing claim. To that end, TCI elicited a supplemental report from Dr. Latham ascribing a portion of TCI's lost profits to the price increase. Contradicting his testimony at the October 2000 trial, Dr. Latham now opines that TCI lost sales and profits as a result of Dayco's price increase. He divided TCI's buyers into two categories: major oil companies and small convenience store operations. Dr. Latham and TCI admit that TCI cannot prove lost sales of the Enviroflex system to major oil companies which use long term contracts less susceptible to price fluctuations.

For the independent jobber market, or that part of the market which excludes major oil companies and includes convenience stores, Dr. Latham attempted to construct a model of the market share percentages [*6] of TCI and its competitors in the years immediately preceding and following the price increase. Dr. Latham claims that such data was not readily available, so Dr. Latham searched for total sales figures by TCI and its two main competitors in the independent jobber market: Advanced Polymer Technologies (APT) and Environ. TCI handily provided him with information regarding its own sales; hard data on APT and Environ sales proved more elusive. Relying on representations by TCI employees, he concluded that APT "was selling only into this jobber market and not into the major oil market." Daubert Hrg. Trans. at 13. He then incorporated into his data pool APT's total sales figure of $11 million from a Dun and Bradstreet report. He based his sales figures for Environ from a former Environ salesperson whom TCI had hired. The employee had brought a great deal of Environ sales data with him during his move to TCI. He also claims to have consulted trade journals. Using the raw total sales data, he then determined the volume and percentage of each company's sales into the independent jobber market.

Comparing TCI's market share percentage in 1994 with its actual percentage of sales in 1996 [*7] and 1997, he opined that TCI lost $1,195,000 in sales within the independent jobber market during 1996 and 1997. Then, relying on assertions by TCI marketing personnel, he claimed that TCI would have retained 80% of its customers from year to year and concluded that TCI lost sales of $1,710,000 from 1997 through 2000.

Dayco moved to preclude Dr. Latham from testifying as to lost sales at the upcoming trial. At the Daubert hearing, Dayco probed into the reliability of Dr. Latham's methodology through the testimony of its own economic expert, Mr. Osborne. Mr. Osborne, a certified public accountant, works as a financial adviser at Price WaterhouseCoopers. He specializes in damage assessment and investigations and has been involved in over

200 determinations of lost profits. Mr. Osborne criticized Dr. Latham for using 1994 as a base year instead of 1995, the year in which Dayco announced the price increase. A study of TCI's 1995 sales figures, Mr. Osborne noted, shows that TCI began to lose sales well before the price increase was announced in August 1995 and before the first payments were due in October 1995. He also faults Dr. Latham for using the Dun and Bradstreet report as [*8] the sole source of APT's sales into the independent jobber market. Such sources are not the type which a professional economist would rely upon in conducting a market share analysis to determine lost profits. In sum, Dayco argues, these errors reduce Dr. Latham's analysis to mere speculation, and his testimony at trial would prejudicially provide a "patina" of economic legitimacy to an unsupported damage claim.

## II. DR. LATHAM'S TESTIMONY FAILS TO MEET THE RELIABILITY REQUIREMENTS OF *DAUBERT v. MERRELL DOW PHARMACEUTICALS*.

### A. Daubert

District court judges serve as evidentiary screens or gate keepers to prevent the introduction of purported expert testimony reached without proper scientific foundation. *See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993); In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 743 (3d Cir. 1994)*("Paoli"). The gate keeping function assigned to district court judges is now also applied to non-scientific experts such as economists. *See Elcock v. Kmart Corp., 233 F.3d 734, 744 (3d Cir. 2000)*(citing *Kumho Tire v. Carmichael, 526 U.S. 137, 141, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999)*. [*9] Whether an expert may testify is entrusted to the trial judge's discretion. *See Kumho Tire, 526 U.S. at 152; Elcock, 233 F.3d at 740-41* However, a court must be careful not to exclude evidence solely on the basis of the general credibility of an expert's testimony. *See Elcock, 233 F.3d at 751 n.8.*

*Federal Rule of Evidence 702* was recently amended to reflect the district court's gatekeeping role under *Daubert* and its progeny:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

As under the precursor to the current Rule, a court must conduct a threefold inquiry before permitting expert testimony. It must: come from a qualified expert witness, be based on [*10] reliable methods, and "fit" the facts of the case. *See Paoli, 35 F.3d at 741-43; Saldana v. Kmart Corp., No. 99-4055, 260 F.3d 228, 2001 U.S. App. LEXIS 16583 (3d Cir. Jul. 23, 2001)*. The present inquiry focuses on the reliability and fitness of Dr. Latham's methods and conclusions.

