LEXSEE 2001 U.S. DIST. LEXIS 20737

**SUPPLY & BUILDING CO., Plaintiff,–against–ESTEE LAUDER INTERNATIONAL, INC., Defendant.**

95 Civ. 8136 (RCC)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2001 U.S. Dist. LEXIS 20737; 57 Fed. R. Evid. Serv. (Callaghan) 1309*

December 13, 2001, Decided
December 14, 2001, Filed

**DISPOSITION:** [*1] Defendant's motion to exclude Plaintiff's Report and expert, Robert Sherwin granted. Plaintiff's motion to preclude admissibility of Defendant's Report as well as its expert, Theodore Martens denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** For SUPPLY & BUILDING COMPANY, plaintiff: Joseph D. Pizzurro, Curtis, Mallet-Prevost, Colt & Mosle, New York, NY.

For ESTEE LAUDER INTERNATIONAL, INC., defendant: Fredric W. Yerman, Kaye Scholer Fierman Hays & Handler, NY, NY.

**JUDGES:** Richard Conway Casey, U.S.D.J.

**OPINIONBY:** Richard Conway Casey

**OPINION:**

### Opinion & Order

Richard Conway Casey, U.S.D.J.:

Before the Court are the parties' cross motions to preclude the admission of each other's expert report on damages, as well as the testimony of each other's damages expert. The Court reviewed the parties' submissions and heard oral argument on November 29, 2001. For the reasons explained below, Plaintiff's motion to preclude is denied and Defendant's motion is granted.

### I. Background

From 1963 until 1990, Plaintiff, Supply & Building Company ("Plaintiff" or "Supply & Building"), contracted with Defendant, Estee Lauder International ("Defendant" or "Estee Lauder"), to be its sole distributor of makeup, skin care and fragrance [*2] products in Kuwait. The arrangement was suspended during the Persian Gulf War with the Iraqi invasion of Kuwait in 1990. Supply & Building alleges that it was prepared to return to business in February 1991, but that Estee Lauder made it nearly impossible to proceed. In September 1994, Estee Lauder terminated the agreement, citing Supply & Building's unsatisfactory performance. Procedurally, the parties are now prepared to try the only remaining claim of pre-termination breach of the covenant of good faith and fair dealing. However, they both urge the Court to exclude the other's damages report as well as testimony from each other's expert witness.

### A. Plaintiff's Expert

Plaintiff's expert, Robert A. Sherwin ("Sherwin"), submitted his damages report on May 27, 1997. Plaintiff Report, Delaney Aff. Ex. 1 (hereinafter "Plaintiff Report"). Sherwin is an economist with nearly twenty-five years of experience. He has undergraduate degrees in physics and economics, as well as a law degree. n1 Id. at 1. He is a principal and vice president of Analysis Group, Inc., an economic consulting firm.

> n1 Sherwin states he is a Certified Public Accountant. Plaintiff's Report, Delaney Aff. Ex. 1 at 1; Sherwin's Resume, Delaney Ans. Aff. Ex. 15. Illinois, the state in which Sherwin is licensed, distinguishes between being licensed and being a practicing CPA. Sept. 26, 2000 Sherwin Dep., Bussey Aff. Ex. 8 at 82. Sherwin is licensed, but not a practicing CPA. Id.

[*3]

Sherwin presented two methods of calculating Supply & Building's lost profits damages. First, in Model 1, Sherwin arrived at a damages amount by subtracting the profits Supply & Building actually made in 1991–

Case 3:02-cv-01492-PCD   Document 68-6   Filed 11/21/2005   Page 2 of 20

Page 2
2001 U.S. Dist. LEXIS 20737, *3; 57 Fed. R. Evid. Serv. (Callaghan) 1309

1994 from the amount it projected it would have made if Estee Lauder had shipped its products on time and in allegedly sufficient quantities during the same period. Plaintiff Report at PP 19-27. Sherwin claims that his analysis was based on orders Supply & Building placed with Estee Lauder during the post-war years. Id. P 19. However, he actually relied on a summary of orders prepared by Sami Bakir, the son of Supply & Building's owner and a general manager of the company, not the orders themselves. See id. at Tab 1.

Sherwin relied on several assumptions in constructing Model 1. First, he assumed that Supply & Building would sell an entire Estee Lauder order within two months of receipt. Id. PP 20-23. However, Sherwin admits that he never actually reviewed Supply & Building's pre-or post-war records in making this assumption. Sept. 26, 2000 Sherwin Dep., Howley Aff. Ex. 3 at 57-58. Instead, he based this assumption on the assurances of Omar Bakir, a principal of [*4] Supply & Building. Id. at 58. n2 Second, Sherwin assumed that Supply & Building had successfully resurrected its operations in June 1991 when it placed its first order to Estee Lauder. Plaintiff Report P 20. Again, Sherwin based this assumption, in part, on Supply & Building's assurances, unaware of its claim to a United Nations tribunal in which it stated it was unable to recommence operations until January 1992. Sept. 26, 2000 Sherwin Dep., Howley Aff. Ex. 3 at 90-91, 97-98.

> n2 The relevant portion of Sherwin's deposition, demonstrating that he did not examine any actual records, follows:
>
>> Q: Did you review any Supply & Building records to determine whether, in fact, full shipments had been sold within two months in the past?
>> A: What do you mean by "the past"?
>> Q: Prewar.
>> A: I did not review any prewar records, to the best of my recollection.
>> Q: Did you review any prewar records in connection with any aspect of your report?
>> A: Not S&B prewar records. Again, to the best of my recollection.
>> Q: Did you review any postwar records to determine whether, in fact, Supply & Building would sell a full shipment within two months of receipt?
>> A: No.
>> Q: Now, for purposes of calculating damages in this case, did you operate from the an assumption that Supply & Building would sell full shipments within two months of their receipt?
>> A: On average, yes, that that would be the rate of sales.
>> Q: What was the basis for that assumption?
>> A: What we've already discussed. That is, the assertion from the Bakirs that that was their business sense on how long it would take for timely and complete shipments being received. Again, on average.
>> Q: Was it based on anything else?
>> A: I don't believe so.
>
> Sept. 26, 2000 Sherwin Dep., Howley Aff. Ex. 3 at 57-58.

[*5]

Utilizing these assumptions, Sherwin calculated what Supply & Building's cost for Estee Lauder products would have been if Defendant had performed its obligations. Plaintiff Report P 24. Then, using the profit margins in place during 1991-1994, Sherwin determined the revenues Supply & Building would have received if it sold all of the products it ordered. Id. P 27. From this amount, Sherwin subtracted what Supply & Building actually did receive from its Estee Lauder sales and arrived at a damages amount of $2.95 million. Id. P 41.

Alternatively, as verification for Model 1, in Model 2 Sherwin estimated Supply & Building's lost profits by calculating its market share in post-war Kuwait. First, Sherwin calculated both the amount of cosmetic and skin care imports and Estee Lauder's sales in United Arab Emirates ("U.A.E."), Saudi Arabia and Qatar in the immediate post-war years. Id. PP 29-30. Sherwin found that Estee Lauder's post-war market share in these comparative countries had decreased by 21%. Id P 31. Sherwin then reduced Estee Lauder's pre-war market share in Kuwait by the same amount to arrive at its post-war market share. Id. Estee Lauder's market share [*6] in Kuwait would have been Supply & Building's share since Supply & Building was the sole distributor. Subsequently, Sherwin placed a dollar value on Supply & Building's market share, assuming Estee Lauder had performed its obligations and factoring in how much it would have cost Supply & Building to sell the products. Id. PP 32-33. Finally, using the profit margins employed in the post-war years, Sherwin calculated the revenue Supply & Building would have made on selling its market share of products. Id. P 34. He arrived at $2.57 million. Id. P 42.

Case 3:02-cv-01492-PCD   Document 68-6   Filed 11/21/2005   Page 3 of 20

Page 3
2001 U.S. Dist. LEXIS 20737, *6; 57 Fed. R. Evid. Serv. (Callaghan) 1309

In addition to the lost profits calculations demonstrated in Model 1 and Model 2, Sherwin surmised three other types of damages. First, due to Estee Lauder's failure to ship its goods, Supply & Building lost profits it would have made in selling other brands of cosmetics. Id. P 43. Second, Estee Lauder did not reimburse Supply & Building for its advertising and promotional costs. Id. P 44. Finally, Supply & Building suffered damages when Estee Lauder raised its prices and restricted Supply & Building's resale prices. Id. P 46. Sherwin added each of these amounts to Model 1 to conclude Supply & Building's total pre-termination [*7] damages were $4.22 million.

As explained above, in calculating Model 1, Sherwin relied on a summary of orders prepared by Sami Bakir. When Estee Lauder requested that he produce the documents from which he derived his summary, Bakir discovered several errors. As a result, Sherwin recalculated Supply & Building's lost profits under Method 1 and decreased the damages amount from $2.95 million to $2.89 million. The Model 2 amount did not change. The three additional forms of damages were also reduced so that the new pre-termination damages amount was $4.17 million. On December 12, 1997 Supply & Building submitted its revised damages report which included indications of its corrections ("Plaintiff's Revised Report"). Plaintiff's Revised Report, Delaney Aff. Ex. 8.

### B. Defendant's Expert

Defendant's expert, Theodore F. Martens ("Martens") is a Certified Public Accountant, he has an undergraduate degree in biology and a masters in business administration. He is a partner in PricewaterhouseCoopers' New York Dispute Analysis & Investigations unit, he teaches several auditing classes for his employer and he has over twenty years of experience in accounting and auditing. n3 In rebuttal [*8] to Sherwin's report on damages, Martens submitted a report on September 1, 2000. Defendant Report, Delaney Aff. Ex. 12 (hereinafter "Defendant Report"). Martens stated that he did not address Plaintiff's Revised Report because Sherwin's "fundamental approach or methodologies" did not change. Oct. 3, 2000 Martens Dep., Delaney Aff. Ex. 13 at 8-9; 141-42.