While the proponent of an expert need not prove that his or her opinions are correct, it must prove, by a preponderance of the evidence, that his or her testimony is reliable. *See Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999); Paoli, 35 F.3d at 743*. The Supreme Court has emphasized that the test for reliability is an "exacting" one. *Weisgram v. Marley Co., 528 U.S. 440, 451, 145 L. Ed. 2d 958, 120 S. Ct. 1011 (2000)*, and the expert will be held to intellectual rigor of his field. *See Kumho Tire, 526 U.S. at 152 (1999);* Margaret A. Berger, *The Supreme Court's Trilogy on the Admissibility of Expert Testimony, in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, at 19 (Federal Judicial Center, 2d ed. 2000); The Supreme Court and the Third Circuit have, combined, established eight criteria to [*11] determine the reliability of expert testimony: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. *See Paoli, 35 F.3d at 742 n.8.* These factors do not constitute a "definitive checklist or test." *Kumho Tire, 526 U.S. at 150* (quoting *U.S. v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985))*.

Courts must also assess whether the expert relied on data reasonably used by economic experts and had good grounds to rely on such data in drawing conclusions. *See Oddi v. Ford Motor Co., 234 F.3d 136, 146 (3d Cir. 2000); Paoli, 35 F.3d at 749.* Nothing requires a court to accept an opinion tied to existing data only through an expert's "ipse dixit." *General Elec. Co. v. Joiner, 522 U.S. 136, 118 S. Ct. 512, 519, 139 L. Ed. 2d 508 (1997).* [*12] To that end, the Third Circuit has found that an expert may not testify where an economic expert's testimony rests on

Case 3:02-cv-01492-PCD   Document 68-5   Filed 11/21/2005   Page 8 of 10

Page 4
2001 U.S. Dist. LEXIS 15838, *12

faulty assumptions. *See, e.g. Elcock, 233 F.3d at 754-55.* "Although mathematical exactness is not required, expert testimony of post-injury earning capacity must be based upon the proper factual foundation." *Elcock, 233 F.3d at 754* (quoting *Benjamin v. Peter's Farm Condo. Owners Ass'n., 820 F.2d 640, 643 (3d Cir. 1987)).* Thus, in *Elcock,* the Third Circuit ordered the exclusion of economic expert evidence which set the plaintiff's potential earnings at $12,000 a year where the record showed that the plaintiff made only $5,574 in the year preceding her injury.

Other courts have not hesitated to exclude an economic expert where their testimony is not supported by sufficient evidence or engaged in mere speculation. *See e.g. Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1056 (8th Cir. 2000)* (exclusion warranted where esteemed economic expert Robert Hall had not considered all relevant facts in relevant market when performing market share analysis); *Target Market Publishing v. ADVO, Inc., 136 F.3d 1139, 1143 (7th Cir. 1998)* [*13] (where economic expert's projections of lost profits unsupported and based on mere speculation, district court may exclude proposed testimony); *Boucher v. United States Suzuki Motor Corp., 73 F.3d 18, 21-22* (approving exclusion of testimony based on conjecture and faulty assumptions); *JMJ Enters. v. Via Veneto Italian Ice, 1998 U.S. Dist. LEXIS 5098,* at *18-19, 97-0652 (E.D. Pa. Apr. 15, 1998) ("JMJ") (Kelly, J.). Particular instructive is *JMJ.* The court excluded JMJ's damages expert because the expert relied on the plaintiff's tax returns without independent verification — despite the fact that plaintiff had admitted that not all sales were properly recorded. *See id.* at *19. Furthermore, the expert conducted no independent market survey or study, though the expert knew little about the market and these are common tools to predict the potential of any business. *See id.* at *20. The court found the expert had violated a professional guideline requiring greater attention be given to those assumptions with a greater impact on prospective results. *See id.* at *21 (quoting American Institute of Certified Public Accountants Guideline 6.31). [*14]

### B. Application

Dr. Latham's opinions on lost sales contained in his June 2001 Supplemental Report are unreliable and do not rest upon good grounds. He hypothesizes that, but for the price increase in August 1995, TCI would have maintained the market share it held in 1994. His conclusions and the underlying data on which they are based lack reliability because: (1) Dr. Latham simply ignores the fact that TCI lost sales in 1995 before the price increase went into effect, assumes without justification that TCI's market share would remain constant even after the entry of Environ into the market; (2) relied on improper sources in determining the respective market shares of TCI's competitors. I note that TCI did not introduce any textbooks, accounting procedure guidelines, economic valuation manuals, or other treatises approving of Dr. Latham's methods. Thus, any justification of those methods must come from the record created to date.