> n3 Plaintiff insists Martens is not qualified to be a damages expert in this case since he is not a lawyer, a sociologist or cultural anthropologist, nor does he have training or experience in demographics, international affairs, the Middle East or Kuwait. Oct. 3, 2000 Martens Dep., Delaney Aff. Ex. 13 at 138. Defendant submits that Martens is not trying to calculate the impact of the Gulf War on Supply & Building's business. Rather, as an accountant, he is pointing out that Sherwin's conclusions are unreliable. Def. Mem. at 12.

Martens found that Sherwin's conclusions were unreliable because he did not consult Supply & Building's records or its claim for damages [*9] from the United Nations, nor did he consider the effect of the Gulf War on Kuwait's economy or Supply & Building's post-war ability to sell Estee Lauder products. Defendant Report at 8-10. For example, the female population of Kuwait was 31% lower the year after the war than it had been the year before. Id. at 8. Further, 500,000 middle-class expatriates fled Kuwait and did not return after the invasion. Id. Martens also claimed that while geographically similar, Saudi Arabia and U.A.E. did not suffer the same effects from the Gulf War that Kuwait did. For example, U.A.E.'s gross domestic product increased due to heightened oil production and prices. Id. at 9. Kuwait, on the other hand, did not return to pre-war production levels until the end of 1992. Id.

Defendant's Report also discusses more specific calculating and methodology errors in Plaintiff's Report, including mathematical errors that Sherwin had corrected in the Revised Report. For example, Martens explains that Estee Lauder had placed a $2 million limit on orders Supply & Building could place. Id. at 13. Defendant submits that Sherwin ignored this limit and overstated the amount of Estee Lauder products [*10] Supply & Building actually received. Id. Further, using the same information that Sherwin relied on, Martens calculated Supply & Building's actual rate of turnover of Estee Lauder products to be approximately twice yearly, not bi-monthly as Sherwin assumed. Id. at 14. In addition to the problems Martens found in Plaintiff's lost profits calculations, he also found that Sherwin's estimation of damages for non-Estee Lauder products, advertising and promotional costs and price restrictions were not supported. Id. at 19-21. With these and other errors in mind, Martens calculated $6.64 million as the sum of all of Sherwin's errors.

## II. Discussion

### A. Standard of Admissibility of Expert Testimony

Pursuant to *Federal Rule of Evidence 702*, the trial court has broad discretion in determining whether to admit expert evidence. n4 *Salem v. U.S. Lines Co., 370 U.S. 31, 35, 8 L. Ed. 2d 313, 82 S. Ct. 1119 (1962); Gen. Elec. Co. v. Joiner, 522 U.S. 136, 141, 139 L. Ed. 2d 508, 118 S. Ct. 512 (1997)* (holding trial court's rulings will be reviewed for an abuse of discretion and overturned only if manifestly erroneous). In assessing admissibility,

Case 3:02-cv-01492-PCD    Document 68-6    Filed 11/21/2005    Page 4 of 20

Page 4
2001 U.S. Dist. LEXIS 20737, *11; 57 Fed. R. Evid. Serv. (Callaghan) 1309

[*11] the trial court must determine whether the expert testimony is relevant and whether it has a sufficiently "reliable foundation." *Campbell v. Metro. Prop. & Cas. Ins. Co., 239 F.3d 179, 184-85 (2d Cir. 2001)* (citing *Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 587, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993))*; see also *Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137, 149, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999)* (explaining the court must "ensure the reliability and relevancy of expert testimony"). "Since Daubert, . . . parties relying on expert evidence have had notice of the exacting standards of reliability such evidence must meet." *Weisgram v. Marley Co., 528 U.S. 440, 455, 145 L. Ed. 2d 958, 120 S. Ct. 1011 (2000)*.

n4 *Federal Rule of Evidence 702* states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Fed. R. Evid. 702.*

[*12]

Accordingly, such evidence will be excluded if it is "speculative or conjectural." *Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996)* (citing *In re Air Disaster at Lockerbie Scotland, 37 F.3d 804, 824 (2d Cir. 1994))*. Additionally, testimony "based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith,' or to be in essence an 'apples and oranges comparison,'" will not be admitted. Id. (quoting *Shatkin v. McDonnell Douglas Corp., 727 F.2d 202, 208 (2d Cir. 1984))*. Further, under *Federal Rule of Evidence 703*, the court must "determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony." n5 Id. (quoting *Shatkin v. McDonnell Douglas Corp., 727 F.2d 202, 208 (2d Cir. 1984))*; see also *Johnson Elec. N. Am., Inc. v. Mabuchi Motor Am. Corp., 103 F. Supp. 2d 268, 284 (S.D.N.Y. 2000)* (excluding expert testimony based on unsupported assumptions). Assumptions based on conclusory statements of the expert's client, rather than on the expert's independent evaluation are not reasonable. *Argus, Inc. v. Eastman Kodak Co., 612 F. Supp. 904, 926 (S.D.N.Y. 1985)*. [*13] "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec., 522 U.S. at 146*. Where, as here, lost profits are at issue, "an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding" a party's future prospects. *Boucher, 73 F.3d at 21* (finding testimony was not "accompanied by a sufficient factual foundation" and therefore district court abused discretion in admitting it) (citing *Gumbs v. Int'l Harvester, Inc., 718 F.2d 88, 98 (3d Cir. 1983))*.

n5 Rule 703 governs the foundation for the expert's opinion testimony and provides, in relevant part:

> the facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

*Fed. R. Evid. 703.*

[*14]

**B. Plaintiff's Expert**

Defendant argues Sherwin's report and testimony should be precluded since his report is based on improper methodologies and assumptions. The Court has some doubt as to Sherwin's qualifications to serve as an expert in this case. Although he has testified in numerous cases, it is not clear in what capacity he has been recognized as having expertise, nor is it clear what "specialized knowledge" Mr. Sherwin can provide here. See *Fed.R.Evid.702*. For the purposes of this case, it seems a witness with expertise in accounting would seem to be more useful. Yet, the Court need not be detained by the appropriateness of Sherwin's background and training as the assumptions upon which his report rests are "too unsupportable and far-reaching to be reasonably certain." *Kidder, Peabody & Co., Inc. v. IAG Int'l Acceptance Group N.V., 28 F. Supp. 2d 126, 137 (1996)*.

As Defendant points out, Plaintiff does not and cannot cite a place in the record demonstrating that Sherwin reviewed Supply & Building's records rather than relying on his client's conclusory statements. See, e.g., Sept. 26,

Case 3:02-cv-01492-PCD   Document 68-6   Filed 11/21/2005   Page 5 of 20

2001 U.S. Dist. LEXIS 20737, *14; 57 Fed. R. Evid. Serv. (Callaghan) 1309

Page 5

2000 Sherwin Dep., Howley Aff. Ex. 3 at 57-58; Sept. 26, 2000 Sherwin [*15] Dep., Bussey Aff. Ex. 8 at 74 (Q: "Did you base that assumption on anything other than what the Bakirs told you?" A: No, other than my belief that their qualifications back up that assertion."). Sherwin admits he did not review any pre- or post-war records to determine if it was reasonable to expect that Supply & Building would turn over its Estee Lauder inventory every two months. Sept. 26, 2000 Sherwin Dep., Howely Aff. Ex. 3 at 57-58. Further, with respect to his assumption that Supply & Building could resume business in June 1991, Sherwin admits he was unaware of Supply & Building's claim to the U.N. that it could not return to business until January 1992. Id. at 97.

Plaintiff maintains that Sherwin's damages calculation based on orders Supply & Building actually placed after the war is buttressed by Kuwait Ministry of Planning and United Nations statistics demonstrating that cosmetics and fragrance sales increased in Kuwait in the years following the war. Plaintiff Report at tab 6; Defendant Report at tab 5. However, orders standing alone cannot prove a company's sales or profits. Sherwin incorrectly assumes that everything Supply & Building ordered would be sold. Moreover, [*16] Sherwin's assumptions about Supply & Building's post-war performance are belied by actual circumstances. Omar Bakir, a Supply & Building general manager for thirty-five years did not return to Kuwait after the war. Oct. 3, 1996 Omar Bakir Dep., Bussey Aff. Ex 9 at 164. Further, Supply & Building "did away" with its own stores after the war. October 1, 1996 Sami Bakir Dep., Bussey Aff. Ex 10 at 199.

Sherwin based his report on his client's unrealistic assurances rather than available records. Further, the client's guarantees were not reliable and were contradicted by other data available to Sherwin. This is not the type of shortcut to be expected from an economist with twenty five years experience. See *Kumho Tire Co., 526 U.S. at 149* (noting that an expert must employ "in the courtroom the same level of intellectual rigor that characterizes" his practice in the relevant field); see also *Brooks v. Outboard Marine Corp., 234 F.3d 89, 92 (2d Cir. 2000)* (approving trial court's exclusion of expert who failed to review several pieces of relevant and available evidence). Accordingly, as an insufficient factual basis exists for the assumptions upon which [*17] Model I rests, the Court finds Plaintiff's report and Sherwin's expert testimony are unreliable and, therefore, inadmissible. n6

n6 Defendant also takes issue with Sherwin's methodology in Method 2. As Method 2 only serves a check on Method 1 and not an independent basis for assessing damages, the Court finds it unnecessary to consider these arguments since the assumptions underlying Method 1 are unreasonable.

### C. Defendant's Expert

The crux of Plaintiff's argument in support of precluding Martens' testimony is that he did not consider Plaintiff's Revised Report and his report actually critiqued Sherwin's mathematical and accounting errors, not his methods. Plaintiff's expert's report and testimony are precluded, so the point is somewhat moot. However, after reviewing Defendant's Report and Plaintiff's Revised Report, the Court is satisfied that Martens' objections are methodological in nature and not rectified by the Revised Report. The Revised Report still utilizes the assumptions with which Martens took [*18] issue and which the Court finds unreasonable. Accordingly, since the Court presumes admissibility and Plaintiff has not convinced it that Martens' testimony will be unreasonable and unreliable, Plaintiff's motion is denied.