### 1. Selection of 1994 as a Base Year and Failure to Account for Causes of Lost Market Share External to Price Increase

First and foremost, Dr. Latham unjustifiably assumed that TCI's 34% market share in 1994 would have remained unchanged but [*15] for the price increase. This assumption is not based upon the "realities of the market" in which TCI was engaged. *Compare Concord Boat, 207 F.3d at 1056.* Mr. Osborne testified that no professional economist would properly use 1994 as the base year, nor is there any propriety in skipping a year sequentially in computing a lost market share computation. He emphatically testified that skipping 1995 in projecting lost profits lacked any professional propriety. *Daubert* Hrg., Aug. 10, 2001, at 104.

At the *Daubert* hearing, Dr. Latham offered only two reasons for using 1994 as a base year. First, he asserted that 1994 was the last full year before TCI felt the effect of the price increase. *See Daubert* Hrg., Aug. 10, 2001, at 28. However, monthly and quarterly data of TCI's 1995 sales were available, and he could have used them in his model to compare TCI's sales before and after the price increase.

Second, he claims that TCI "was doing a lot of one-night called damage control [sic] with respect to the effects of the defective pipe in the market." *Daubert* Hrg., Aug. 10, 2001, at 28. n4 He reiterated that position during his colloquy with the court. *See* [*16] *Daubert* Hrg., Aug., 10, 2001, at 75-76. His explanation actually undermines his use of 1994 as a base year: TCI lost a significant amount of sales in 1995 before the price increase was announced in August 1995 and its effects felt in November 1995. One TCI executive has already admitted that TCI's loss in sales between 1994 and 1995 was unrelated to the price increase. *See e.g.* Boehmer Dep., July 27, 2001, at 180. Dr. Latham also failed to account for new marketplace pressures which TCI faced in 1995 — the emergence of Environ as a competitor to TCI and its aggressive marketing strategies. Thus, the dip in TCI's market share from its high in 1994 to its low in 1996 could easily be attributed to any number of the factors which emerged in 1995. Indeed, a review of Dr. Latham's data shows that TCI's market share actually grew after Dayco announced its price increase in August 1995.

n4 Randy Braun, TCI's Vice President of Sales

and Marketing, also stated under oath that the pipe replacement program distracted TCI personnel from making new sales. See Tr. Trans., Oct. 26, 2000, at 103-117.

[*17]

I noted this problem during argument, and counsel for TCI all but conceded that Dr. Latham had not sufficiently explained why TCI's market share would have remained at a constant 34% as it was in 1994:

> THE COURT: []. My concern is that he never justified to me why that market share stays the same in light of market changes in the world, the fact that Environ was a new company growing, whether or not there were other aggressive marketing techniques being used from other companies and this company, whether or no there were all kinds of other problems that affected price.
>
> [TCI COUNSEL]: Well, we have a problem here, because unfortunately, we had an expert who had to leave and none of that was presented.

Daubert Hrg., Aug. 10, 2001, 190-91.

Rather, counsel for TCI argues that the factual predicate for the selection of Dr. Latham's opinion should be laid by TCI fact witnesses at trial, rather that at a *Daubert* hearing. The point of a *Daubert* hearing is to make a preliminary assessment of the expert opinion's reliability. TCI delegated the task of creating an economic model, as it must, to its expert, Dr. Latham. He must select appropriate points of [*18] comparison for his market share model and cannot delegate that task to non-expert employees at TCI. Thus, Dr. Latham bore the burden of explaining why 1994 remained reliable as a base to predict TCI's lost profits into 2005, rather than 1995 or a multi-year average. This defect alone renders Dr. Latham's analysis unreliable. See *Paoli*, 35 745 (analysis unreliable where any step of analysis unsupported by good grounds); *see also JMJ Enters.*, 1998 U.S. Dist. LEXIS at *21 (assumptions with large effect on economic prediction must be given great attention and explanation).

### 2. Reliance on Unreliable Data

Dayco also faults Dr. Latham for relying on unreliable economic data. First, in constructing his market share model, Dr. Latham also had to include the respective market shares of TCI's two competitors: APT and Environ. n5 Dr. Latham's information on APT came mainly upon TCI executive John R. Wright and a Dun & Bradstreet report.