However, to the extent that Martens' report and testimony are based on his objections to Sherwin's inadmissible report, they will be precluded. The Court will consider the admissibility of Martens' testimony that is based on his own review of Supply & Building's records and his accounting background and experience.

### III. Conclusion

For the reasons explained above, Defendant's motion to exclude Plaintiff's Report and its expert, Robert Sherwin, is granted. Plaintiff's motion to preclude the admissibility of Defendant's Report as well as its expert, Theodore Martens, is denied with the conditions explained.

So ordered.

Richard Conway Casey, U.S.D.J.

December 13, 2001
New York, New York

LEXSEE 2003 US DIST LEXIS 15976

ROWE ENTERTAINMENT, INC., et al., Plaintiffs, - against - THE WILLIAM MORRIS AGENCY, INC., et al., Defendants.

98 Civ. 8272 (RPP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2003 U.S. Dist. LEXIS 15976

September 15, 2003, Decided September 16, 2003, Filed

SUBSEQUENT HISTORY: Motion granted by *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 2003 U.S. Dist. LEXIS 17623 (S.D.N.Y., Oct. 2, 2003)

PRIOR HISTORY: *Rowe Entm't v. William Morris Agency, Inc.*, 2002 U.S. Dist. LEXIS 8308 (S.D.N.Y., May 8, 2002)

DISPOSITION: Defendants' motion to exclude testimony was granted.

LexisNexis(R) Headnotes

COUNSEL: [*1] Counsel for Plaintiffs: Ivie, McNeill & Wyatt, Los Angeles, CA, By: Rickey Ivie, and Gary, Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando, Stuart, FL.

Counsel for William Morris Agency, Inc.: Loeb & Loeb LLP, New York, NY, By: Charles M. Miller, Helen Gavaris.

Counsel for Creative Artists Agency, Inc.: Weil Gotshal & Manges, LLP, New York, NY, By: Jeffrey Kessler, Jeffrey Klein.

Counsel for Renaissance Entertainment, Inc: Parcher, Haues & Snyder, P.C., New York, NY, By: Steven M. Hayes.

Counsel for Beaver Productions, Inc. Emmett, Cobb, Waits & Kessenich, New Orleans, LA, By: Matthew F. Popp, Esq., James A. Cobb, Jr., Esq.

Counsel for Jam Productions: Piper Rudnick LLP, Chicago, IL, By: George L. Grumley, Esq., James D. Roberts, Esq. Piper Rudnick, LLP, New York, NY, By: Monica Petraglia McCabe, Esq.

JUDGES: Robert P. Patterson, Jr., U.S.D.J.

OPINIONBY: Robert P. Patterson, Jr.

OPINION:

**OPINION AND ORDER**

ROBERT P. PATTERSON, JR., U.S.D.J.

The motion, pursuant to the *Federal Rules of Evidence 401, 402, 702 and 703*, of Defendants Creative Artists Agency LLC ("CAA"), The William Morris Agency, Inc. ("WMA") and Renaissance Entertainment, Inc.'s ("Renaissance") [*2] (collectively, the "Booking Agency Defendants") to exclude the expert testimony of Dr. Gerald Jaynes that (1) Plaintiffs have been under-utilized by the Booking Agency Defendants creating an inference of racial discrimination; and (2) Plaintiffs have suffered damages of $29 million as a result, is granted, and the motion by the Booking Agency Defendants to strike the supplemental affidavit of Dr. Jaynes, pursuant to *Federal Rules of Civil Procedure 26(a)* and *37(c)*, is denied as moot.

**1. Dr. Jaynes's conclusion of underutilization of black promoters**

*A. The sampling used by Dr. Jaynes was not representative.*

Dr. Jaynes's Report concludes that the four Plaintiffs, Rowe Entertainment, Inc. ("Rowe"), Lee King Productions ("King"), Summit Management Corporation ("Summit"), and Sung Song Productions ("Sung") have been underutilized as concert promoters due to racial discrimination. This determination, however, is unreliable because the evidence shows that the sample Dr. Jaynes utilized was not a random sample or other representative sample of Defendants' contracts as a whole.

Expert testimony involving a scientific technique must

meet standards of reliability set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc. 509 U.S. 579; 593, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).* [*3] Daubert enunciates four key issues as relevant "in determining whether a theory or technique is scientific knowledge that will assist the trier of fact." *Id.* These considerations are: (1) "whether [the theory or technique] can be (and has been) tested," id., (2) "whether the theory or technique has been subjected to peer review and publication," id., (3) "in the case of a particular scientific technique . . . the known or potential rate of error . . . and the existence and maintenance of standards controlling the technique's operation," *id. at 594*, (4) whether the theory or technique has "general acceptance" in the scientific community. Id. As discussed infra, Dr. Jaynes's Report fails to meet these standards.

According to the Reference Manual on Scientific Evidence, when using "sample data to characterize a population":

> The population is the whole class of units that are of interest; the sample is a set of units chosen for detailed study. Inferences from the part to the whole are justified only when the sample is representative . . . .

Federal Judicial Center, Reference Manual on Scientific Evidence 90 (2d ed. 2000). [*4]

As the court in Guardians Ass'n of New York City Police Department, Inc. v. Civil Service Commission of City of New York stated, "necessity often dictates that the composition of a given population be estimated by projecting data gathered by less than optimal means from only a sample of that population." *633 F.2d 232, 240 (2d Cir. 1980).* While use of such a sample is permissible, to be properly admitted into evidence, "the sample [must be] adequate, the data gathering techniques reliable, and the conclusions drawn demonstrated to be statistically significant." *Id.*

Dr. Jaynes's expert report dated July 31, 2002 states that he based his study on a sample of 1,561 contracts. (Declaration of Maria Sperando, dated March 19, 2003, Ex. 2, expert report of Gerald Jaynes ("Jaynes Report") at 5.) However, Dr. Jaynes did not obtain his sample set in a manner that provided assurance that it was representative of the contracts entered into by the Booking Agency Defendants during the study period, 1994-2001. During argument on the motions on June 11, 2003, it developed that of the 1,561 contracts relied on in Dr. Jaynes's Report, 1,214 were contracts obtained and copied [*5] by Plaintiffs and Plaintiffs' counsel out of the tens of thousands of contracts, possibly over 100,000, produced by the Defendants' talent agencies. (Hrg. Tr. at 14-15; Jaynes Report at 9.) n1 Dr. Jaynes testified at his deposition that Plaintiffs' counsel told him "they didn't have any method of determining what contracts they were selecting. Whoever was doing the selecting was choosing contracts that looked interesting to them." (Declaration of Pierre Armand, dated February 24, 2003, Ex. 2 ("Jaynes Dep.") at 288.) In support of his position that the sample was fair and representative, Dr. Jaynes reasoned that as Plaintiffs and Plaintiffs' counsel were unaware of how he would conduct his analysis when they selected the contracts, they would not know how to create a biased group of contracts. (Id. at 289, 349.)

> n1 There were two sets of contracts turned over by Plaintiffs' counsel to Dr. Jaynes: 1,214 hard copies, and a computer disk ("WMA CD Rom") of contracts in the files of WMA (New York only) from which Dr. Jaynes selected one in every six contracts until he stopped at 342, due to both time constraints and because he felt that the CD Rom was over represented by black artists. (Jaynes Dep. at 358-59, 506-07.) It is unclear if "342" contracts referred to in the deposition is accurate or rather if "347" contracts were reviewed since "347" plus "1,214" equals the "1,561" contacts Jaynes states he relied upon.

[*6]

In their responsive motion papers, Plaintiffs' counsel attempted to buttress this testimony by the inclusion of a declaration by Laura L. Mall, Esq., dated April 22, 2003 ("Mall Decl."), stating that she attended the inspections of WMA contracts and of two promoters, Jam Productions and Beaver Productions. n2 (Pls.' Response Mem of Law in Opp. to Defs.' Motion to Exclude Pls.' Expert Witness, Dr. Gerald D. Jaynes's Affidavit ("Pls.' Response Mem.") at Ex. 7, PP 3, 7, 10.) Ms. Mall maintains that the several persons conducting the inspections of Defendants' documents were instructed to employ a broad selection process in determining what contracts to copy from the thousands presented by Defendants for their inspection. (Id. at PP 4-9.) This selection process was intended to obtain a broad sampling of contracts representative of major and lesser artists, black and white artists, non-Defendants and Defendant promoters, non-Plaintiff and Plaintiff promoters, and non-Defendant and Defendant agencies, as well as "specific artists named in the Amended Complaint." (Id. at PP 4-5.) Ms. Mall also states that she believes Plaintiffs, Rowe and King, and other attorneys and paralegals [*7] engaged in selecting contracts for copying followed the same selection procedure. (Id. at PP 4-8.)

n2 These inspections were conducted long before Dr. Jaynes was retained, and included the contracts of booking agents and promoters who are no longer defendants in the case. Defendants assert, without contradiction, that Ms. Mall does not purport to have reviewed the thousands of contracts in the concert files of CAA and Renaissance or the CD Rom of the contract files of WMA in New York from which 342 (or 347) contracts were copied.

Ms. Mall's testimony, however, is inadequate to demonstrate the reliability or representative quality of Dr. Jaynes sample, for the following reasons: (1) Ms. Mall presents no description of the utilization of any control mechanism to show that the contracts selected by each document reviewer were balanced in the manner the alleged selection process intended; (2) Ms. Mall presents no description of how the contracts selected by each document reviewer were counter-balanced with the [*8] contracts selected by another document reviewer to achieve the balance intended; (3) finally, Ms. Mall does not show that the contracts copied from each Booking Agency Defendant were balanced by means of any control mechanism to show they were indeed representative of all the contracts entered into by the Booking Agency Defendants during the period studied.