Mr. Wright assumed, and Dr. Latham demurred, that all of APT's sales were into the jobber market and that all of APT's sales were of pipe. No independent verification of that may be found on the record. Lastly, the Dun & Bradstreet reports themselves [*19] are not a professionally accepted means of determining a company's sales. Dr. Latham himself acknowledged that "there are known difficulties with Dun and Bradstreet data." Daubert Hrg., Aug. 10, 2001, at 16. Mr. Osborne explained those problems in greater detail based on his experience as a former Chief Financial Officer [CFO]:

> A: The real use of Dun and Bradstreet is solely for debt payment obligations, when people - - companies don't pay their debts, and if you're going to extend credit, you want to know that, so you use a Dun and Bradstreet report to give you that information.
> The information that was included on this APT Dun and Bradstreet report was one number with no definition, no notes to the financial statement, no description as to what sales it was, and it was a very suspect number, because it - - there's no explanation as to what it is and what it does not represent.
> Q: Well, in your experience as a CFO, how reliable were sales number [sic] or annual sales numbers given to D&B?
> A: They're not reliable.
> Q: Why is that?
> A: — for a private company, because private companies don't want to give that kind of information out.
> Q: So, what do the [sic] tell [*20] D&B when D&B calls?
> A: They'll give them, they'll answer questions and D&B's personnel asks them. They don't answer anything more, and depending on how they ask the questions, they'll give them an answer.
> That's not something private companies in my experience want to do is to report information about sales. They don't want to do that, that's why [they're] private companies. They like to keep their information to themselves, and they're not going to give detailed information, and it will probably be highly suspect as to it's [sic] relevance and what it represents.
> Q: In your professional experience how much reliability would you place on Dun and Bradstreet reports for precisely this information?
> A: In and - - by itself?

Q: Yes
A: I give it no weight.
Q: Zero.
A: Zero weight.

*Daubert* Hrg., Aug. 10, 2001, at 94. Thus, the D&B report on APT did not provide Dr. Latham with good grounds for his testimony. To the extent the report was reliable at all, D&B did not define into which markets APT sold its products — whether major oil or jobber, national or international. In short, comparing the APT sales data reported by Dun and Bradstreet with TCI's sales within the [*21] jobber market could lead to the sort of "apples and oranges" comparison condemned by the Second Circuit. *Boucher v. United States Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996)* (quoting *Shatkin v. McDonnell Douglas Corp., 727 F.2d 202, 208 (2d Cir. 1984))*; *see also MTX Communs. Corp. v. LDDS/WorldCom, Inc., 132 F. Supp. 2d 289, 292-93 (S.D.N.Y. 2001)* (excluding economic expert who conducted no independent verification of information for comparison purposes supplied by non-expert).

> n5 The Court notes that Dr. Latham has not testified that he did independent research to determine if any other competitors controlled a significant share of the "independent jobber market."

Second, in projecting TCI's lost sales through 2005, Dr. Latham relies on a prediction made by Mr. Wright that TCI would retain 80% of its customers each year, with no explanation made as to why that is a reasonable assumption. *See* June 2001 Latham Rpt. at 8. Mr. Wright, in the deposition [*22] excerpt provided to the court, admitted that the 80% figure came from him, but he provided no explanation of how he arrived at that crucial figure under accepted accounting of economics methods. Although TCI's sales figures were presented to Dr. Latham in abundance, and Dr. Latham could have computed such a crucial figure on his own, he did not. Without an acceptable prediction of TCI's retained customers, the prediction of sales through 2005 is unsupported.

While Dr. Latham also testified that he relied on trade journals such as the "Convenience Store News" and "National Petroleum Magazine," Dr. Latham made no specific reference to those journals in his report or in his testimony, leaving this court ill-equipped to examine precisely what data Dr. Latham gleaned from them. Thus, I cannot lend any credence to an assertion that those journals were part of the grounds for Dr. Latham's opinion.

As aptly summarized by Mr. Osborne, if relevant data is simply unavailable:

> A: I think you really have — you have to think hard about what potential methodology you employ.
> You can't employ a methodology that on its face just uses data that's unsupported, untested, and unreliable because [*23] the level of risk, the error margin in that data is infinite, because there's no substantiation or no fact base in that data.

*Daubert* Hrg., Aug. 10, 2001, at 87-88. The model is so unreliable, Mr. Osborne testified, that one cannot ascertain whether TCI lost three million dollars in profits, or zero. *Id.* at 97.

## CONCLUSION

TCI has not produced sufficient evidence that Dr. Latham's proposed testimony is reliable and well-grounded. Dayco's motion in limine is granted, and Dr. Latham's expert testimony as to lost sales due to the price increase is excluded from the upcoming retrial.

An appropriate order follows.

## ORDER

**AND NOW**, this 6th day of **September, 2001**, upon consideration of Defendant's motion in limine to exclude the supplemental expert report of Dr. William Latham, III, Plaintiff's opposition thereto, testimony and evidence presented at a *Daubert* hearing, oral argument thereon, and in light of the reasoning above, it is hereby **ORDERED** that:

> Defendant Dayco Product's Motion in Limine (docket no. 233-5) is **GRANTED**. Dr. Latham shall not testify as an expert witness as to lost sales and profits due to [*24] Dayco's 1995 price increase (June 2001 Supplemental Report at 6-8) at the September 2001 Retrial.

**BY THE COURT:**

**Berle M. Schiller, J.**