By allowing the contracts to be selected on the basis of the "specific artists named in the Complaint," (i.e., those contracts in which white promoters were selected for concerts and the Plaintiffs were not selected), the "sample" received by Dr. Jaynes would be neither random nor representative. Instead, the sample would, perforce, be biased or weighted towards the concert contracts for those artists whose business Plaintiffs wanted but did not get. Indeed, Dr. Jaynes's results are proof that the contracts selected by Plaintiffs and Plaintiffs' counsel were not representative. Dr. Jaynes concluded, based on his study of the 1,561 contracts and information provided by Plaintiffs, that black-owned firms were awarded only seven of the 1,561 contracts during the study period 1994-2001 and promoted no music events featuring a white [*9] act or featuring a major black act during that period. (Jaynes Report at 5.) All seven of the contracts with black promoters came from the 342 WMA contracts copied by Dr. Jaynes. n3 (Jaynes Dep. at 502.) Accordingly, the 1,214 contracts selected by Plaintiffs and used in Dr. Jaynes's sample of 1,561 contained no contracts by black promoters for white or black acts. In short, the only contracts selected by Ms. Mall and the other reviewers were contracts with white promoters.

n3 Dr. Jaynes should have been aware of this discrepancy since he admitted one of the reasons he discontinued making a random examination of WMA's CD Rom was his determination the CD Rom was over represented with black artists. (Jaynes Dep. at 507.)

Since over three-quarters of the sample used by Dr. Jaynes was not representative of concert contracts entered into in the concert promotion industry, the entire sample would not be representative and appropriate for use in Dr. Jaynes's statistical study. When he made the decision to utilize the [*10] 1,214 contracts which Plaintiffs Rowe and King and Plaintiffs' legal team had selected for copying, Dr. Jaynes failed to observe a basic tenet of a statistical study: to maintain professional autonomy, i.e., the same objectivity as he would apply in his other studies. See Reference Manual, supra, at 88 (stating that experts who conduct research in the context of litigation should proceed with the same objectivity that they would apply in other contexts); *Kumho Tire Company, Ltd. v. Patrick Carmichael, 526 U.S. 137, 152, 143 L. Ed. 2d 238, 119 S. Ct. 1167* (stating that the objective of Daubert's gatekeeping principles "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

**B. *Dr. Jaynes's information about the race of the promoters in his sample was not based on independent or reliable study.***

The sample of contracts used by Dr. Jaynes was further compromised by his reliance, not on his own independent study and analysis of the concert promotion industry, [*11] but on Plaintiffs' information about the black and white promoters considered as active in the 1994-2001 period in the 1,561 contracts he examined. Dr. Jaynes acknowledged that he was not an expert in the concert music business. (Jaynes Dep. at 6.) Regardless, any expert should be aware that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply. See *Supply & Building Co. v. Estee Lauder International, Inc., 2001 U.S. Dist. LEXIS 20737, 2001 WL 1602976, *4 (S.D.N.Y. 2001)* (dismissing "assumptions based on conclusory statements of the expert's client, rather than on the expert's independent evaluation" as unreasonable) (citing to *Argus, Inc. v. Eastman Kodak Co., 612 F. Supp. 904, 926 (S.D.N.Y. 1985)*).

Dr. Jaynes's Report states that he based his findings on data from the 1,561 contracts which he had entered into a Microsoft Access database. n4 (Jaynes Report at 9.) From this database, he concluded that black promoters

Case 3:02-cv-01492-PCD   Document 68-6   Filed 11/21/2005   Page 9 of 20

Page 4
2003 U.S. Dist. LEXIS 15976, *11

represented nine out of the ninety promoters ready, willing, and able to promote concerts throughout the period 1994-2001. (Jaynes Dep. at 303, 345) As the ethnicity of [*12] the promoters or artists was not indicated in the contracts, Dr. Jaynes depended on Plaintiffs to provide this information. (Hrg. Tr. at 53.) At his deposition, Dr. Jaynes stated that he did not know what criteria had been used to select the nine black promoters. n5 (Jaynes Dep. at 47-48, 64-66). He also disclosed that the original number of eleven was arrived at in consultation with counsel and Mr. Rowe. (Id. at 66.) Dr. Jaynes then later testified that eleven was a typographical error or mistake and that the number of black promoters should be reduced from eleven to nine, as in his Report he concluded that the four Plaintiffs constitute 44% of the nine black promoters. (Id. at 303.)

> n4 This database consisted of fifteen fields: (1) talent agency name, (2) artist name, (3) artist ethnicity, (4) promoter name, (5) promoter ethnicity, (6) city of show, (7) state of show, (8) show date, (9) # of shows, (10) artist guarantee, (11) artist bonus, (12) ticket price, (13) capacity, (14) gross potential, and (15) advance payment to artist. (Jaynes Report at 9.)

> n5 Dr. Jaynes's Report lists thirteen such black promoters (Jaynes Report at 10), but states that "active black promoters number eleven." (Jaynes Report at 6.) During his deposition by the Booking Agency Defendants, Dr. Jaynes reduced this number first to eleven, and then, to nine. (Jaynes Dep. 303, 345-351, 469.)

[*13]

It developed at the hearing that Dr. Jaynes had also reduced the number of white promoters in his sample from a total of about 140 to 81. (Hrg. Tr. at 83.) Plaintiffs' counsel stated that Dr. Jaynes reached this figure by eliminating not-for-profit promoters, talent buyers, and corporate promoters. (Id. at 83-87.) Since these categories are not contained in the Microsoft database used by Dr. Jaynes, that information must have been supplied to Dr. Jaynes by Plaintiffs, the only source of information used by Dr. Jaynes other than the 1,561 sample contracts. (Id. at 53.)

In his supplemental affidavit dated March 19, 2003, Dr. Jaynes maintains he validated his results by use of the Pollstar data and cites to his deposition at pages 284, 289-291. (Declaration of Maria P. Sperando, dated March 19, 2003, Ex. 3 at 24 ("Jaynes Aff.").) However, the Pollstar data is merely a list of artists' concerts at venues having a seating capacity of 3,000 seats or more from June 1998 to May 1999, contained in Exhibit A to the Amended Complaint for which Pollstar collected Box Office results. (Amended Complaint P 65.) Plaintiffs then conducted their own study of the Pollstar concerts breaking [*14] down concert promoters and artists on racial lines. n6 (Hrg. Tr. at 109-10, 114-16.) Given that Plaintiffs were the source of what Plaintiffs refer to as the "Pollstar data" on the race of the artists and promoters (id.), and Plaintiffs were the source of Dr. Jaynes's determinations in his Report of race of the artists and promoters, Dr. Jaynes's reliance on the Pollstar data in the amended complaint does not constitute an independent validation of his results.

> n6 As was admitted at the oral argument, Pollstar did not provide information on racial composition of promoters or artists. (Hrg. Tr. 113-14.) There was no suggestion that the Pollstar data identified the Booking Agent or the selector of the promoter of the concert.
>
> As the amended complaint states, it was Plaintiffs who examined the Pollstar box office results for June 1998 to May 1999. (Amended Complaint PP 65.) Plaintiffs estimated that: (i) Promoter Defendants (then twenty-six) and uncharged promoter conspirators conducted 65 percent of the 2,460 major concerts in the one year period (id. at PP 66-67); (ii) of the concerts by white acts, black promoters promoted none (id. at P 69); and (iii) of the concerts by black artists, black promoters promoted less than 3% for each. (Id. at P 72).

[*15]

Accordingly, the conclusion in Dr. Jaynes's Report that black promoters have been underutilized is not based on an independent study but is based solely on material provided by Plaintiffs. Although Plaintiffs may have some information about some promoters' ownership and availability throughout the 1994-2001 period, Dr. Jaynes should have verified this information with each of the promoters -- not an overwhelming task given the small numbers -- to comply with the standard in *City of Richmond v. J.A. Croson Co., 488 U.S. 469, 102 L. Ed. 2d 854, 109 S. Ct. 706 (1989)*, which Plaintiffs claim Dr. Jaynes was following. (Hearing at 120; see also Jaynes Aff. at 14-15.) Dr. Jaynes's failure to do so makes his opinions undependable. As the Reference Manual on Statistics states, "an analysis is only as good as the data upon which it rests[,]" and "it is important to verify the accuracy of the data collection." Reference Manual, supra, at 90.

I. Dr. Jaynes's characterization of "active black pro-

moters" is unreliable.

Dr. Jaynes not only failed to independently verify Plaintiffs' information as to the race of the artists and promoters in his 1,561 contract samples, [*16] he relied on Plaintiffs to advise him as to the degree to which other promoters in the sample were active throughout the 1994-2001 period. In his Report, Dr. Jaynes concluded that, based on his study of the 1,561 contracts and information provided by Plaintiffs, black-owned firms represented ten percent of the concert promoters active throughout the period 1994-2001. (Jaynes Report at 6.) Dr. Jaynes based this conclusion on the finding that in his sample, there was a weighted average number of nine black concert promotion businesses out of a total number of ninety concert promotion businesses active throughout the period. n7 (Jaynes Dep. at 315-319). The activity of concert promotion businesses throughout the period necessarily involves obtaining information not contained in the microsoft database of the 1,561 contracts Dr. Jaynes studied. Nowhere in his Report, affidavit or testimony, however, does Dr. Jaynes provide a breakdown of how he arrived at his figures of nine and ninety. Nor did he provide such a breakdown for the Defendants in discovery. n8 (Hrg. Tr. at 46-47, 94-96.)

> n7 Dr. Jaynes stated that to determine the 10% percentage his "calculation used methods [he] helped develop and have been used by other researchers for more than a decade." (Jaynes Aff. at 16.) For support he refers to his deposition (Jaynes Aff. at 16), which merely reiterates that "the procedures that [Dr. Jaynes] utilized for constructing these numbers is a standard procedure for constructing the market set of ready and able firms for a given set of buyers," but does not explain what that procedure actually is. (Jaynes Dep. at 349.)

[*17]

> n8 Under *Rule 26(a)(2)(B)* of the Federal Rules of Civil Procedure, expert testimony must include a written report which "contains a complete statement of all opinions to be expressed and the basis and reasons thereof." *Fed. R. Civ. P. 26(a)(2)(B)* (emphasis added). Plaintiffs failed to provide a "complete statement of . . . the basis and reasons" as required by *Rule 26(a)(2)(B)* for Dr. Jaynes's opinion that there were nine black concert promotion businesses out of a total of ninety concert promotion businesses in his sample. Plaintiffs failed to remedy this deficiency during oral argument. Without such a breakdown, the validity of his conclusions cannot be checked.

In his March 19, 2003 affidavit, Dr. Jaynes stated that the relevant market for the Booking Agency Defendants is the entire United States (Jaynes Aff. at 18), and defined the concert music promoter as "a for-profit business that engages in the promotion of concerts of contemporary music by . . . buying talent and putting up risk capital" (id.), and additionally "arranges for the marketing of the concert, secures the venue and the [*18] concert production, transportation and housing of artists, etc." (Id. at 18 n.2.) Dr. Jaynes then defined a black concert promoter as "a concert promotion business that is majority owned and controlled by African Americans" (id. (emphasis in original)), and a qualified promoter as "a concert music promoter that is 'ready, willing, and able.'" (Id. at 18) According to Dr. Jaynes, "Ready refers to time. A firm that is ready is immediately available at the time the services are needed." (Id.) Dr. Jaynes applied a weighting procedure for those firms which were available only in some years. (Id.) "Willing refers to inclination. A willing firm is available in the sense that it is inclined to perform the services of a concert music promoter where and for whom they are required. . . . in at least a large multi-state region of the U.S." (Id. at 19 (emphasis in original).) "Able refers to capability and experience." n9 (Id.)

> n9 At oral argument, this definition was limited to those producers "ready, willing, and able" to do concert promotions in at least three states.

[*19]

During his deposition, Dr. Jaynes explained his number nine as follows:

> [In] a nice, simple beautiful world where you could say there existed on January 1, 1994, a given set of promoters, black promoters, which you could take through a list of criteria and they'd all qualify, or if they didn't you can strike them. And on December 31, 2001, you had the same list. And so everything would be nice and simple to do. But, in fact, that is not the way business operates, as we all know.
>
> As a consequence, you're going to have situations where individuals are in and out of the business. They may be in the business for the initial part of the period. They may not be in. They may not be there in the second part of the periods or the middle. There may be individuals who are not there at all in the beginning part of the period and are there

towards the end of the period.

> So what you're really trying to do is come up with a proportion, throughout the period, of promoters who are black.

(Pls.' Response Memorandum of Law in Opposition, dated April 23, 2003, Ex. 4 at 315-316 (emphasis added).)

In response to questioning as to why one black promoter, Al Haymon, was not included, [*20] he partially explains the process he attempted to utilize:

> What I said was that under the strict definition of what is a black promotion company that I was utilizing in determining my 9 as the representative number through that period, I would said (sic) that, strictly speaking, Al Haymon or Haymon Entertainment would be recognized as a black promoter up until the time it was acquired by SFX. . . . After that period, it wouldn't be. n10

(Id. at 319.)

> n10 Thus, Haymon Entertainment was apparently not considered a "black promoter" during the entire 1994-2001 period, while each of the Plaintiffs was counted as a "black promoter" throughout the entire period.

Dr. Jaynes did not provide a list, as required by *Rule 26(a)(2)(B)*, of how he weighed the other active black promoters active during the period as to arrive at his proportion figure of nine. n11

> n11 Nor was such a list provided at oral argument. At his deposition, Dr. Jaynes stated that he had received a larger list of black promoters from Plaintiffs' counsel. (Jaynes Dep. at 303.) However, he was unable to explain what reasons had been used to eliminate a number of identified black promoters from the list. (Id. at 46-60; 64-66.)

[*21]

Dr. Jaynes admitted that he did not do any independent analysis to check Mr. Rowe's information, such as going to speak to third parties or looking at books containing listings of concert promoters. (Jaynes Dep. at 62.) Thus, when Dr. Jaynes concluded that nine was a proportion or representation of the black concert promotion businesses as to the total of ninety concert promotion businesses in his sample active throughout the 1994-2001 period, Dr. Jaynes relied on Plaintiffs' information as to the degree and nature of activity of both black and white concert promoters contained in the 1,561 contracts studied.

Were one to test Dr. Jaynes's definition of whether a concert promotion business was "ready, willing and able" during the years 1994-2001, one would have to: (1) inquire of each concert promoters doing business in those years in all fifty states as to their availability to do business in a large multi-state region (or three states) and their willingness and readiness to do business in each year; and (2) then determine whether such a business meets Dr. Jaynes's test for a concert promotion business, his regional test market test and his test for whether such promoter should be [*22] weighted as a whole promoter or less than one. In violation of *Rule 26(a)(2)(B)*, Dr. Jaynes provides no documents indicating he did such an analysis; nor does his Report, his affidavit or his testimony n12 suggest such an analysis was made in order to reach his conclusion that black promoters constituted 10% of the total concert promoters in the United States active throughout the study period. As a result, his technique for reaching such a conclusion cannot be tested. Since he has not divulged the methodology he used to reach the conclusion, it cannot be subjected to peer review, nor can it be tested for known or potential rate of error. Dr. Jaynes does not cite to any standards controlling his methodology nor does he show that there is general acceptance within the relevant scientific community for conclusions reached in this manner. Accordingly, Plaintiffs have not shown that any of the Daubert factors, *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)*, are met by Dr. Jaynes's conclusion that a "representation" of nine black concert promoters and a "representation" of ninety total concert promoters were active [*23] throughout his study period. n13

> n12 Other than referring to the weighing apprisal for businesses not 51% black owned throughout the period, e.g. Haymon Entertainment

> n13 Despite numerous direct questions during oral argument, Plaintiffs' counsel could not detail how Dr. Jaynes reduced the number of white promoters, active throughout 1994-2001, to 140 and to 81. (Hrg. Tr. at 93-95.) Despite *Rule 26(a)(2)(B)*, no discovery of this process was provided to Defendants. (Id. at 46-47.)

II. Dr. Jaynes's conclusion about the number of black promoters as a percentage of all active promoters is faulty.

Case 3:02-cv-01492-PCD  Document 68-6  Filed 11/21/2005  Page 12 of 20

Page 7
2003 U.S. Dist. LEXIS 15976, *23

Based on his study of the 1,561 contracts, Dr. Jaynes found that nine black concert promotion businesses (as defined and weighted for years of activity), to ninety total concert promotion businesses (as defined and weighted for years of activity), was a fair breakdown of the promoters in his sample, willing, ready and able to promote concerts during 1994-2001. Accordingly, he concluded that black [*24] concert promotion businesses constituted 10% of the total concert promotion businesses for all the concerts performed during the period.

These percentages of black and white promoters are utilized in his damages calculation, which states:

> We therefore estimate that major concerts featuring artists represented by defendant booking and talent agencies accounted for $734.4 million (64% of $1.1 billion). We arrive at an estimate of black promoters' competitive share of this last total in the following manner. Active black promoters number eleven (11). n14 This is approximately 10% of the organizations promoting concert events featuring artists represented by the defendant talent and booking agencies during 1994-2001. In the absence of discrimination, it is reasonable to assume that as a group black promoters would have earned net revenues proportional to their availability of 10%.

(Jaynes Report at 6.) n15

> n14 Dr. Jaynes testified that the number eleven actually should be nine. (Jaynes Dep. 303, 345-51, 469.). Contrary to the Report, nowhere in the amended complaint is it stated that 64% of the concerts were by artists represented by the "defendant booking and talent agencies". (See, e.g., Amended Complaint at P 71.)

[*25]

> n15 Dr. Jaynes's finding that discrimination caused the "underutilization" of black promoters does not attempt to take into consideration so called "confounding variables" such as lack of financing, or lack of sufficient organizational support with respect to each of the several promoters included in his "representative" number of nine. Reference Manual, supra, at 92. However, lack of consideration of "confounding variables" might go more to the weight that should be given to Dr. Jaynes's testimony than to its admissibility, although Dr. Jaynes acknowledged that he was not an expert in the concert music business and thus does not have the background to make such an analysis. (Jaynes Dep. at 6.)

In his reply affidavit dated March 19, 2003, Dr. Jaynes makes clear that he was making a calculation of the proportion of black promoters to white promoters in his sample who were fully active during the period:

> ... The number 9 (and 90) are *representations* of the average numbers of black and total independent concert promoters existing throughout the period 1994-2001....
>
> I calculated [*26] that black independent promoters represent about 10% of all independent concert promoters during the period 1994-2001.... The proportions were calculated using a weighting procedure that produces an average *proportion of ready, willing, and able black promoters* active throughout the period. "Representative" numbers for this proportion are 9 and 90 respectively....
>
> Defendant is well aware that my definitions of a "black concert promoter" and a concert promoter generally are materially different from the one defendant uses to determine the number and proportion of promoters of concert music who are black. My definition of a black promoter for purposes of the case is based on what is a black concert promotion *business* and applies standard practices for making such a determination....

(Jaynes Aff. at 16 (citations omitted) (emphasis added).)

Nowhere in his Report, his affidavit or his testimony does Dr. Jaynes provide the basis or calculations by which he reaches his opinions that black concert promotion businesses represented "10% of the organizations promoting concert events featuring artists represented by the defendant talent and booking agencies during [*27] 1994-2001." (Jaynes Report at 6.) At oral argument, when Plaintiffs' counsel was pressed for this information, she came up with evasions and unresponsive answers even after a recess to confer with Dr. Jaynes. (Hrg. Tr. 111-116.) During his deposition, Dr. Jaynes admitted he did not consult directories of concert promoters. (Jaynes Dep. at 62.) Since Dr. Jaynes admitted that he arrived at his figure of eleven based on information supplied by Plaintiffs and Plaintiffs' counsel (id. at 39, 66), one can only conclude that Dr. Jaynes also made his estimates of the proportion of black to total concert promotion businesses active in

the period based on information from Plaintiffs' counsel. (Hrg. Tr. 109-110.) This does not constitute an independent study.

Furthermore, one cannot simply use a sample of 1,561 contracts to calculate the number of active promoters in a given period. Nonetheless, in his affidavit of March 21, 2003, Dr. Jaynes states he did just that, that he "used a sample size of more than 1,500 contracts to calculate the number of active promoters." (Jaynes Aff. at 21.) Using such a sample to calculate the total number of black and white concert promotion businesses "ready, [*28] willing and able" to engage in the concert promotions, without making any further calculations, is not a proper statistical method to arrive at the total of such businesses active during the period. A sample can properly be used to show the characteristics of the overall group. A sample, however, cannot determine the total number within the group. Nowhere in his Report or deposition does Dr. Jaynes make a calculation of the total number of concert promotion business active during 1994-2001 nor does he ascertain what percentage the sampled 1,561 contracts is of all concert contracts for 1994-2001 Calculation of the total number of concert promotion businesses active in the period cannot be determined based on his sample, unless other calculations are made; Dr. Jaynes does not provide any such calculations.

## II. Dr. Jaynes's calculation of damages is illogical and fallacious.

Based on his conclusion that black concert promotion businesses represented 10% of the concert promotion businesses "ready, willing and able" to promote concerts in a tri-state area throughout the 1994-2001 period, Dr. Jaynes's Report also makes a determination of the lost net profits which black concert [*29] promotion businesses, including Plaintiffs, sustained. His calculations of gross concert revenues during the 1994-2001 period rely on a Moss Adams, LLP's (certified public accountants) study of gross revenues of major concert tours based on the Pollstar data for the years 1994-1997 of concerts performed at venues with at least 3,000 seats. (Moss Adams Report dated July 15, 1998 ("Moss Adams Report") at 9.) In his Report, Dr. Jaynes makes reference to the gross concert revenues published by Pollstar on July 28, 2000, but he does not use these figures in his calculations of damages. (Jaynes Report at 5-6.) Instead, Dr. Jaynes accepts the Moss Adams Report gross concert revenues for the years 1994-1997 and assumes that gross ticket sales for 1995 were representative of the four years from 1998 through 2001. (Id.) In this manner, he calculates the total concert revenues for the 1994-2001 study period. To obtain annual net revenues for the total concert promotion business, his Report uses a 32.5% figure for promoter expenses based on Moss Adams' calculation of 30-35% for those expenses. Dr. Jaynes concludes that total net revenues for 1994 through 2001 for all promoters from major concerts [*30] were $1.1 billion. (Id. at 6.) Dr. Jaynes then reduces total net revenues to 64% to reflect the market share of revenues from concerts by artists represented by the Booking Agency Defendants. n16 (Jaynes Report at 6.) The resulting figure was $734.4 million. (Jaynes Report at 6.) Next, however, Dr. Jaynes moves to his separate conclusion, based on his 1,561 contract sample, that black promoters represented 10% of the ninety concert promotion businesses active throughout 1994-2001. (Id.) He then states that, but for discrimination, "nine" black promoters should have earned $73.4 million, 10% of his calculations of net revenues of all promoters contained in the Moss Adams Report. (Id.) His reasoning overlooks the fact that the number nine is not an actual number, as Dr. Jaynes's affidavit of March 19, 2002 makes clear, but is a proportionate number based on the 1,561 sample. (Jaynes Aff. at 16.) It does not represent the total number of black concert promotion businesses active throughout the period, but only those in the sample active throughout the period. The Report concludes that, since the Plaintiffs constitute four black concert promotion businesses, they comprise [*31] 44% of the black promoters (four of nine), and that their fair share of profits for the years 1994-2001 was $32.3 million or 44% of $73.4 million, and, whereas their total net revenues in that period had been only $3.2 million, they are entitled to total damages of $29.1 million. (Jaynes Report at 6-7.) He then calculated each individual Plaintiff's damages by deducting each Plaintiff's net revenues during the period from one quarter of the $32.3 million. (Id.)

> n16 This number is based on Plaintiffs' estimate of the Booking Agency Defendants' market share during Plaintiffs' test period (June 1998-May 1999). (Amended Complaint P 65.) Only three of the Booking Agency Defendants included in the 64% market share are defendants going to trial. (Hrg. Tr. at 129.) Dr. Jaynes has concluded that no adjustment need be made to the damages he finds in his Report due to this substantial miscalculation because the damages cited in his Report is a conservative number based on his review of defendant's expert report. (Jaynes Dep. at 216.)

[*32]

This calculation mixes oranges and apples. Dr. Jaynes used a sample of 1,561 contacts and had a family of ninety active concert promotion businesses within his sample. He made no calculations of the total number of African-American concert promotion business active in the pe-

riod or the total number of concert promotion businesses, but only calculated the proportion of black promoters to total promoters in his sample. As number nine is only a proportionate number based on the sample—not an actual number based on a study of the racial makeup and activity of all concert promotion business during the period—Dr. Jaynes has provided no basis for his conclusion that nine is the total number of black concert promotion businesses who were active throughout the 1994-2001 period. Nor does he provide any basis for his conclusion that the four Plaintiffs constitute 44% of the black concert promotion businesses which Dr. Jaynes finds should have earned 10% of the net revenues. Dr. Jaynes also errs in concluding that the total number of promoters in Dr. Jaynes's sample active throughout the period earned the concert revenues included in the Moss Adams Report. The Moss Adams and Pollstar concert [*33] revenues included revenues from concerts by promoters who were not active throughout the period; there was no reduction made for those promoters who would not qualify as a whole concert promotion business under Dr. Jaynes's test. Additionally, there is no limitation of Dr. Jaynes's revenue calculations for revenues attributable to those regional areas in which the Plaintiffs' black concert promotion businesses were not "ready, willing, and able" to promote concerts.

As stated in Boucher v. U.S. Suzuki Motor Corp., "expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison.'" *73 F.3d 18, 21 (2d Cir. 1996)* (citations omitted). Dr. Jaynes's Report falls within this standard.

**Conclusion**

The Jaynes Report and proposed testimony does not meet the *Daubert/Kumho* standards. Dr. Jaynes has failed to provide a complete statement of the basis and reasons for his opinions as required by *Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure*. He has also failed to maintain the professional autonomy [*34] required by the Reference Manual on Scientific Evidence, supra:

1) by relying on Plaintiffs' preselected contracts; 2) by relying on Plaintiffs' oral information about black and white concert promotion businesses active in a three state region during the period 1994-2001 to arrive at his calculation of a total of ninety concert promoters and nine black promoters active in the 1994-2001 period; and 3) by relying on Plaintiffs' amended complaint for the estimated percentage of market share of 64% attributed to the Booking Agency Defendants. (Jaynes Dep. at 130.) Moreover, in each of these three determinations critical to both his underutilization analysis and his damage analysis, Dr. Jaynes took no steps to verify the accuracy of the data Plaintiffs provided to him. n17 (Id. at 90, 98.) Furthermore, in his damage analysis, he improperly uses a proportionate number, nine, as the real number of black concert promotion businesses active throughout the 1994-2001 period, thereby vastly increasing his calculation of the four Plaintiffs' potential share of revenues to which in his opinion the black concert promotion businesses in the period should have been entitled. For all these reasons, [*35] Dr. Jaynes's underutilization analysis and his damage analysis are found unreliable and his testimony based on his Report is excluded.

> n17 The Court only notes that Dr. Jaynes made no attempt to show that any of the "ready, willing and able" "nine" black promoters were ready, willing and able to promote the concerts included in the Moss Adams Report.

Defendants' motion regarding Dr. Jaynes's testimony is granted. Defendants' motion to strike Dr. Jaynes's affidavit of March 19, 2003 is denied as moot.

IT IS SO ORDERED.

Dated: New York, New York

September 15, 2003

Robert P. Patterson, Jr.

U.S.D.J.

LEXSEE 1998 U.S. DIST. LEXIS 15414

**DAVID OTIS, Plaintiff, v. DOCTOR'S ASSOCIATES, INC., FREDERICK A. DELUCA, and PETER H. BUCK, Defendant(s).**

Case No. 94 C 4227

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*1998 U.S. Dist. LEXIS 15414*

September 10, 1998, Decided
September 14, 1998, Docketed

**DISPOSITION:** [*1] Defendants' Motion to Preclude Testimony of Plaintiff's Damage Expert and Bar Other Evidence Regarding Plaintiff's Alleged Lost Profit Damages granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** For DAVID OTIS, plaintiff: Jeffrey Alan Berman, Jacquelyn F. Kidder, Ross & Hardies, P.C., Chicago, IL.

For DAVID OTIS, plaintiff: David M Duree, Robert L. Carter, Reinert, Duree & Crane, P.C., St. Louis, MO.

For DOCTORS ASSOCIATES, INC., FREDERICK A DELUCA, PETER H BUCK, defendants: William M. McErlean, Howard L. Teplinsky, Seidler & McErlean, Chicago, IL.

**JUDGES:** Ann Claire Williams, Judge.

**OPINIONBY:** Ann Claire Williams

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Plaintiff David Otis ("Otis") is suing defendants Doctor's Associates, Inc., Frederick DeLuca, and Peter Buck (collectively referred to as "defendants") for fraud arising out of a failed fast food franchise restaurant known as Cajun Joe's Chicken ("Cajun Joe's"). Otis became involved with Cajun Joe's as a Development Agent ("DA"), which meant that he agreed to promote Cajun Joe's restaurants in the Chicago area by selling Cajun Joe's franchises and assisting the new franchisees. The only claim remaining in this case is whether defendants fraudulently induced Otis into [*2] his Development Agent Agreement ("DA Agreement") by misrepresenting that Cajun Joe's was a fully-developed franchise. Currently before the court is Defendants' Motion to Preclude Testimony of Plaintiff's Damage Expert and Bar Other Evidence Regarding Plaintiff's Alleged Lost Profit Damages. For the following reasons, the court grants defendants' motion.

### Background

The court incorporates by reference the statement of facts from its March 17, 1998 Memorandum Opinion and Order. See *Otis v. Doctor's Associates, Inc., 1998 U.S. Dist. LEXIS 3610*, No. 94 C 4227, *1998 WL 142383*, at *1 - 4 (N.D. Ill. March 17, 1998). For purposes of this opinion, however, the court will set forth additional facts necessary to understand the motion presently before the court. The court notes that Otis does not dispute any of the following facts.

Otis's fraud case involves a damages claim for lost profits under the benefit-of-the-bargain theory. In short, Otis claims that one of the appropriate measures of his compensatory damages is the money he would have earned during the 20 year life of his DA Agreement if Cajun Joe's had been successful. To support his claim that defendants' alleged fraud entitles him to lost profits [*3] under this benefit-of-the-bargain theory, Otis retained a certified public accountant named Kevin M. Carlie ("Carlie"). n1

---

n1 Although Carlie is a CPA, the record fails to establish that Carlie has any expertise in projecting sales of any kind twenty years into the future, not to mention franchise fast food sales forecasts.

Case 3:02-cv-01492-PCD    Document 68-6    Filed 11/21/2005    Page 16 of 20

1998 U.S. Dist. LEXIS 15414, *                                        Page 2

Carlie performed damages calculations which purport to determine Otis's lost future profits over the anticipated 20 year term of Otis's DA Agreement. Carlie's calculations were, however, based exclusively on projections contained in Otis's May 22, 1990 DA Agreement. (See Defs.'s Mot. n2 at 5-7, quoting Carlie Dep. at 69, 85-86, 106-07, 110.) Carlie did not perform any independent market analysis to verify the reasonableness or accuracy of the projections in the DA Agreement. Nor did Carlie perform any comparative analysis which measured the DA Agreement's projections against actual results achieved by other fast food chicken franchise restaurants.

n2 "Defs.'s Mot." refers to "Defendants' Motion to Preclude Testimony of Plaintiff's Damage Expert and Bar Other Evidence Regarding Plaintiff's Alleged Lost Profit Damages."

[*4]

The DA Agreement upon which Carlie based his future lost profits calculations required Otis to establish up to 121 Cajun Joe's franchise restaurants in the Chicago area over a period of years. n3 Alternatively, the DA Agreement required Otis to set up at least 89 Cajun Joe's franchise stores in Chicago. (See id. at 2-3.) The DA Agreement provided an interim development time schedule during which Otis was to establish these Cajun Joe's restaurants. Specifically, the DA Agreement required Otis to set up Cajun Joe's restaurants as follows:

| Total Number of Units To Be Operating Including Existing Units | Date Required By |
|---|---|
| 1 | January 1, 1991 |
| 3 | July 1, 1991 |
| 6 | January 1, 1992 |
| 21 | January 1, 1993 |
| 28 | July 1, 1993 |
| 36 | January 1, 1994 |
| 51 | January 1, 1995 |
| 58 | July 1, 1995 |
| 66 | January 1, 1996 |
| 73 | July 1, 1996 |
| 81 | January 1, 1997 |
| 89 | July 1, 1997 |

(Defs.'s Mot., Ex. A at 2-3.)

n3 This number arose out of the requirement that Otis "establish that number of units which will equal the number of units operated by the fast food chain with the most units in the Territory." When Otis signed his DA Agreement, McDonald's operated the most fast food restaurants in Chicago with 121.

[*5]

Otis's DA Agreement also provided that the total sales of all Cajun Joe's franchise restaurants in Otis's area must equal an average of $ 6,750 per restaurant. (See Defs.'s Mot., Ex. A.) In other words, if Otis had set up one Cajun Joe's restaurant, the DA Agreement required that its weekly sales must equal $ 6,750; if Otis had set up two restaurants, those two Cajun Joe's restaurants combined must produce weekly sales of $ 13,500; after Otis established three Cajun Joe's franchises, those three restaurants must combine to have made a total of $ 20,250 in sales every week. (See Defs.'s Mot. at 3 & n.4.)

Finally, Otis's DA Agreement provided a formula for calculating Otis's share of the profits from the gross sales made by Cajun Joe's restaurants in Otis's territory. Neither party has supplied the court with a detailed explanation of precisely how this formula operates; however, Otis's "Schedule G -- Itemized Statement of Damages" ("Schedule G") filed with the Final Pretrial Order sets forth a relatively simple formula for calculating Otis's alleged lost profits. According to Schedule G, Otis arrives at his lost future profits under one of three alternative methods.

Case 3:02-cv-01492-PCD   Document 68-6   Filed 11/21/2005   Page 17 of 20

1998 U.S. Dist. LEXIS 15414, *                                                                    Page 3

(1) [*6] $ 6,750 (the projected average weekly sales of one Cajun Joe's restaurant) x 89 (the minimum total number of Cajun Joe's restaurants the DA Agreement required Otis to establish) x 1.3% (one-half of Otis's one-third of 8% royalty on franchisee's gross sales of royalties) x 52 (number of weeks in a year) x 20 (number of years the DA Agreement was supposed to last) = $ 8,122,140 in lost future profits.

(2) $ 6,750 (projected average weekly sales) x 121 (the target number of Cajun Joe's restaurants) x 1.3% (royalty calculation) x 52 (weeks) x 20 (years) = $ 11,042,460 in lost future profits.

(3) $ 3,450 (actual average weekly sales of Cajun Joe's restaurants in Otis's territory) x 20 (actual number of Cajun Joe's restaurants Otis opened in his territory) x 1.3% (royalty calculation) x 52 (weeks) x 20 (years) = $ 932,880.

Based on the DA Agreement's (1) projected average weekly sales requirement, (2) schedule by which Otis was to establish the required number of Cajun Joe's franchise restaurants, and (3) formula for calculating Otis's share of the profits, Carlie made two separate damages calculations. Carlie first determined that Otis would have earned $ 8,568,031 over the 20 [*7] year life of his DA Agreement if Otis had established the goal of 121 Cajun Joe's franchise restaurants. (Defs.'s Mot., Ex. C.) Carlie based his second lost profits calculation on the premise that Otis could only set up 89 Cajun Joe's restaurants during the predicted 20 year life of the DA Agreement. (Id.) Using that estimate, Carlie concluded that Otis would have reaped $ 6,709,610 in lost profits. (See Defs.'s Mot., Ex. D.) It is clear from comparing Carlie's lost profit estimates and Otis's lost profit estimates in Schedule G that the two are very inconsistent. Neither party has attempted to explain why Otis's calculations in Schedule G so greatly exceed Carlie's "expert" calculations. This discrepancy, however, does not interfere with the court's analysis of the admissibility of Carlie's expert testimony or Otis's other evidence of lost future profits.

**Analysis**

Defendants argue that the court must exclude Carlie's proffered expert testimony because Carlie's calculations fail to meet the requirements imposed on expert testimony by *Rule 702 of the Federal Rules of Evidence.* The court agrees. Specifically, Rule 702 provides that:

> if scientific, technical, [*8] or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The leading case interpreting Rule 702 is *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).* In Daubert, the Supreme Court held that the trial court must, under Rule 702, exercise "some degree of regulation of the subjects and theories about which an expert may testify." *509 U.S. at 589.* When construing Rule 702, the Supreme Court explained that "the adjective 'scientific' implies a grounding in the methods and procedures of science" and "the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert, 509 U.S. at 590.*

Accordingly, a trial judge faced with a proffer of expert scientific testimony:

> must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary [*9] assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Id. at 592-593.* The Seventh Circuit has interpreted Daubert to require a two-step inquiry, where both steps must be met before the testimony is admissible. According to the Seventh Circuit, Daubert:

> [first] directs the district court to determine whether the expert's testimony pertains to scientific knowledge. This task requires that the district court consider whether the testimony has been subjected to the scientific method; it must rule out "subjective belief or unsupported speculation." Second, the district court must determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue. That is, the suggested scien-

tific testimony must fit the issue to which the expert is testifying.

*O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106 (7th Cir.) (citing *Porter v. Whitehall Lab., Inc.*, 9 F.3d 607, 613, 616 (7th Cir. 1993)); see also *Deimer v. Cincinnati Sub-Zero Prods., Inc.*, [*10] '58 F.3d 341, 344 (7th Cir. 1994); *Dukes v. Illinois Cent. R.R. Co.*, 934 F. Supp. 939, 947-948 (N.D. Ill. 1996).

Daubert provides four nonexhaustive guideposts to assist district courts in determining whether the proffered scientific expert testimony can be fairly characterized as "scientific knowledge" within the meaning of Rule 702. The nonexclusive factors in Daubert are: (1) whether the theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the general acceptance of the theory in the scientific community. *Daubert*, 509 U.S. at 591-95; *Gruca v. Alpha Therapeutic Corp.*, 51 F.3d 638, 643 (7th Cir. 1995); *Porter*, 9 F.3d at 613; *Dukes*, 934 F. Supp. at 948. The most important factor in the Daubert analysis is whether the proffered scientific theory can be and has been tested by the scientific method. *Bradley v. Brown*, 42 F.3d 434, 438 (7th Cir. 1994); *Stanczyk v. Black & Decker, Inc.*, 836 F. Supp. 565, 567 (N.D. Ill. 1993). "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified." *Daubert*, [*11] 509 U.S. at 593 (citation omitted). Accordingly, a scientific theory that is not supported by appropriate validation is not admissible under Rule 702. *Id.* at 590. Courts must exclude "subjective belief or unsupported speculation." *Porter*, 9 F.3d at 614 (citing *Daubert*, 509 U.S. at 590).

Importantly, for purposes of this case, the court notes that several courts have applied the Daubert requirements not only to proffered expert "scientific" evidence, but also to the expert "mathematical" lost profits evidence at issue in this case. See *Target Mkt. Publ'g, Inc. v. Advo, Inc.*, 136 F.3d 1139, 1142-44 (7th Cir. 1998) (applying Daubert test to lost profits calculation in breach of contract case); *Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.*, 1998 U.S. Dist. LEXIS 8331, No. 94 C 50392, 1998 WL 299300, at *1 (N.D. Ill. June 3, 1998) (same); *Terrell v. Childers*, 1996 U.S. Dist. LEXIS 9618, No. 93 C 2460, 1996 WL 385310, at *8-11 (N.D. Ill. July 3, 1996) (applying Daubert analysis to lost profits calculation based on benefit-of-the-bargain theory in common law fraud case). Additionally, as the proponent of the proffered expert testimony, Otis bears the burden of establishing the admissibility of Carlie's [*12] testimony by a preponderance of the evidence. See *Dukes*, 934 F. Supp. at 946; *Bradley v. Brown*, 852 F. Supp. 690, 697 (N.D. Ind. 1994). With these legal princi-

ples in mind, the court evaluates Carlie's proffered expert testimony concerning Otis's alleged lost profits.

The court finds that Otis has failed to show that Carlie's lost profit calculations are based on "scientific knowledge" as Rule 702 requires. Most importantly, Otis has made no showing that the formula and projected values Carlie relied on is accurate or has been tested for accuracy. Carlie himself admitted that he had not performed any independent analysis of the reliability or factual accuracy of the figures used in the DA Agreement. Other than citing the target estimates in the DA Agreement, Otis has failed to establish that the average weekly sales estimates in the DA Agreement have any basis in fact or fast food market reality. For example, Otis has not demonstrated that other fast food chicken franchises in the Chicago market consistently average sales of approximately $ 6,750 per week. Nor has Otis supplied any proof which shows that a fast food chicken franchise could establish and operate 89 or 121 restaurants [*13] in the Chicago marketplace in the limited time period provided by the DA Agreement. Finally, Otis has not shown that Carlie's lost profits formula accounts for possible future trends in the fast food business. Basically, Otis has failed to show any proof that Carlie's lost profits estimates have been subjected to any testing to verify the accuracy of the numbers Carlie used or the accuracy of Carlie's conclusions. n4

> n4 Although not addressing the issue at length, the court does not hesitate to conclude that Otis could have subjected Carlie's calculations to some sort-of scrutiny or market analysis to verify their accuracy and reliability. See *Daubert*, 509 U.S. at 593 ("a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be ***whether it can be*** (and has been) tested") (emphasis added).

Likewise, the other Daubert factors also require the court to exclude Carlie's proffered expert testimony. Aside from failing [*14] to subject Carlie's formula to actual testing, Otis also fails to show that the theory Carlie relied on has been subjected to peer review and publication. In fact, Otis has shown no evidence indicating that the methodology Carlie used is anything more than an exercise in arithmetic based on inherently unreliable values. Additionally, Otis has not provided the court with the known or potential rate of error in Carlie's calculations. Finally, Otis has not shown that Carlie's theory of calculating lost future profits for a fast food franchise has been generally accepted by other experts who frequently predict future sales for similar franchise operations. Be-

Case 3:02-cv-01492-PCD    Document 68-6    Filed 11/21/2005    Page 19 of 20

1998 U.S. Dist. LEXIS 15414, *                                              Page 5

cause Otis fails to show evidence that satisfies any of the Daubert factors, the court grants defendants' motion to exclude the expert testimony of Kevin Carlie.

Rather than respond to defendants' argument that Carlie's methodology does not pass the Daubert analysis, n5 Otis simply insists that Illinois law entities him to recover the benefit of his bargain on his fraud claim. Otis argues that defendants are attempting to confuse the fact of fraud damages with the amount of fraud damages in this case. This argument, [*15] however, appears to be a response to a separate argument advanced by defendants. Specifically, defendants argued in their brief that this court's March 17, 1998 Memorandum Opinion and Order eliminates any claim Otis may have for lost profits. On this point, the court agrees with Otis. The court's March 17, 1998 ruling was not fatal to Otis's claim for lost profits. The court must therefore determine whether, aside from the now-excluded Carlie expert testimony, Otis may introduce any remaining evidence of lost profits at trial.

n5 Otis's one paragraph response to the Daubert issue is woefully incomplete. (See Pl.'s Resp. at 11.)

Under Illinois law, when "a misrepresentation induced the victim to consummate the bargain, benefit-of-the-bargain damages are appropriate to give the victim the rewards he reasonably expected under the contract." *Roboserve v. Kato Kagaku Co., Ltd., 78 F.3d 266, 274 (7th Cir. 1996)*. However, Illinois law also enforces the "new business rule" which precludes a plaintiff from [*16] recovering lost profits in some circumstances. Under Illinois law, "a new business generally has no right to recover lost profits." *Stuart Park Assocs. Ltd. Partnership v. Ameritech Pension Trust, 51 F.3d 1319, 1328 (7th Cir. 1995)*. Rather, "this element of damages is recoverable only if the business was previously established." Id. (citing *Hill v. Brown, 166 Ill. App. 3d 867, 520 N.E.2d 1038, 1043, 117 Ill. Dec. 687 (Ill. App. Ct. 1988)*). Moreover, proffered evidence demonstrating lost profits must provide "'a reasonable basis for the computation of damages' and cannot be 'conjecture or sheer speculation.'" *Real Estate Value Co. v. USAIR, Inc., 979 F. Supp. 731, 741 (N.D. Ill. 1997)* (quoting *Midland Hotel Corp. v. Reuben H. Donnelley Corp., 118 Ill. 2d 306, 515 N.E.2d 61, 66, 113 Ill. Dec. 252 (Ill. 1987))*.

Defendants argue that because Cajun Joe's was a new franchise with no proven track record of profitability, Illinois law precludes Otis from recovering lost profits. The court points out that Otis's response brief completely fails to address defendants' argument that the "new business rule" precludes Otis from recovering lost profits. Additionally, when this [*17] court questioned Otis's counsel during the hearing on defendants' motions in limine, counsel failed to provide any principled reason why the new business rule should not preclude Otis's claimed lost profits.

Based on the facts of this case, the court finds that Cajun Joe's was a start-up venture and therefore subject to the new business rule. Otis himself admitted at his deposition that Cajun Joe's was start-up business venture that might very well fail. (See Defs.'s Mot., Ex. B, Otis Dep. at 118.) Additionally, the undisputed facts of this case clearly show that Cajun Joe's was a brand new fast food franchise. Since Cajun Joe's was a new business without a history of losses or profits, there is no "baseline against which the post-breach situation may be measured to arrive at a reasonably certain calculation of lost profits." *Real Estate Value Co., 979 F. Supp. at 741*. Accordingly, the court holds that Illinois's new business rule precludes Otis from introducing any evidence of future lost profits.

Assuming, arguendo, that the "new business rule" did not preclude evidence of Otis's theory of lost profits, Otis's proffered evidence still fails to provide the reasonable degree [*18] of certainty necessary to obtain future lost profits. As the court has already explained, Otis has provided no factual basis for the court to conclude that the DA Agreement's estimated average weekly profits of Cajun Joe's restaurants was reasonable. Nor has Otis shown that establishing the target numbers of 89 or 121 Cajun Joe's franchises in Chicago was a reasonable goal that could be achieved in the time period provided by the DA Agreement. Without some foundation to substantiate the legitimacy of these fundamental elements of the DA Agreement, any lost profits calculations based on these figures are speculative and inherently unreliable.

The court finds Otis's reliance on the projected average weekly sales and estimated number of stores strikingly similar to the marketing plan relied on by the plaintiff in *Target Market Publishing, Inc. v. Advo, 136 F.3d 1139, 1145 (7th Cir. 1998)*. In that case, the plaintiff cited a market report that estimated profits of more than $31,000 per month as its measure of lost profits damages. Id. The Seventh Circuit discredited the report because it was "identifying a target profit, not making a projection of actual profits." Id. The [*19] court also rejected the market report because the plan sought to demonstrate what "profits might be given certain assumptions that had not yet, and might never, come to pass." Id.

Similarly, Otis has failed to show that the projected average weekly profits and the estimated number of Cajun Joe's franchises in the DA Agreement represent anything more than aspirational hopes of a successful fast

Case 3:02-cv-01492-PCD    Document 68-6    Filed 11/21/2005    Page 20 of 20

1998 U.S. Dist. LEXIS 15414, *                                              Page 6

food franchise. As the court has explained, Otis provides no basis for the reasonableness of these projections. Accordingly, the court concludes that Otis's theory of lost profits is speculative and fails to establish lost profits with a reasonable degree of certainty. Because Otis fails to establish lost profits with a reasonable degree of certainty, the court precludes any evidence of future lost profits.

The court notes, however, that Otis may be entitled to recover his actual (as opposed to future) lost profits. Those actual lost profits could be easily calculated by determining the total gross sales actually made by the Cajun Joe's restaurants that Otis actually established during his tenure as a DA. The court does not now hold that Otis is entitled to those damages. Rather, the court [*20] merely suggests that applying the profit formula in Otis's DA Agreement to the actual gross sales made by the 20 Cajun Joe's that Otis actually opened would be a logical and reasonable method by which to calculate Otis's actual lost profits.

**Conclusion**

The court grants Defendants' Motion to Preclude Testimony of Plaintiff's Damage Expert and Bar Other Evidence Regarding Plaintiff's Alleged Lost Profit Damages. The court bars any expert testimony from Kevin Carlie and precludes Otis from introducing any evidence of future lost profits based exclusively on the DA Agreement. The court instructs the parties to discuss settlement of this case. The court orders the parties to call the court on Friday, September 11, 1998 at 3:00 p.m. to report on the progress of settlement discussions.

**ENTER:**

**Ann Claire Williams,**

**Judge**

Dated: SEP 10 1998